**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND and LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated,<br><br>                        Plaintiffs,<br><br>               v.<br><br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br><br>                      Defendants. | CIVIL ACTION<br>NO. 15-cv-12732-ADB<br><br>**Oral Argument Requested** |

<u>**OPPOSITION TO NOVARTIS'S MOTIONS TO DISMISS**</u>

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................1

II.  STATEMENT OF FACTS .........................................................................................2

    A.  The regulatory and economic context fosters patent challenges but can also lead to antitrust abuse..........................................................................2

    B.  Original compound patents often protect against competition; follow-on patents are usually weaker. .......................................................3

    C.  The original Gleevec patent protected against generic competition for many years, and is not questioned in this lawsuit. .............................3

    D.  Novartis procured and asserted a follow-on polymorph patent it knew would not hold up were a court to rule on the issue of validity. ..............................................................................................................4

III.  STANDARD OF REVIEW .........................................................................................6

IV.  ARGUMENT ............................................................................................................7

    A.  Purchasers have standing to bring federal antitrust claims predicated on Novartis's anticompetitive conduct..................................8

        1.  The Supreme Court acknowledges that end payers have standing to seek injunctive relief under federal antitrust law....................................................................................................9

        2.  Purchasers seek an antitrust remedy; they do not seek, and their harm would not be remedied by, a declaration that the patents are invalid. ....................................................................9

        3.  The complaint does not allege a *Walker Process* exception, but *Walker Process* supports purchasers' antitrust standing....................11

    B.  Purchasers allege that *Noerr-Pennington*'s limited immunity does not apply.......................................................................................................12

        1.  Purchasers allege a sham litigation exception to *Noerr-Pennington*'s limited immunity. .................................................13

        2.  Novartis does not challenge, and thus concedes for purposes of resolving this motion, that purchasers adequately allege objective baselessness, subjective baselessness, and a stand-alone ministerial exception.............................15

    C.  Courts regularly deny defendants' attempts to evade antitrust liability for sham Hatch-Waxman infringement suits.............................16

1.    Sham litigation allegations do not stand or fall on the existence of a prior ruling of patent invalidity, nor should they..........................................................................................................16

2.    Novartis's citations are unavailing..........................................................19

V.    CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Teva Pharm. USA, Inc.*,
    432 F. Supp. 2d 408 (D. Del. 2008) ......................................................................................7

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..........................................................................................................6, 7

*In re Androgel Antitrust Litig.*,
    888 F. Supp. 2d 1336 (N.D. Ga. 2012) ..............................................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................................6

*Assoc. Gen. Contractors, Inc. v. Valid. State Council of Carpenters*,
    459 U.S. 519 (1983) ..............................................................................................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................................................................................................6

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) ..............................................................................................................8

*In re Buspirone Patent Litig.*,
    185 F. Supp. 2d 363 (S.D.N.Y. 2002) ................................................................................16

*Cal. Motor Transp. v. Trucking Unlimited*,
    404 U.S. 508 (1971) ............................................................................................................12

*In re Cardizem CD Antitrust Litig.*,
    105 F. Supp. 2d 618 (E.D. Mich. 2000) *aff'd* 332 F.3d 896 (6th Cir. 2003) ......................7

*In re Ciprofloxacin Hydrochloride Antitrust Litigation*,
    363 F. Supp. 2d 514 (E.D.N.Y. 2005) ................................................................................20

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ..............................................................................................................9

*Davric Maine Corp. v. Rancourt*,
    216 F.3d 143 (1st Cir. 2000) .........................................................................................12, 13

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) ........................................................................................ *passim*

*Eastern R.R. President's Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ................................................................................................7, 12, 13

*In re Effexor Antitrust Litig.*,
    No. 11-cv-5479, 2014 WL 4988410 (D.N.J. Oct. 6, 2014) ......................................................7

*In re Flonase Antitrust Litig.*,
    795 F. Supp. 2d 300 (E.D. Pa. 2011) ..................................................................................16

*Foley v. Wells Fargo Bank, N.A.*,
    772 F.3d 63 (1st Cir. 2014) ...................................................................................................6

*FTC v. Actavis*,
    133 S. Ct. 2223 (2013) ...............................................................................12, 17, 18, 19

*Gonzalez v. United States*,
    284 F.3d 281 (1st Cir. 2002) ...................................................................................................6

*Grogan v. Garner*,
    498 U.S. 279 (1991) ...............................................................................................................6

*Hanover Shoe Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) ...............................................................................................................9

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1972) ...............................................................................................................9

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ...............................................................................................................6

*Hewlett-Packard Co. v. Boston Sci. Corp.*,
    77 F. Supp. 2d 189 (D. Mass. 1999) ......................................................................................8

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ...............................................................................................................9

*iLor v. Google*,
    631 F.3d 1372 (Fed. Cir. 2007) ...........................................................................................20

*King Drug Co. of Florence v. SmithKline Beecham Corp.*,
    791 F.3d 338 (3d Cir. 2008) ..................................................................................................8

*In re Lipitor Antitrust Litig.*,
    No. 12-cv-2389, 2013 WL 4780496 (D.N.J. Sept. 5, 2013) .................................................16

*Litton Systems, Inc. v. AT&T Co.*,
    700 F.2d 785 (2d Cir. 1983) ................................................................................................16

*In re Loestrin 24 FE Antitrust Litig.*,
  45 F. Supp. 3d 180 (D.R.I. 2014) ........................................................................8

*In re Lupron Mktg. & Sales Practices Litig.*,
  295 F. Supp. 2d 148 (D. Mass. 2003) ..................................................................8

*Molecular Diagnostics Labs. v. Hoffmann-La Roche, Inc.*,
  402 F. Supp. 2d 276 (D.D.C. 2005) ...................................................................10

*In re Neurontin Antitrust Litig.*,
  MDL No. 1479, 2009 WL 2751029 (D.N.J. Aug. 28, 2009) ................................7

*In re Neurontin Mktg. & Sales Practices Litig.*,
  712 F.3d 21 (1st Cir. 2013) ..................................................................................8

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  968 F. Supp. 2d 367 (D. Mass. 2013) ..................................................................8

*Nobelpharma AB v. Implant Innovations, Inc.*,
  141 F.3d 1059 (Fed. Cir. 1998) ...........................................................................7

*Noonan v. Wonderland Greyhound Park Realty LLC*,
  723 F. Supp. 2d 298 (D. Mass. 2010) ................................................................15

*Ocasio-Hernandez v. Fortuno-Burset*,
  640 F.3d 1 (1st Cir. 2011) ....................................................................................6

*P.R. Tel. Co. v. Telecomm. Regulatory Bd. of P.R.*,
  189 F.3d 1 (1st Cir. 1999) ....................................................................................6

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  307 F. Supp. 2d 196 (D. Mass. 2004) ..................................................................8

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries*,
  508 U.S. 49 (1992) ..................................................................................... *passim*

*In re Prograf Antitrust Litig.*,
  No. 11-md-02242, 2014 WL 4745954 (D. Mass. June 10, 2014) .....................7, 16

*In re Prograf Antitrust Litig.*,
  No. 11-md-2242, 2012 WL 293850 (D. Mass. Feb. 1, 2012) (Zobel, J.) ...........8, 16

*Ramsey v. United Mine Workers*,
  401 U.S. 306 (1971) ..............................................................................................6

*In re Relafen Antitrust Litig.*,
  346 F. Supp. 2d 349 (D. Mass. 2004) ..................................................................8

*In re Relafen Antitrust Litig.*,
  360 F. Supp. 2d 166 (D. Mass. 2005) ........................................................................7, 16

*Ritz Camera & Image, LLC v. Sandisk Corp.*,
  700 F.3d 503 (Fed. Cir. 2012).........................................................................................10

*Rochester Drug Coop., Inc. v. Braintree Labs.*,
  712 F. Supp. 2d 308 (D. Del. 2010).............................................................................7, 19

*SmithKline Beecham v. Apotex Corp.*,
  383 F. Supp. 2d 686 (E.D. Pa. 2004) ................................................................................7

*In re Suboxone Antitrust Litig.*,
  64 F. Supp. 3d 665, 688 (E.D. Pa. 2014) ........................................................................16

*T.F.T.F. Capital Corp. v. Marcus Diary, Inc.*
  312 F.3d 90 (2d Cir. 2002)...............................................................................................16

*United Mine Workers v. Pennington*,
  381 U.S. 657 (1965)...........................................................................................................7

*United States v. Boston Sci. Corp.*,
  167 F. Supp. 2d 424 (D. Mass. 2001) (Saris, J.)...............................................................8

*United States v. Singer Mfg. Co.*,
  374 U.S. 174 (1963).........................................................................................................10

*Walker Process Equip. Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965)................................................................................................ *passim*

*In re Warfarin Sodium Antitrust Litig.*,
  214 F.3d 395 (3d Cir. 2000)...............................................................................................9

*Warner Lambert Co. v. Purepac Pharm. Co.*,
  Nos. 98-cv-2749, 99-cv-5948, 00cv-2053, 2000 WL 34213890 (D.N.J. Dec.
  22, 2000) .............................................................................................................................7

*In re Wellbutrin SR Antitrust Litig.*,
  749 F. Supp. 2d 260 (E.D. Pa. 2010) ................................................................................7

*In re Wellbutrin SR Antitrust Litig.*,
  Nos. 04-cv-5525, 04-cv-5898, 05-cv-396, 2006 WL 616292 (E.D. Pa. Mar. 9,
  2006) ...................................................................................................................................7

*In re Wellbutrin XL*,
  Nos. 08-2431, 08-2433, 2012 WL 1657734 (E.D. Pa. May 11, 2012).....................................7

**Statutes**

35 U.S.C. § 285.................................................................................................20

Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98
    Stat. 1585 (1984)..........................................................................................2

Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* ...............................2

Sherman Antitrust Act, 15 U.S.C. § 2...............................................................1

**Other Authorities**

Brief for United States and FTC as Amici Curiae in Support of Appellee, *Ritz
    Camera*, No. 12-1183 (Fed. Cir. May 22, 2012), *available at*
    https://www.ftc.gov/policy/advocacy/amicus-briefs ...............................10

Compl. *Sun Pharma Global FZE v. Novartis Pharm. Corp. et al.*,
    No. 13-cv-03542 (D.N.J. July 26, 2013), ECF No. 9 .............................3

Fed. R. Civ. P. 8(a) ..........................................................................................6

Fed. R. Civ. P. 12(b)(1).....................................................................................6

Fed. R. Civ. P. 12(b)(6).................................................................................6, 19

PricewaterhouseCoopers, *2014 Patent Litigation Study* (July 2014), *available at*
    http://www.pwc.com/en_US/us/forensic-services/publications/assets/2014-
    patent-litigation-study.pdf.......................................................................2, 16

RBC Capital Markets, *Pharmaceuticals: Analyzing Litigation Success Rates* (Jan.
    15, 2010) *available at* http://amlawdaily.typepad.com/pharmareport.pdf ........................3, 16

## I.    INTRODUCTION

This lawsuit, brought by two employee health funds on behalf of a proposed class of all purchasers of the cancer drug Gleevec, seeks injunctive relief under § 16 of the Clayton Act for violations of the Sherman Antitrust Act, 15 U.S.C. § 2.  Novartis listed an invalid follow-on patent in the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book"), and then asserted that patent against would-be generic competitors.  Novartis did so knowing that, were a court to rule on the merits of the patent claims, it had no realistic expectation of succeeding.  But so long as Novartis could avoid the inevitable court ruling – *i.e.*, that the follow-on patent was based on nothing more than a publicly-disclosed, routine piece of lab work – Novartis could forestall generic competition.

Novartis moves to dismiss the complaint, offering only one, fundamentally flawed, argument: the lack of a prior ruling of invalidity or non-infringement precludes both (i) end payers' standing to bring antitrust claims, and (ii) the ability to allege a sham litigation claim.  Novartis is incorrect as a matter of law.

First, antitrust law governs standing in antitrust cases.  Even where the underlying antitrust violation entails an inquiry into whether the defendant unlawfully obtained or enforced patent rights, it is antitrust law, not patent law, which governs whether the purchasers' case may proceed.  Here, as the Supreme Court has confirmed, purchasers' right to do so under Section 16 of the Clayton Act is unquestionable.

Second, the antitrust claims here fall squarely under the *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries* ("*PRE*")[1] line of cases.  Those cases do not require a prior court determination of patent non-infringement or invalidity.  It would be absurd

---

[1] 508 U.S. 49 (1992).

to condition a later antitrust claim on the existence of such a ruling where, as here, the antitrust scheme includes Novartis's conscious, successful effort *to avoid a ruling* on the merits of patent validity.

## II.    STATEMENT OF FACTS

**A.    The regulatory and economic context fosters patent challenges but can also lead to antitrust abuse.**

The complaint details (i) the legal framework for the approval of generic drugs under the Hatch-Waxman Amendments[2] to the Food, Drug, and Cosmetic Act,[3] including how the statutory scheme encourages legal challenges to brand drug patents to assure that only valid and infringed patents protect brand companies from generic competition;[4] (ii) the economics of generic drug entry, including how the monopoly-to-commodity feature of generic entry often results in 90% or more of the units going generic, with attendant price decreases to highly competitive levels;[5] and (iii) how brand companies can violate antitrust laws by delaying this generic conversion, *e.g.*, how brand companies can profiteer using patents they know cannot stand up in court to forestall generic entry by, for example, suing, then quickly settling before a court can rule on the merits.[6]  But when brand companies actually permit a federal court to rule on the validity and enforceability of a patent, the asserted patent is found invalid, unenforceable, or not infringed about 50% of the time.[7]  And 76% of all Hatch-Waxman litigation is voluntarily

---

[2] *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

[3] 21 U.S.C. §§ 301 *et seq.*

[4] Class Action Complaint ("CAC") ¶¶ 53-63.

[5] CAC ¶¶ 90-98.

[6] CAC ¶¶ 45, 53-55, 70-88.

[7] *See* PricewaterhouseCoopers, *2014 Patent Litigation Study* at 4, 21 (July 2014) ("PWC Study"), *available at* http://www.pwc.com/en_US/us/forensic-services/publications/assets/2014-patent-litigation-study.pdf (brand company's success rate at proving infringement of a valid patent since 2006 is only 52%).

dismissed, settled, or adjudicated in favor of the generic company.[8]  Antitrust abuse of the Hatch-

Waxman scheme to prolong the life of brand monopolies is not uncommon.[9]

**B.     Original compound patents often protect against competition; follow-on patents are usually weaker.**

The complaint details how brand-name drug makers develop patent portfolios: the first

group of patents usually covers the drug's active ingredient (*i.e.*, the compound); later patents

cover increasingly narrow modifications or argued "surprising" features of the original.[10]  These

later patents are less likely to be held infringed (as they claim narrower features or formulations),

or held valid (as the initial compound patent becomes a part of the "prior art," and limits the

scope of what a later patent may claim, and more information about the particular follow-on

feature is in the public domain).  The increasingly narrow scope of later patents, and the growing

body of prior art, often renders a brand-name drug company's later patents weak, invalid, or

unenforceable.  The Hatch-Waxman Amendments provide incentives to would-be generic

competitors to challenge these weak, invalid, and/or unenforceable patents.

**C.     The original Gleevec patent protected against generic competition for many years, and is not questioned in this lawsuit.**

In the 1980s and early 1990s, scientists at Ciba-Geigy, a predecessor of Novartis AG,[11]

formulated and developed a pharmaceutical compound, code named "CGP 57148" and

---

[8] RBC Capital Markets, *Pharmaceuticals: Analyzing Litigation Success Rates* at 4 (Jan. 15, 2010) ("RBC Study") *available at* http://amlawdaily.typepad.com/pharmareport.pdf (more than 75% of all Hatch-Waxman patent suits result in the brand company forfeiting some portion of its patent protection).

[9] CAC ¶¶ 84-88 (citing 2002 FTC study).

[10] *Id.*

[11] Novartis professes that the complaint "does not specify which of the three named defendants allegedly did what" and is therefore improperly "general," but does not move for dismissal on that ground.  Purchasers have sued the two Novartis entities that sued Sun for infringement:  Novartis Pharmaceuticals Corporation and Novartis AG.  *See* Compl. *Sun Pharma Global FZE v. Novartis Pharm. Corp. et al.*, No. 13-cv-03542 (D.N.J. July 26, 2013), ECF No. 9.  And the CAC identifies Novartis Corporation as the assignee of the '184 patent (CAC ¶ 16). At this time, in the absence of discovery, purchasers' allegations are sufficient.

generically denoted "imatinib."[12]  Imatinib inhibits the activity of the Bcr-Abl tyrosine kinase,

which is the fusion gene that causes Chronic Myeloid Leukemia ("CML").[13]  Over the

succeeding months, the Ciba-Geigy team synthesized a number of different salts of the

compound, including the methane sulfonate acid addition salt form (denoted "imatinib mesylate"

and/or "CGP 57148B") and determined a polymorphic form to be used.[14]

In May 1996 the U.S. Patent and Trademark Office ("PTO") issued the '184 patent,

covering imatinib and its acid addition salts.[15]  On May 10, 2001, the FDA approved for

marketing a capsule form of Gleevec, and Gleevec – the non-needle-shaped crystal form of

imatinib mesylate – entered the U.S. market shortly thereafter.[16]  Novartis obtained a patent term

extension for the '184 patent until July 4, 2015.[17]  The '184 patent conferred a statutorily-granted

market monopoly for Gleevec for about 14 years, and Novartis grossed over $13.5 billion on it.[18]

The complaint makes no bones about this; an innovative product with a valid patent yielded

lawful monopoly rewards.  But Novartis's monopoly profits should have ended there.

**D.      Novartis procured and asserted a follow-on polymorph patent it knew would not
          hold up were a court to rule on the issue of validity.**

Starting in 1996, Novartis procured a follow-on polymorph patent, the '051 patent, that it

knew was invalid.[19]  Novartis knew both that the inventors of the compound patent had disclosed

---

[12] CAC ¶¶ 117-19.

[13] CAC ¶¶ 106-17.

[14] CAC ¶¶ 120-21.

[15] CAC ¶ 161.

[16] CAC ¶ 213.

[17] CAC ¶¶ 250-52.

[18] CAC ¶¶ 3-4 (reporting U.S. sales).

[19] CAC ¶¶ 169-70, 172-201, 254-56.

publicly the salt form of imatinib in several publications, and that the polymorphic form was easily obtained and had predictable, desired characteristics.[20]

"[I]t did not take Novartis's scientists an unreasonably long time to develop the mesylate salt and/or the β-crystal form" of imatinib mesylate using "known techniques" involving "routine steps" to arrive "at an expected result."[21]  It took "no unusual skill or undue degree of experimentation" to achieve the "desired and expected features" of the β-crystal form because "the state of the art did not teach away from mesylate salts and/or non-needle forms."[22]  In sum,

> At all times the follow-on polymorph patent, the '051 patent, has been in substance an invalid patent, for at least obviousness if not anticipation.  In the context of the *ex parte* PTO proceedings where Novartis controlled the information given to reviewers, Novartis was successful in having the PTO mistakenly issue the patent.  But in the stark light of patent litigation alleging infringement of the '051, Novartis knew that if a court were to eventually rule on the validity issue after deliberative proceedings, the '051 patent would be held invalid.[23]

Novartis listed the '051 patent in the Orange Book, knowing that it would then pose an impediment to the launch of generic imatinib mesylate – even though Novartis had no realistic likelihood of ever having the '051 patent or later follow-on patents found to be valid and capable of excluding otherwise infringing products.[24]

Finally, Novartis wielded the '051 patent in its lawsuit against the first generic filer, Sun Pharmaceuticals.  Novartis avoided a ruling on the invalidity of the '051 patent by settling those

---

[20] CAC ¶ 169.  Purchasers do not repeat here facts about the patent's initial examination, which are discussed at length in the complaint.  *See* CAC ¶¶ 202-05, 215-21, 230-31, 234-42.

[21] CAC ¶¶ 125-26, 191.

[22] CAC ¶¶ 125-26, 191.

[23] CAC ¶ 254; *see also id.* at ¶¶ 55, 125-26, 169-73, 191.

[24] CAC ¶¶ 201, 256.  Novartis claims that purchasers have contradicted themselves by "conceding" that polymorphism is important in the development of pharmaceutical ingredients while also asserting "as a general matter that the development of different polymorphic forms of a compound is routine."  Def. Br. at 5.  But there is no contradiction: determining whether there is a polymorph of a given drug, and taking steps to identify an appropriate polymorphic form, are routine but important tasks in any drug formulation process.

claims before a court could make such a ruling, thereby delaying generic entry past July 4, 2015.[25]

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a court may not dismiss a complaint unless it "fail[s] to state a claim upon which relief can be granted."  A complaint need include only a short and plain statement of the claim showing that the pleader is entitled to relief.[26]  Purchasers' claims here need only be plausible, not absolute.[27]  "In short, an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim."[28]  Motions to dismiss under Rules 12(b)(1) and 12(b)(6) are decided under similar standards.[29]

In assessing whether a complaint meets this standard, a court must accept as true all non-conclusory factual allegations to determine whether the complaint raises a reasonable inference of the defendants' liability.[30]

In the absence of a congressional mandate, the burden of proof is preponderance of the evidence.[31]  The burden of persuasion for all antitrust laws is preponderance of the evidence.[32]

---

[25] CAC ¶¶ 256, 273-78.

[26] Fed. R. Civ. P. 8(a).

[27] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007); *see also Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 72 (1st Cir. 2014) (Plaintiffs need not "submit evidence to defeat a Rule 12(b)(6) motion, but need only sufficiently allege in their complaint a plausible claim.").

[28] *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (discussing post-*Iqbal/Twombly* pleading standards).

[29] *P.R. Tel. Co. v. Telecomm. Regulatory Bd. of P.R.*, 189 F.3d 1, 14 n.10 (1st Cir. 1999).  In the First Circuit, these two standards differ only insofar as a court can consider matters outside the pleadings when deciding a Rule 12(b)(1) motion to dismiss.  *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002).

[30] *Ocasio-Hernandez*, 640 F.3d at 12.

[31] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[32] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-88 (1983); *Ramsey v. United Mine Workers*, 401 U.S. 306 (1971).  Novartis argues for a "clear and convincing standard."  The court need not determine the appropriate standard now.  As Justices Berger and Rehnquist have noted, "it would seem to make *no difference* whether the standard of proof which the plaintiff had to meet in order to prevail was the preponderance of the evidence, clear and convincing evidence, or proof beyond a reasonable doubt."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 270-71 (1986) (dissent).  Justice Brennan agrees: "I, for one, cannot imagine a case in which a judge might plausibly hold that the evidence on motion for summary judgment was sufficient to enable a plaintiff bearing a mere preponderance

## IV.   ARGUMENT

The Supreme Court's *Noerr-Pennington* decisions provide limited antitrust protection for genuine petitioning activity, including legitimate patent infringement litigation.[33]  But they provide no protection for ministerial acts.[34]  And the limited protection disappears, and antitrust liability attaches, when a party *either* (a) pursues sham litigation *or* (b) commits fraud on the PTO.[35]

Here, purchasers allege both ministerial acts and sham litigation.  Courts recognize that the sham litigation exception to *Noerr-Pennington*'s limited immunity applies to purchasers' claims premised on underlying Hatch-Waxman litigation – even when there was no adjudication of invalidity or non-infringement in the underlying case – and routinely deny motions to dismiss such claims.[36]

---

burden to get to the jury . . . but insufficient for a plaintiff bearing a clear-and-convincing burden to withstand a defendant's summary judgment motion." *Id.* at 267.  District courts considering sham petitioning cases echo this sentiment, noting that their decisions resolving dispositive motions would be the same under either standard. *See, e.g.*, *In re Prograf Antitrust Litig.*, No. 11-md-02242, 2014 WL 4745954, at *8, n.9 (D. Mass. June 10, 2014); *In re Wellbutrin XL*, Nos. 08-2431, 08-2433 (indirect), 2012 WL 1657734, at **4-5 (E.D. Pa. May 11, 2012).

[33] *Eastern R.R. President's Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

[34] *In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 178 n.3 (D. Mass. 2005) (Young, J.).

[35] *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *see also In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 184 (D. Mass. 2005) (Young, J.) (stating that *Walker Process* provides an "'alternative' legal theory, which may strip a patentee of immunity independently of or in addition to the sham litigation exception.  Either or both may be applicable to a particular party's conduct."); *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 427-28 (D. Del. 2008) ("*PRE* and *Walker Process* provide alternative legal grounds on which a patentee may be stripped of immunity from the antitrust laws[.]").

[36] *See, e.g.*, *In re Effexor Antitrust Litig.*, No. 11-cv-5479, 2014 WL 4988410, at *24 (D.N.J. Oct. 6, 2014) (denying motion to dismiss as to direct purchasers' *Walker Process* claims and, inferentially, their sham litigation allegations); *Rochester Drug Coop., Inc. v. Braintree Labs.* ("*Miralax*"), 712 F. Supp. 2d 308, 319-20 (D. Del. 2010) (denying motion to dismiss as to direct purchasers' sham allegations); *In re Wellbutrin SR Antitrust Litig.*, 749 F. Supp. 2d 260, 263-67 (E.D. Pa. 2010) (denying dismissal of purchasers' sham litigation allegations, even though manufacturer prevailed on one of its patent infringement claims); *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2009 WL 2751029, at **21-22 & n.46 (D.N.J. Aug. 28, 2009) (denying summary judgment as to direct purchasers' sham litigation allegations even though decisions in underlying infringement case allegedly favored the antitrust defendant); *In re Wellbutrin SR Antitrust Litig.*, Nos. 04-cv-5525, 04-cv-5898, 05-cv-396, 2006 WL 616292, at **9-10 (E.D. Pa. Mar. 9, 2006) (denying motion to dismiss end payers' sham litigation allegations); *SmithKline Beecham v. Apotex Corp.* ("*Paxil*"), 383 F. Supp. 2d 686, 694 (E.D. Pa. 2004) (denying motion to dismiss as to competitor's purchaser's sham litigation allegations despite settlement of the underlying patent infringement case without any ruling on the validity or infringement of the patents); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 644 (E.D. Mich. 2000) (denying motion to dismiss end payers' sham litigation allegations) *aff'd* 332 F.3d 896 (6th Cir. 2003) (affirmed without discussion of sham litigation allegations); *Warner Lambert Co. v. Purepac Pharm. Co.*

## A.   Purchasers have standing to bring federal antitrust claims predicated on Novartis's anticompetitive conduct.

Section 16 of the Clayton Act provides, "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title."[37]  It confers standing on *any* person (including direct purchasers and end payers) to address threatened injuries caused by *anything* forbidden in the antitrust laws.

Antitrust standing is a simple threshold inquiry:  if a plaintiff's injury is of the type the antitrust laws were intended to prevent and is sufficiently direct, then he has standing.[38]  And countless district and circuit courts have recognized purchasers' – both direct purchasers' and

<hr/>

("*Gabapentin*"), Nos. 98-cv-2749, 99-cv-5948, 00cv-2053, 2000 WL 34213890, at *5 (D.N.J. Dec. 22, 2000) (denying summary judgment as to competitor's sham litigation allegations despite favorable patent infringement rulings for antitrust *defendant*.).

Courts in the First Circuit similarly deny motions to dismiss in other types of pharmaceutical antitrust or pricing cases:  *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013) (affirming decision of Saris, J.); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367 (D. Mass. 2013) (Young, J.) (denying motion to dismiss antitrust claims predicated on reverse-payment settlement); *In re Prograf Antitrust Litig.*, No. 11-md-2242, 2012 WL 293850 (D. Mass. Feb. 1, 2012) (Zobel, J.) (denying motion to dismiss purchasers' sham petitioning claims); *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196 (D. Mass. 2004) (Saris, J.) (denying motion to dismiss antitrust claims related to illegal manipulation of market prices for prescription pharmaceuticals); *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349 (D. Mass. 2004) (Young, J.) (denying summary judgment on purchasers' claims of anticompetitive sham litigation tactics); *see also In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148 (D. Mass. 2003) (Stearns, J.) (denying motion to dismiss claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) alleging that pharmaceutical manufacturers conspired to maintain artificially-inflated prices for prescription drugs); *United States v. Boston Sci. Corp.*, 167 F. Supp. 2d 424 (D. Mass. 2001) (Saris, J.) (denying in part motion to dismiss antitrust enforcement action brought by U.S. government against maker of medical device for violation of a consent order preventing anticompetitive conduct); *Hewlett-Packard Co. v. Boston Sci. Corp.*, 77 F. Supp. 2d 189 (D. Mass. 1999) (Saris, J.) (denying motion to dismiss monopolization claims against manufacturer of medical device); *cf. In re Loestrin 24 FE Antitrust Litig.*, 45 F. Supp. 3d 180 (D.R.I. 2014) (acknowledging that purchasers may bring federal antitrust claims against pharmaceutical manufacturers for reverse payment agreements, but erroneously limiting those actionable payments to cash) (currently on appeal to the First Circuit), *cast into doubt by King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.* ("*Lamictal*"), 791 F.3d 338 (3d Cir. 2008) (holding that anticompetitive reverse payments may be made in forms other than cash).

[37] 15 U.S.C. § 16.

[38] *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982) (purchasers of goods who were injured by restrained competition in the market for those goods suffer the very type of injuries Congress sought to prevent through enactment of the Sherman Act); *Assoc. Gen. Contractors, Inc. v. Valid. State Council of Carpenters*, 459 U.S. 519, 538 (1983) (same).

end payers' – standing to bring antitrust claims premised on underlying patent infringement litigation and resolutions.[39]

Here, purchasers allege standing. Novartis's monopolization of the market beyond July 5, 2015 has injured, and will continue to injure, purchasers of Gleevec. Their losses are sufficiently direct to confer standing to pursue a permanent injunction, without which purchasers will continue to suffer the very injury the antitrust laws seek to prevent: overcharges caused by Novartis's wrongfully-prolonged monopolization.

> **1.    The Supreme Court acknowledges that end payers have standing to seek injunctive relief under federal antitrust law.**

The Supreme Court recognizes end payers' standing to seek injunctive relief under the Sherman Act.[40] The concern that may motivate a limitation on end-payer damages under the Sherman Act – duplicative recovery – does not apply.[41] Purchasers' amended complaint will seek damages, in a manner consistent with the Supreme Court's guidance in *Illinois Brick* and *Hanover Shoe*.[42]

> **2.    Purchasers seek an antitrust remedy; they do not seek, and their harm would not be remedied by, a declaration that the patents are invalid.**

There simply is no merit to Novartis's arguments that purchasers lack antitrust standing because they lack patent standing. A purchaser has standing to seek a remedy under federal antitrust law for anticompetitive conduct, regardless of whether he *also* has standing to bring a

---

[39] *See supra* note 36.

[40] *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 762 (1977) (recognizing viability of injunctive relief under the Sherman Act for indirect purchasers *even though* it limited the availability of damages relief).

[41] *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1972). The Supreme Court has repeatedly held that a less strict standard applies to a claim for injunctive relief than one for damages under the Sherman Act. *Id.*; *Illinois Brick*, 431 U.S. at 762; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399 (3d Cir. 2000) (reversing district court for failing to recognize distinction between the standard for injunctive relief and monetary damages under Section 4 of the Clayton Act).

[42] *Illinois Brick*, 431 U.S. 720; *Hanover Shoe Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968).

patent claim . . . *because they are qualitatively different claims*.[43]   And this antitrust case is the

only means by which purchasers of imatinib mesylate can prevent incurring additional

overcharges (and, post amendment, their damages).[44]

The Supreme Court recognizes that whether a plaintiff has standing to seek cancellation

of, or a declaration regarding, the validity or enforceability a patent is immaterial to whether that

plaintiff has antitrust standing to seek a damages.[45]   As does the Federal Circuit.[46]   As does the

Second Circuit.[47]   As does the Federal Trade Commission, the agency charged with enforcing the

antitrust laws.[48]   All of whom broadly condone antitrust standing for purchasers.

The Supreme Court explained why broad antitrust standing exists, even where patents are

involved:

> A patent by its very nature is affected with a public interest . . . .
> [It] is an exception to the general rule against monopolies and to
> the right to access to a free and open market.   The far-reaching
> social and economic consequences of a patent, therefore, give the
> public a paramount interest in seeing that patent monopolies spring
> from backgrounds free from fraud or other inequitable conduct and
> that such monopolies are kept within their legitimate scope.[49]

---

[43] *See Molecular Diagnostics Labs. v. Hoffmann-La Roche, Inc.*, 402 F. Supp. 2d 276, 280 (D.D.C. 2005).

[44] Inter partes review by the PTO provides a limited opportunity to challenge patents, but does not offer an opportunity to seek damages or injunctive relief for antitrust violations.

[45] *Walker Process Equip. Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 175 (1965).

[46] *Ritz Camera & Image, LLC v. Sandisk Corp.*, 700 F.3d 503, 507 (Fed. Cir. 2012) (nothing in *Walker Process* supports importing the rules governing standing to bring patent validity challenges into antitrust cases).

[47] *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 686, 691 (2d Cir. 2009) (noting that "because the plaintiffs have filed an antitrust suit, patent law does not create the cause of action," and permitting antitrust claims to go forward).

[48] Brief for United States and FTC as Amici Curiae in Support of Appellee at 7, *Ritz Camera*, No. 12-1183 (Fed. Cir. May 22, 2012), *available at* https://www.ftc.gov/policy/advocacy/amicus-briefs (Purchaser's claim for overcharges "creates a justiciable controversy *whether or not there is a threat of patent enforcement* against" the purchaser, and neither *Walker Process* not any other appellate court decision justifies limiting standing.).

[49] *Walker Process*, 382 U.S. at 173, 174, 176-78 (internal citation omitted); *see also United States v. Singer Mfg. Co.*, 374 U.S. 174, 196 (1963) ("It is well settled that 'beyond the limited monopoly which is granted, the arrangements by which the patent is utilized are subject to the general law,' and it 'is equally well settled that the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly.'" (internal citation omitted)).

**3.     The complaint does not allege a *Walker Process* exception, but *Walker Process* supports purchasers' antitrust standing.**

Novartis devotes considerable real estate to arguing that purchasers lack "standing based on *Walker Process*."[50]   But this argument is both superfluous and legally flawed.

As Novartis acknowledges three times, purchasers have not alleged a *Walker Process* claim.[51]

Further, reliance on *Walker Process* hurts, rather than helps, Novartis's cause.   *Walker Process* clarified that "an injured party" has standing to "attack the misuse of patent rights" under federal antitrust law.[52]   It did *not* deny standing to anyone, purchasers or otherwise.   And it held that a party that "obtained its patent by fraud . . . cannot enjoy the limited exceptions to the prohibitions of § 2 of the Sherman Act" – that is the *Noerr-Pennington* doctrine – "but must answer . . . to those injured by any monopolistic action taken under the fraudulent patent claim."[53]   By recognizing *Noerr-Pennington* immunity as a "*limited* exception" to, not absolute protection from, antitrust liability, *Walker Process* paved the way for courts to further refine the limits of antitrust defendants' immunities for other patent abuses, such as sham litigation.[54]

Perhaps more to the point, *Walker Process permitted an antitrust claim to proceed even though there was no underlying declaration of patent invalidity.*

Novartis's citations to *K-Dur* and *In re Ciprofloxacin Hydrochloride Antitrust* ("*Cipro*") are unavailing.   First, both involved end payers' claims for damages under state antitrust and

---

[50] Def. Br. at 10-11, 13-15.  Novartis's entire argument on its motion to dismiss fills only seven pages; yet Novartis devotes fully three of those pages to whether purchasers have standing to bring *Walker Process* claims.

[51] *See id.* at 10, 11, 13.  Novartis's hypothetical question of standing to assert *Walker Process* claims thus has no bearing on whether this Court should grant Novartis's motion to dismiss purchasers' sham litigation allegations.

[52] 382 U.S. at 176.

[53] *Id.*

[54] *See PRE*, 508 U.S. at 60.

consumer protection laws for *Walker-Process*-like fraud, claims not asserted here.  Second, the *Cipro* court's "doubt" that indirect purchasers could have standing to bring *Walker Process* claims is irrelevant dictum, based on inapposite cases that are wholly inapplicable here.  Third, in *Cipro,* the motion to dismiss was based on federal patent law preemption and the statute of limitations, neither of which is at issue here.  Fourth, *Actavis* rebuffs *K-Dur*'s speculation that permitting antitrust plaintiffs to question patent validity would hinder the ability to settle.[55]  Finally, even if they were good law, neither *K-Dur* nor *Cipro* was decided in this Circuit, and neither is binding on this Court.

Despite Novartis's protests to the contrary, there is no effort here to "expand the boundaries of antitrust standing," as purchasers do not seek to "litigate the patent in the first instance" and their claims are well within the body of sham litigation case law.[56]  There are no circumstances in which purchasers' antitrust claims could result in the invalidation of the patent.

## B.    Purchasers allege that *Noerr-Pennington*'s limited immunity does not apply.

The *Noerr-Pennington* doctrine provides limited protection for a party's First Amendment right to petition the government for redress of grievances.[57]  This doctrine originated in the context of lobbying the legislature to adopt certain laws,[58] and it has been expressly extended to encompass "the approach of citizens . . . to administrative agencies . . . and to courts."[59]  But if a party's petition  "ostensibly directed toward influencing government action" is not really speech, or is really a "mere sham to cover what is actually nothing more than

---

[55] *FTC v. Actavis*, 133 S. Ct. 2223, 2237 (2013).

[56] Def. Br. at 15.

[57] *PRE*, 508 U.S. at 56; *see also Davric Maine Corp. v. Rancourt*, 216 F.3d 143 (1st Cir. 2000).

[58] *Noerr*, 365 U.S. at 129.

[59] *Cal. Motor Transp. v. Trucking Unlimited*, 404 U.S. 508, 516 (1971).

an attempt to interfere directly with the business relationships of a competitor," holding a

wrongdoer accountable for its anticompetitive actions does not offend the First Amendment.[60]

### 1. Purchasers allege a sham litigation exception to *Noerr-Pennington*'s limited immunity.

In *PRE*, the Supreme Court held that a lawsuit is a sham if it is (1) "objectively baseless

in the sense that no reasonable litigant could realistically expect success on the merits"; and (2)

subjectively motivated by a desire to "conceal[] an attempt to interfere directly with the business

relationships of a competitor, through the use of the governmental process . . . as an

anticompetitive weapon."[61]

A lawsuit is objectively baseless when it "constitute[s] the pursuit of claims so baseless

that no reasonable litigant could realistically expect to secure favorable relief."[62]  A petitioner

enjoys *Noerr-Pennington*'s limited immunity from antitrust liability only if he or she "could

realistically expect success on the merits" of his or her petition – that is, if the petition is

"reasonably calculated" to elicit a "favorable outcome" or obtain "favorable relief."[63]

Here, purchasers allege the claimed "invention" of the non-needle-shaped crystal form of

imatinib mesylate was obvious over the prior art and thus lacked the element of novelty essential

to any patent's validity.[64]  Purchasers allege that searching for and selecting a non-needle-shaped

crystal form was an obvious step to anyone skilled in the art of pharmaceutical formulation and

development at the time.[65]  Purchasers allege that "Novartis knew that the ['051 and later follow-

---

[60] *See, e.g.*, *Noerr*, 365 U.S. at 144.

[61] *PRE*, 508 U.S. at 60; *see also DDAVP*, 585 F.3d at 686 (acknowledging that the sham petitioning exception to *Noerr-Pennington*'s limited antitrust immunity extends to sham citizen petitions to the FDA); *Davric*, 216 F.3d at 147-48 (applying *PRE* to a petition to an administrative agency).

[62] *PRE*, 508 U.S. at 62.

[63] *PRE*, 508 U.S. at 60-62.

[64] CAC ¶¶ 254, 285-87.

[65] CAC ¶¶ 192-95.

on patents] would be an impediment to the launch of generic imatinib mesylate even though the patents had no realistic likelihood of ever being able to stand up in court as valid patents warranting the exclusion of otherwise infringing products."[66]  Purchasers allege that the infringement counterclaim against Sun was a sham undertaken in order to create leverage for a secret settlement that would stall generic entry for as long as possible past the expiration of the '184 patent, while leaving the '051 and subsequent patents available as weapons to brandish against all other prospective generic competitors.[67]

Once an antitrust plaintiff alleges that the antitrust defendant's underlying lawsuit was objectively baseless, a court must consider subjective baselessness.  Specifically, it must "examine the litigant's subjective motivation," and "focus on whether the baseless lawsuit [allegedly] conceals an attempt to interfere directly with the business relationships of a competitor through the use of a governmental process – as opposed to the outcome of that process – as an anticompetitive weapon."[68]

Here, purchasers allege that Novartis's patent infringement claims against Sun were "frivolous litigation undertaken solely for the purpose of extracting settlements that delay generic entry," in violation of the basic principles of antitrust law.[69]  And purchasers explain, in detail, that Novartis's baseless litigation was a part of a "knowing[] and intentional[] . . . scheme deliberately designed to block and delay entry of AB-rate generic versions of Gleevec."[70]

---

[66] CAC ¶ 264.

[67] CAC ¶¶ 275-78.

[68] *PRE*, 508 U.S. at 61.

[69] CAC ¶ 4; *see also id.* ¶ 286 (alleging that Novartis's decision not to file a patent infringement lawsuit against Sun in 2007, its affirmative filing of an infringement counterclaim in the lawsuit that Sun filed against it in 2013, and its settlement of that lawsuit, were all part of an overarching scheme to maintain its dominant power in the U.S. imatinib market and to delay generic competitors from entering that market.).

[70] CAC ¶ 350.

These allegations, taken as true, suffice to establish that Novartis's litigation against Sun was both objectively baseless and subjectively motivated by a desire to hinder generic competition.

### 2. Novartis does not challenge, and thus concedes for purposes of resolving this motion, that purchasers adequately allege objective baselessness, subjective baselessness, and a stand-alone ministerial exception.

Novartis concedes much by failing to raise arguments in its opening briefs.[71]

Novartis does not argue that purchasers' complaint fails to provide enough detail to plausibly allege objective baselessness (*i.e.*, that a reasonable pharmaceutical manufacturer would not have had a reasonable expectation of success on the merits). Nor does Novartis contest that the complaint fails to allege subjective baselessness (*i.e.*, that Novartis was motivated by anything other than a desire to hinder generic competition). To the extent Novartis alludes obliquely to pleading deficiencies on either prong, the complaint addresses each in detail.[72]

Novartis does not challenge that purchasers adequately allege a ministerial exception for its Orange Book listings. Where the governmental agency being "petitioned" is asked to perform only a required, non-discretionary, ministerial action, such as listing a patent in the Orange Book, the "petitioning activity" is not entitled to *Noerr-Pennington*'s limited immunity. In *In re Buspirone Patent Litigation*, the court recognized that submitting a patent to the FDA for listing in the Orange Book was not an act of petitioning because "the FDA's actions [in listing the patent] are non-discretionary and do not reflect any decision as to the validity  of the

---

[71] An argument  raised for the first time in reply papers "is waived as a means to support the pending motion to dismiss" because "[t]he purpose of a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum." *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010).

[72] *See supra*, notes 64-67, 69-70.

representations in an Orange Book listing."[73]   Other courts have agreed.[74]   Similarly, in *Litton Systems*, the Second Circuit that determined *Noerr-Pennington*'s immunity did not apply to AT&T's act of filing a tariff because the FCC merely allowed the tariff to take effect.[75]

**C.   Courts regularly deny defendants' attempts to evade antitrust liability for sham Hatch-Waxman infringement suits.**

   **1.   Sham litigation allegations do not stand or fall on the existence of a prior ruling of patent invalidity, nor should they.**

   Novartis proposes that a prior declaration of invalidity is a condition precedent for bringing a sham litigation claim.   The case law shows otherwise:   courts recognize that the sham litigation exception to *Noerr-Pennington*'s limited immunity applies to claims brought by purchasers that are premised on underlying Hatch-Waxman litigation – even when there was no adjudication of invalidity or non-infringement in the underlying case – and routinely deny motions to dismiss such claims.[76]   Courts likewise deny dispositive motions challenging sham petitioning to administrative agencies.[77]   When courts do jettison sham litigation allegations, they nevertheless recognize that a prior determination of patent invalidity is not necessary.[78]   Even winning a lawsuit does not definitively demonstrate that the lawsuit was not a sham.[79]

---

[73] 185 F. Supp. 2d 363, 371 (S.D.N.Y. 2002).

[74] *In re Relafen*, 360 F. Supp. 2d at 178 n.3 (Young, J.) (endorsing sham petitioning arguments, relying on *In re Buspirone*).

[75] *Litton Systems, Inc. v. AT&T Co.*, 700 F.2d 785, 795, 798 n.12 (2d Cir. 1983).

[76] *See supra* note 36 (listing cases).

[77] *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 688 (E.D. Pa. 2014) (denying motion to dismiss as to sham FDA petitioning); *In re Prograf*, 2014 WL 4745954 (denying motion for summary judgment as to purchasers' sham petitioning allegations); *In re Prograf*, 2012 WL 293850 (denying motion to dismiss sham petitioning allegations); *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300 (E.D. Pa. 2011) (denying motion for summary judgment as to sham FDA petitioning allegations).

[78] *See, e.g.*, *In re Lipitor Antitrust Litig.*, No. 12-cv-2389, 2013 WL 4780496, at **17, 21 (D.N.J. Sept. 5, 2013) (explicitly not requiring a prior determination of invalidity or tarnish, and dismissing direct purchasers' sham litigation and *Walker Process* claims on other grounds).

[79] *T.F.T.F. Capital Corp. v. Marcus Diary, Inc.* 312 F.3d 90 (2d Cir. 2002) (holding the win did not foreclose the possibility that the suit was a sham under the exception to *Noerr-Pennington*).   *But cf.* PWC Study, *supra* note 7, at 4, 21; RBC Study, *supra* note 8, at 4.

Alleging – and later proving – objective baselessness is, indeed, a high hurdle.  But it is one that purchasers regularly vault without relying on an existing favorable patent merits ruling.

The policy problem with Novartis's proposed rule is that it would completely immunize a groundless Hatch-Waxman lawsuit from antitrust scrutiny simply because the parties settle.  A brand company that recognizes the invalidity of its patent, or one that knows its litigation is a sham, would have a powerful incentive to settle before a court reaches a decision on the merits, simply to avoid a merits determination and thus shield itself from antitrust scrutiny.  And where the patent is invalid, the parties, as Novartis puts it, "will have settled nothing,"[80] yet they will have exposed purchasers of prescription drugs to potentially hundreds of millions of dollars in overcharges as a result of their anticompetitive behavior.[81]

In *DDAVP*, a case predating *Actavis*, the Second Circuit recognized this absurdity, rejected the brand-manufacturer defendants' argument that "direct purchasers would be able to recover antitrust damages from a fraudulent patentee *only* after that patentee loses on a fraudulent procurement claim," and overturned a district court's dismissal of class purchasers' antitrust claims premised on *Walker Process* and sham exceptions.[82]  The court acknowledged that requiring a prior adjudication of the patent merits would create the potential for parties to "resolve" the infringement case through secret settlements (which may be anticompetitive in their own right) before an adjudication on the merits, thus leaving purchasers with no recourse

---

[80] Def. Br. at 13.

[81] Such settlements may independently run afoul of *Actavis*, the recent Supreme Court case prohibiting brand companies from "settling" by making large and unjustified payments to the generic – potentially in excess of what the generic would recover in damages if it won the patent litigation – in exchange for avoiding a merits decision and (wrongfully) prolonging their monopolies.  *Actavis*, 133 S. Ct. at 2231-34 (citing ancient Supreme Court precedent for the long-acknowledged proposition that patent licensure rights do not trump antitrust laws).  If Novartis's proposed rule is accepted, then, as long as brand companies shield their anticompetitive agreements from the public's eyes, even indisputably sham litigation becomes protected the second it "settles."  Such an outcome flouts the antitrust laws and is, frankly, absurd.

[82] *DDAVP*, 585 F.3d 677.

for recovering the potentially hundreds of millions of dollars in improper overcharges they will be forced to pay as a result of drug companies' anticompetitive actions – an outcome that would be anathema to the antitrust laws.[83]

The *DDAVP* court simply refused to endorse a rule that would have put the power to block viable antitrust claims in the antitrust defendant's own hands, out of a fear that it would "leave a significant antitrust violation undetected or unremedied."[84]

Novartis's surreal citation to *Actavis* makes no sense.[85]  Of course, the *Actavis* court referred to weighing the patent and antitrust merits in the context of evaluating an antitrust claim premised on a pay-for-delay agreement.  The court considered whether resolving antitrust claims arising from anticompetitive agreements (where by definition there is no ultimate resolution of the merits) would require the antitrust court to decide whether the patent was valid.  In that context, the court concluded that it was not necessary, because the size of the payment from the brand to the generic provided a "workable surrogate" for the patent's weakness.[86]  But nowhere did the court hold that the need for an antitrust court to address some patent merits issues precludes purchasers from bringing antitrust claims.  If anything, *Actavis* reiterates the broad antitrust principles that counsel against requiring a prior adjudication of patent merits, noting that the presumption of validity does not preclude antitrust litigation.  "[T]o refer, as the Circuit

---

[83] *Id.* at 693-94.

[84] *Id.* at 690-91.

[85] Novartis apparently believes that, because the purchasers have alleged neither a reverse payment under *Actavis* nor a prior patent invalidation, the antitrust laws provide no remedy to purchasers.  *See, e.g.*, Def. Br. at 3 (fearing that permitting purchasers' claims to proceed "would expose every patent settlement to antitrust attack, thus rendering every patent settlement non-final."), 13 ("If Plaintiffs are permitted to stretch antitrust pleading to confer standing to litigate what they are expressly precluded from doing under the patent laws, [Novartis] – and any other litigants who settle patent cases within the boundaries outlined in *Actavis* – will have settled nothing."). *Walker Process* – the case Novartis views as panacea for all of its antitrust woes – defeats this argument.  "[T]he interest in protecting patentees from 'innumerable vexatious suits' [cannot] be used to frustrate the assertion of rights conferred by the antitrust laws."  *Walker Process*, 382 U.S. at 176 (citations omitted).

[86] *Actavis*, 133 S. Ct. at 2236.

referred, simply to what the holder of a valid patent could do does not by itself answer the antitrust question. The patent here may or may not be valid, and may or may not be infringed."[87] *Actavis* permitted antitrust claims to proceed despite the absence of a prior adjudication of the patent merits.

In any event, there is a well-developed body of case law that permits purchasers to bring antitrust claims alleging sham litigation. *Actavis* did not change that, it merely clarified the standard for analyzing a reverse payment theory of antitrust liability – a theory not at issue in this complaint.

### 2.    Novartis's citations are unavailing.

Novartis cites *Cipro* to support its argument that purchasers' claim is "unduly speculative" because it is "dependent on predicting the outcome of a specific lawsuit."[88]  The *Cipro* decision dates from 2003; the later well-developed body of sham litigation case law cited above, and the reasoning expressed in *DDAVP*, belies the argument.

Novartis also cites an early decision in *Braintree Labs v. Schwarz Pharma*, but fails to tell the full story.  True, Judge Robinson tried and rejected a sham litigation counterclaim brought by a competitor in the underlying patent infringement suit.  But she refused to dismiss sham litigation allegations in a subsequent antitrust suit brought by a class of purchasers, finding sufficient allegations that Braintree's patent infringement suit had been a sham.[89]  Put simply, she found that the prior decision did not doom the purchasers' complaint.

Novartis relies entirely on dicta from summary judgment cases decided after completion of discovery and with the benefit of a full factual record, not Rule 12(b)(6) cases where

---

[87] *Id.* at 2230-31.

[88] Def. Br. at 17.

[89] *Miralax*, 712 F. Supp. 2d 308.

plaintiffs' allegations must be accepted as true.  The *iLor v. Google* decision from the Federal Circuit concerned an award of fees on appeal under 35 U.S.C. § 285, following a district court grant of *summary judgment*, with a full factual record.[90]  *Androgel* and *Ciprofloxacin* were also decided on summary judgment.[91]  In none of these cases was the absence of an underlying patent validity ruling essential to the verdict.

## V.    CONCLUSION

The motions to dismiss should be denied.  If the Court finds purchasers' existing pleadings deficient under the *PRE* line of cases, purchasers respectfully request leave to file an appropriate amendment.

Dated:  August 20, 2015

Respectfully submitted,

By: **/s/ Thomas M. Sobol**
Thomas M. Sobol (BBO# 471770)
Kristen A. Johnson (BBO# 667261)
Hannah Schwarzschild (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003
tom@hbsslaw.com
kristenj@hbsslaw.com
hannahs@hbsslaw.com

John Radice (*pro hac vice*)
Kenneth Pickle (*pro hac vice*)
RADICE LAW FIRM
34 Sunset Blvd.
Long Beach, NJ 08008
(646) 245-8502
jradice@radicelawfirm.com

*Attorneys for Plaintiffs, in Their Capacity as Proposed Class Representatives, and the Proposed Class*

---

[90] 631 F.3d 1372, 1375 (Fed. Cir. 2007).

[91] 888 F. Supp. 2d 1336, 1342-43 (N.D. Ga. 2012); 363 F. Supp. 2d 514, 517 (E.D.N.Y. 2005).

Kenneth A. Wexler (*pro hac vice*)
Edward A. Wallace (*pro hac vice*)
Justin N. Boley (*pro hac vice*)
WEXLER WALLACE
55 West Monroe St., Suite 3300
Chicago, IL 60603
(312) 346-2222
kaw@wexlerwallace.com
eaw@wexlerwallace.com
jnb@wexlerwallace.com

Jonathan D. Karmel (*pro hac vice forthcoming*)
KARMEL LAW FIRM
221 N. LaSalle Street, Suite 1307
Chicago, IL 60601
T: (312) 641-2910
jon@karmellawfirm.com

*Attorneys for United Food and Commercial Workers
Unions and Employers Midwest Health Benefits
Fund and the Proposed Class*

J. Gerard Stranch, IV (*pro hac vice*)
Joe P. Leniski, Jr.  (*pro hac vice*)
BRANSTETTER, STRANCH & JENNINGS PLCC
227 Second Avenue North, Fourth Floor
Nashville, TN 37201-1631
(615) 254-8801
gerards@BSJFirm.com
joeyl@BSJFirm.com

*Attorneys for Laborers Trust Fund for Northern
California and the Proposed Class*

21

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas M. Sobol, hereby certify that I caused a copy of the attached document to be filed electronically via the Court's electronic filing system.  Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated:  August 20, 2015            Respectfully submitted,

**<u>/s/ Thomas M. Sobol</u>**
Thomas M. Sobol, BBO No. 471770

1