UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND and LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br><br>     Defendants. | CIVIL ACTION<br>NO. 15-cv-12732-ADB<br><br>Leave to file granted on September 17, 2015<br>[ECF No. 71] |

**PLAINTIFFS' SUR-REPLY IN FURTHER
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

When caught with your hand in the cookie jar, argue standing.[1]  This is, indeed, a defendant's prerogative.  But in doing so here, Novartis ignores and mischaracterizes the relevant antitrust authority and standards and, instead, wraps itself in inapplicable patent law and policy arguments long rejected by the Supreme Court, the Federal Circuit, and others.  Purchasers therefore offer this brief sur-reply to make five points.

*First*, Novartis argues that purchasers' lack of standing to seek a declaration of invalidity under the patent laws precludes them from bringing an antitrust claim.[2]  But the Federal Circuit explicitly rejected this argument in *Ritz Camera & Image, LLC v. SanDisk Corp.*[3]  And in doing so, the court noted that the Supreme Court had already disposed of this fiction, acknowledged the distinction between antitrust claims and patent claims, observed that it was untroubled that the likely practical effect of a purchaser prevailing on its antitrust claims is that the patent is functionally rendered invalid or unenforceable, and dismissed out of hand the unsubstantiated concern that granting standing to direct purchasers would trigger a flood of litigation and stem innovation.[4]  That *Ritz* involved a *Walker Process* exception to *Noerr-Pennington* limited

---

[1] *See* Jay L. Himes, *When Caught With Your Hand In the Cookie Jar . . . Argue Standing*, 41 Rutgers L.J. 187 (2009).

[2] Defendants' Reply Memorandum, ECF No. 69 ("Reply") at 1, 2-6.

[3] 700 F.3d 503, 506 (Fed. Cir. 2012) ("SanDisk's appeal is limited to a single question: whether direct purchasers who cannot challenge a patent's validity or enforceability through a declaratory judgment action (and have not been sued for infringement, and so cannot assert invalidity or unenforceability as a defense in the infringement action) may nevertheless bring a *Walker Process* antitrust claim that includes as one of its elements the need to show that the patent was procured through fraud.  SanDisk contends that allowing parties such as Ritz to use a *Walker Process* antitrust lawsuit to challenge patents would represent an unjustifiable expansion of the *Walker Process* doctrine and would undermine well-recognized limitations on standing to bring a declaratory judgment action challenging a patent.  We disagree."); *id.* at 508 ("A *Walker Process* antitrust claim is a separate cause of action from a patent declaratory judgment action.  It is governed by principles of antitrust law, and there is nothing novel about the fact that it includes as one of its elements the need to prove a violation that is not independently actionable between the same parties.").

[4] *Id.* at 508 ("The [Supreme] Court stated that it found no merit in the proposition that rules defining who may bring suit 'to cancel or annul a patent' should also dictate the boundaries of antitrust standing"; "Particularly in light of the demanding proof requirements of a *Walker Process* claim, we are not persuaded by SanDisk's 'flood of litigation' argument"; "Ritz's claim likewise seeks relief under the antitrust laws; it does not directly seek to invalidate SanDisk's patents or render them unenforceable, even though that would likely be the practical effect if Ritz were to prevail on its *Walker Process* claim." (internal citations omitted)).

1

immunity, rather than a sham litigation exception, is irrelevant to the antitrust standing question; its reasoning applies equally in both contexts.

*Second*, Novartis cannot seriously dispute that courts resoundingly reject – whether implicitly or explicitly – the argument that a prior decision on the patent merits is a prerequisite to bringing an antitrust case alleging sham litigation.[5]  So Novartis tries to do away with some of purchasers' citations by pointing out that they involve sham allegations based on non-infringement, as opposed to invalidity or unenforceability.  But Novartis identifies a distinction without a difference.  The relevant antitrust question in both contexts is the same:  Would a reasonable pharmaceutical manufacturer realistically expect to succeed on the merits, *i.e.*, win the patent infringement suit?[6]  That courts permit sham litigation antitrust suits to proceed *without* decisions on the patent merits in both non-infringement and invalidity contexts is not surprising, particularly in light of the uncontroversial proposition that "the 'court hearing the antitrust claim must make its own assessment of the objective merits of the predicate suit,' regardless of how the case fared before the previous court."[7]

*Third*, in *FTC v. Actavis*, the Supreme Court considered Novartis's much-touted "strong public policy favoring settlements"[8] and rejected the argument that "the desirability of settlements" shields anticompetitive conduct from antitrust scrutiny.[9]  The Court found the

---

[5] In thirty pages of briefing devoted to this issue, Novartis cites one case to the effect that "without a showing of patent invalidity, all that the complaints contain is conjecture."  The quoted language is non-binding dicta.

[6] *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* ("*PRE*"), 508 U.S. 49, 50 (1993) ("First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits").  *PRE* focuses on the antitrust defendant's expectations at the time the suits were filed, not the outcome of the lawsuit.  This standard is, undeniably, a very high bar, which should allay Novartis's fear that all patent litigation and settlement will be open to rampant attack if purchasers are permitted to proceed here.  Reply at 1-2.

[7] *In re Wellbutrin SR Antitrust Litig.*, No. 04-cv-5525, 2006 WL 616292, at *11 (E.D. Pa. Mar. 9, 2006) (quoting *Filmtec Corp. v. Hydranautics*, 67 F.3d 931, 937 (Fed. Cir. 1995)).

[8] Reply at 2.

[9] *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2234 (2013) ("We recognize the value of settlements and the patent litigation problem. But we nonetheless conclude that this patent-related factor should not determine the result here.").

2

possible deterrence of settlements was "outweigh[ed]" by other considerations, including the underlying purposes of the Hatch-Waxman Act and "the risk of significant anticompetitive effects" on the free marketplace.[10] Courts have been adjudicating cases challenging patent settlement agreements under the antitrust laws for upwards of fifty years, and neither the pace of innovation nor the rate of settlements appears to have been drastically slowed as a result.[11] If a general policy in favor of settlements did not convince the Supreme Court to shield settlements themselves from antitrust scrutiny, how could it prevent purchasers from seeking antitrust damages for the institution and maintenance of a sham patent infringement suit?

*Fourth*, Novartis appears to suggest that, because *Actavis* did not explicitly reaffirm the validity of the *PRE* line of cases, the Supreme Court silently jettisoned the sham litigation doctrine and shrank the universe of anticompetitive litigation conduct to include *only* large and unjustified reverse-payment settlements.[12] But *Actavis* addressed reverse payments because those facts were before it; it did not address sham litigation because the appeal did not involve a sham litigation claim. *PRE* remains good law.[13] Novartis points to no authority suggesting otherwise.

---

[10] *Id.* at 2237. With regard to the settlement between Novartis and Sun, Novartis argues that "[i]f the invalidity of '051 patent was so clear that any reasonable pharmaceutical company would not have expected it to survive litigation, there would have been no reason for Sun to settle and abandon its patent challenge." Sun's motives for settling are questions of fact and are not now at issue. There are many reasons that a prospective generic competitor might settle a patent challenge, including the high cost of such litigation or because the brand paid the generic a large sum of money to stay off the market. Novartis's logic works equally well in reverse: if the validity of the patent was so clear that any reasonable patentee would have expected it to survive litigation, why would Novartis have agreed to abandon its infringement claim and allow Sun to launch its generic Niaspan more three years before the '051 patent's expiration date?

[11] *See, e.g.*, *U.S. v. Singer Mfg. Co.*, 374 U.S. 174, 199 (1963); John R. Allison et. al., *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1779 (2014) (reporting detailed empirical analysis of all substantive decisions rendered by any court in every patent infringement case filed in 2008 and 2009, noting that (as with all studies) the data has limitations, and observing that as to overall invalidity win rates "[p]atentees won only 164 of the 636 definitive merits rulings, or 26%" and that the invalidation rate for patents whose validity was decided is 43%).

[12] *See* Reply at 10 (contending that in *Actavis*, the Supreme Court "held that only settlements providing for 'large and unjustified' payments trigger antitrust scrutiny," and that, in so holding, the Court was "confining scrutiny to a carefully limited category of potentially anticompetitive settlements").

[13] *See, e.g.*, *Otsuka Pharm. Co., Ltd. v. Apotex Corp.*, No. 14-cv-8074, 2015 WL 4756636, at *5 (D.N.J. Aug. 11, 2015) (denying, post-*Actavis*, a motion to dismiss sham petitioning claims); *Otsuka Pharm. Co. Ltd. v. Torrent*

*Finally*, Novartis misstates purchasers' burden, the standard applicable to a motion to dismiss, and the deference due purchasers' allegations.  (1) Under black-letter law, purchasers' antitrust claims are subject to proof by a preponderance of the evidence, not clear and convincing evidence… but, again, that dispute can wait for another day.[14]  (2) On a motion to dismiss, purchasers need not *prove* anything; they need only to have *alleged* facts sufficient to "raise a right to relief above a speculative level."[15]  Despite Novartis's newly-raised criticisms, the complaint includes detailed allegations about why the patent infringement lawsuit was a sham.[16]

---

*Pharms. Ltd., Inc.*, No. 14-cv-1078, 2015 WL 3869677 (D.N.J. June 22, 2015) (same); *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 WL 4988410 (D.N.J. Oct. 6, 2014) (dismissing reverse payment claims, but permitting sham litigation claims to proceed); *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 688-89 (E.D. Pa. 2014) (same); *In re Prograf Antitrust Litig.*, No. 1:11-md-02242-RWZ, 2014 WL 4745954 (D. Mass. June 10, 2014) (denying motion for summary judgment on sham petitioning claims, post-*Actavis*); *see also In re Neurontin Antitrust Litig.*, No. 02-cv-1390, 2013 WL 4042460, at *9 (D.N.J. Aug. 3, 2013) (addressing evidentiary disputes related to pending sham litigation claims).

And, of course, as the *Actavis* Court acknowledged, reverse payments are peculiar to pharmaceutical patent litigation; to suggest that a single form of anticompetitive conduct within a single industry somehow unravels antitrust liability for litigation conduct for all other industries is nonsensical.  *See, e.g.*, *Tyco Healthcare Group LP v. Mut. Pharm. Co., Inc.*, 762 F.3d 1338 (Fed. Cir. 2014) (reversing, in part, grant of summary judgment and reinstating sham litigation claims, post-*Actavis*); *IPtronics Inc. v. Avago Tech. U.S., Inc.*, No. 14-cv-5647, 2015 WL 5029282, at *1 (N.D. Cal. Aug. 25, 2015) (denying in part motion to dismiss sham litigation claims, post-*Actavis*).

[14] Plaintiffs' Opposition to Novartis's Motion to Dismiss, ECF No. 68 ("Opp. Br.") at 6, n.32.  *See, e.g.*, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994).

[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007); *Veal v. Portfolio Recovery, Inc.*, No. 14-cv-12967, 2015 WL 1609109, at *2 (D. Mass. Apr. 9, 2015) (Burroughs, J.) (citing *Ashcroft*); *Raso v. Pegasus & Sons Masonry Co., Inc.*, No. 15-cv-10730, 2015 WL 3833737 (D. Mass. June 22, 2015) (Burroughs, J.) (same).

[16] *See, e.g.*, CAC ¶ 182 ("[T]he [earlier] Zimmermann patent listed amongst the acceptable salts the methane sulfonic acid addition salt.  And in any event, Zimmermann and the other Ciba-Geigy scientists had already long before publicly disclosed the specific salt form to be used, imatinib mesylate."), ¶¶ 184-85 ("Novartis represented that it has recently 'surprisingly' found that imatinib mesylate could be made in a beta crystal form . . . this representation was misleading."), ¶ 187 ("The '097 application did not disclose the above-mentioned Druker, Buchdunger, or Zimmermann articles, nor did it disclose Druker's presentation . . . nor did it disclose that the Buchdunger article expressly described the mesylate salt form years before Novartis applied for the '097 application in the U.S."), ¶ 188 (listing 19 mesylate salt form drugs approved before Novartis's application, including four Novartis drugs); ¶ 190 ("[N]either the specification nor prosecution history made any claim of any unusual skill or undue degree of experimentation that were required to develop the β-crystal form . . . , the only reasonable inference that can be drawn from the fact that Novartis did *not* make any of these arguments is that it would have been false to do so."), ¶ 196 ("[A]nyone skilled in the art would have known that the needle-shaped crystal form was not suitable for large scale commercial development of a prescription drug, and would have undertaken to find a more suitable, non-needle-shaped crystal form."), ¶ 255 ("[I]n the stark light of patent litigation alleging infringement of the '051, Novartis knew that it a court were to eventually rule on the validity issue after deliberative proceedings, the '051 patent would be held invalid.  The Gleevec compound *is* the β-crystalline form of the methanesulfonate salt of imatinib."), ¶ 255 ("The '051 Patent was and is invalid because the claimed invention was obvious or anticipated by prior art, including the [Zimmermann] Patent, the Buchdunger article, and what a person of ordinary skill in the art at the time knew.  Novartis knew when is submitted is application for the '051 Patent that the claimed invention was obvious over prior art, and/or that the claimed invention merely described the same imatinib mesylate compound that was already covered by the '184 Patent and other prior art references.").  *See also* Opp. Br. at 4-6.

4

(3) Novartis cites *PRE* to suggest that purchasers here must "disprove" the objective reasonableness of the underlying infringement suit.[17]  But *PRE* discussed summary judgment:[18]

> Since the motion to dismiss standard is much lower than the summary judgment motion standard, the application of [the sham litigation doctrine] will vary from the Court's application in [*PRE*]. Here, all that is required is that the complaint *allege* facts which, *if proven*, show that the defendant is not entitled to *Noerr-Pennington* immunity.[19]

(4) On a motion to dismiss, the Court accepts plaintiffs' factual allegations as true and draws all reasonable inferences in plaintiffs' favor.[20]  Novartis's invitations to draw inferences in its favor must be declined.[21]

At bottom is this:  Purchasers' goal in this litigation is to obtain relief for their antitrust injuries, not to invalidate a patent.  And, as the *Ritz Camera* court put it, "there is nothing novel about the fact that [an antitrust case] includes as one of its elements the need to prove a violation that is not independently actionable between the same parties."[22]  Novartis's motion to dismiss should be denied.

Dated:  September 17, 2015                     Respectfully submitted,

By: **/s/ Thomas M. Sobol**
Thomas M. Sobol (BBO# 471770)
Kristen A. Johnson (BBO# 667261)
Hannah Schwarzschild (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP

---

[17] Reply at 3 n.2.

[18] *PRE*, 508 U.S. at 52 (describing procedural posture and recounting cross-motions for summary judgment).

[19] *Jarrow Formulas, Inc. v. Int'l Nutrition Co.*, 175 F. Supp. 2d 296, 310 (D. Conn. 2001) (emphasis added); *see also In re Prograf Antitrust Litig.*, No. 1:11-md-02242, 2012 WL 293850, at *6 (D. Mass. Feb. 1, 2012) (Zobel, J.) (assaying plaintiffs' allegations of sham petitioning, and finding them sufficient to meet the *PRE* standard).

[20] *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011); *Veal v. Portfolio Recovery, Inc.*, No. 14-cv-12967, 2015 WL 1609109, at *2 (D. Mass. Apr. 9, 2015) (Burroughs, J.).

[21] *See, e.g.*, Reply at 1-2, 7 n.8 (advancing Novartis's preferred inference that Sun would not have settled the underlying patent litigation if the patent infringement claims were baseless); *id.* at 2, 8 (drawing a defendant-friendly inference from the fact that 50% of all litigated Hatch-Waxman infringement claims result in a verdict for the generic company).

[22] *Ritz*, 700 F.3d at 508.

55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003
tom@hbsslaw.com
kristenj@hbsslaw.com
hannahs@hbsslaw.com

John Radice (*pro hac vice*)
RADICE LAW FIRM
34 Sunset Blvd.
Long Beach, NJ 08008
(646) 245-8502
jradice@radicelawfirm.com

*Attorneys for Plaintiffs, in Their Capacity as Proposed Class Representatives, and the Proposed Class*


Kenneth A. Wexler (*pro hac vice forthcoming*)
Edward A. Wallace (*pro hac vice forthcoming*)
Justin N. Boley (*pro hac vice forthcoming*)
WEXLER WALLACE
55 West Monroe St., Suite 3300
Chicago, IL 60603
(312) 346-2222
kaw@wexlerwallace.com
eaw@wexlerwallace.com
jnb@wexlerwallace.com

Jonathan D. Karmel (*pro hac vice forthcoming*)
KARMEL LAW FIRM
221 N. LaSalle Street, Suite 1307
Chicago, IL 60601
T: (312) 641-2910
jon@karmellawfirm.com

*Attorneys for United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund and the Proposed Class*


J. Gerard Stranch, IV (*pro hac vice forthcoming*)
Joe P. Leniski, Jr.  (*pro hac vice forthcoming*)
BRANSTETTER, STRANCH & JENNINGS PLCC
227 Second Avenue North, Fourth Floor

6

Nashville, TN 37201-1631
(615) 254-8801
gerards@BSJFirm.com
joeyl@BSJFirm.com

*Attorneys for Laborers Trust Fund for Northern California and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, Thomas M. Sobol, hereby certify that I caused a copy of the attached document to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: September 17, 2015                                        Respectfully submitted,

                                                                 **/s/ Thomas M. Sobol**
                                                                 Thomas M. Sobol, BBO# 471770