**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND and LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, on behalf of themselves and others similarly situated, | C.A. No. 15-12732-ADB |
| | Jury Trial Demanded |
| Plaintiffs, | |
| v. | |
| NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION, | |
| Defendants. | |

---

| | |
|---|---|
| LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, on behalf of themselves and others similarly situated, | C.A. No. 15-13461-ADB |
| | Jury Trial Demanded |
| Plaintiff, | |
| v. | |
| NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION, | |
| Defendants. | |

---

| | |
|---|---|
| AFSCME HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated, | C.A. No. 15-13724-ADB |
| | Jury Trial Demanded |
| Plaintiff, | |
| v. | |
| NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION, | |
| Defendants. | |

| | |
|---|---|
| MINNESOTA LABORERS HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br><br>Defendants. | C.A. No. 15-13725-ADB<br><br>Jury Trial Demanded |
| PENNSYLVANIA EMPLOYEES BENEFIT TRUST FUND, on behalf of themselves and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NOVARTIS PHARMACEUTICALS CORP., NOVARTIS AG, and NOVARTIS CORPORATION,<br><br>Defendants. | C.A. No. 15-13726-ADB<br><br>Jury Trial Demanded |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Leave to File Granted on March 24, 2016, *See* ECF No. 104

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. JURISDICTION AND VENUE .............................................................................3

III. PARTIES ................................................................................................................4

IV. REGULATORY BACKGROUND .........................................................................6

  A. The Regulatory Structure for Approval of New Drugs .................................6

    1. Basic Principles of Pharmaceutical Formulation ...........................6

      a. The Salt Selection ...............................................................7

      b. Basic Compounds are Often Formulated as Mesylate Salts ...8

      c. Formulation Chemists and Engineers Prefer Non-Needle Shaped Crystal Habits ...9

    2. Patent Protection for New Drugs ..................................................11

    3. FDA Approval of New Drugs .......................................................14

    4. Brand Companies List Patents in the FDA's "Orange Book" ......14

  B. The Regulatory Structure for Approval of Generic Drugs .........................15

    1. Congress's Effort to Get Generics to Market Sooner ..................15

    2. Hatch-Waxman Encourages Generics to Challenge Questionable Patents ...16

      a. Paragraph IV Certifications .............................................16

      b. Patents are Not Bulletproof ...............................................17

      c. Tentative Approval ............................................................19

    3. Hatch-Waxman's "First-to-File" Incentive .................................20

    4. The Hatch-Waxman Scheme is Subject to Abuse ........................21

    5. The Patent Information Submission ..............................................22

C.      The Competitive Effects of AB-Rated Generic Competition ................................24

        1.      The First AB-rated Generic is Priced Below the Brand ..........................26

        2.      Later Generics Drive Prices Down Further ..............................................26

D.      Abuse of the Hatch-Waxman Scheme is Both Illegal and
        Widespread ....................................................................................................27

        1.      Defrauding the PTO, Wrongfully Listing Patents in the
                Orange Book, and/or Filing Sham Lawsuits Benefit the
                Brand at Purchasers' Expense ..................................................................27

        2.      A Generic Can Overcome Patent Infringement Allegations
                through Litigation, Settlement, or At-Risk Launch ................................28

V.   FACTS ........................................................................................................................29

        A.      The 1950s – 1970s Facts .................................................................................29

                1.      Scientists Discovered the Philadelphia Chromosome .............................29

                2.      Swiss Drug Companies Ciba and Geigy Merged .....................................29

                3.      Scientists Linked Genetic Mutations, Kinases, and Cancer ...................30

        B.      The 1980s Facts ..............................................................................................30

                1.      Scientists Discovered that the Philadelphia Chromosome
                        Encodes the Bcr-Abl Kinase .....................................................................30

                2.      Ciba-Geigy Starts Studying Kinases .......................................................31

        C.      The 1990 Facts ................................................................................................32

        D.      The 1992 Facts ................................................................................................32

                1.      Ciba-Geigy Developed CGP 57148, a Bcr-Abl Kinase
                        Inhibitor ....................................................................................................32

                2.      Ciba-Geigy Developed the Mesylate Salt Form, Called
                        CGP 57148B ..............................................................................................33

                3.      Ciba-Geigy Applied for a Swiss Patent ...................................................35

        E.      The 1993 – 1994 Facts ....................................................................................36

                1.      Druker Tests CGP 57148B in CML Cells ................................................36

2.      Ciba-Geigy Applied for a U.S. Patent that Claimed
        Imatinib, Including the Mesylate Salt Form ...............................37

F.      The 1995 Facts ...............................................................................38

        1.      Ciba-Geigy Submitted Articles Disclosing their
                Discoveries.........................................................................38

        2.      Druker Presented His Findings to the American Society of
                Hematology.........................................................................38

G.      The 1996 Facts ...............................................................................39

        1.      Ciba-Geigy Discloses the Methane-Sulfonate Salt Form in
                *Cancer Research* ...........................................................39

        2.      Ciba-Geigy Discloses Crystalline Derivates and Typical
                Synthesis Processes in *Bioorganic & Medicinal Chemistry
                Letters* ...............................................................................40

        3.      Ciba-Geigy and Sandoz Merged to Create Novartis.................41

        4.      Ciba-Geigy Published More About its Discovery in *Nature
                Medicine*.............................................................................41

        5.      The Compound Patent Issued, Protecting Gleevec until July
                4, 2015.................................................................................42

H.      The 1997 - 1998 Facts.....................................................................42

        1.      Novartis Published Another Article, in *Bioorganic &
                Medicinal Chemistry Letters*................................................42

        2.      Novartis Filed a New Swiss Patent Application for the
                Mesylate Salt and Beta-Crystal Form .....................................43

        3.      Novartis Publishes Two More Articles, in *Blood* .....................44

        4.      Novartis Began Clinical Trials of Imatinib Mesylate ...............45

I.      The 2000 Facts ...............................................................................45

        1.      Novartis Applied for a U.S. Patent Covering the Mesylate
                Salt and $\beta$-Crystal Form.........................................................45

                a.      The Specification Contained Misleading Statements ...................46

                b.      The Specification Did Not Disclose that Imatinib
                        Mesylate Had Been Disclosed Years Earlier ................................47

c.      The Specification Did Not Disclose That Mesylate Salts Are Common ........................................................47

d.      The Specification Did Not Claim that the β-Crystal Form Required Undue Experimentation .........................48

e.      One Skilled in the Art Would Have Sought a Non-Needle, Less-Hygroscopic Crystal Form .......................49

f.      Novartis Used Common Methods to Make the β-Crystal Form ........................................................................50

g.      The Specification Disclosed Many Potential Indications .............................................................................51

2.      The Examiner Rejects All Claims .......................................................52

J.      The 2001 Facts ......................................................................................52

1.      Novartis Amended its Claims and Responded to the Rejection for the Follow-On Polymorph Patent .....................52

2.      Novartis Sought Orphan Drug Exclusivity for Gleevec ...........54

3.      The FDA Approved Gleevec Capsules ...........................................54

4.      Back at the PTO, the Examiner Issued a Final Rejection of the Follow-On Polymorph Patent .............................................54

K.      The 2002 Facts ......................................................................................55

1.      Novartis Appeals the Examiner's Final Rejection of the Follow-On Polymorph Patent .......................................................55

2.      The Examiner Opposes Novartis's Appeal ...............................56

L.      The 2003 Facts ......................................................................................56

1.      The FDA Approved Gleevec Tablets .........................................56

2.      The Patent Board Did Not Sustain the Examiner's Rejection ..................................................................................56

3.      Six Weeks Later, With No Further Proceedings, the Examiner Issued a Notice of Allowability ............................57

4.      After the Appeal Decision and Notice of Allowability, Novartis Submits the Buchdunger and Zimmermann and Improperly Argues *Res Judicata* ...........................................58

M.   The 2004-2005  Facts.............................................................61

  1.   The PTO Extended the Term of the Original Compound
       Patent...............................................................................61

  2.   The PTO Issued the Follow-On Polymorph Patent (the '051
       patent) .............................................................................61

  3.   Novartis's Misrepresentations and Omissions During
       Prosecution of the '051 patent ....................................63

  4.   Novartis Intended to Deceive the PTO ........................64

N.   The 2006-2007 Facts............................................................65

  1.   Sun files an ANDA for Imatinib Mesylate. ................65

  2.   Novartis Applied for a Third U.S. Gleevec Patent ......66

O.   The 2009 – 2011 Facts.........................................................68

  1.   The '799 Patent Issued...................................................68

  2.   The FDA Granted Sun Tentative Approval .................68

  3.   Novartis Sought Reissuance of the '799 Patent...........69

P.   The 2013 – 2014 Facts.........................................................69

  1.   The '799 Patent Reissued as the RE '932 Patent.........69

  2.   India's Supreme Court Rejected Novartis's Application for
       a Beta-Crystal Imatinib Mesylate Patent ...................69

  3.   Sun Sued For a Declaration of Non-Infringement or
       Invalidity.........................................................................70

  4.   Sun and Novartis Settled................................................70

  5.   The FDA Granted Apotex Tentative Approval ............71

  6.   Novartis Faced Competition from Other Generics ......71

Q.   The 2015-2016 Facts............................................................75

  1.   Sun Launches generic Gleevec .....................................75

  2.   FDA Approved Indications for Gleevec .......................76

3.      How Gleevec is Prescribed and Dosed ......................................................76

4.      Gleevec Sales in the United States...........................................................77

5.      Gleevec's Cost ...........................................................................77

6.      Novartis's Unlawful Conduct Harms Competition....................................78

VI.    MONOPOLY POWER AND MARKET DEFINITION....................................................79

VII.   CLASS ACTION ALLEGATIONS ........................................................................81

VIII.  INTERSTATE AND INTRASTATE COMMERCE ......................................................84

IX.    EFFECTS ON COMPETITION ...........................................................................84

X.     CLAIMS FOR RELIEF .....................................................................................86

1.      The plaintiffs, Laborers Health and Welfare Trust Fund for Northern California

("Laborers Trust Fund") and Louisiana Health Service and Indemnity Company d/b/a Blue Cross

and Blue Shield of Louisiana ("BCBSLA"), (collectively, "the end payers"), on behalf of

themselves and all others similarly situated, for their complaint against defendants Novartis

Pharmaceuticals Corporation, Novartis AG, and Novartis Corporation (collectively "Defendant"

or "Novartis"), allege as follows based on (a) personal knowledge; (b) the investigation of their

counsel; and (c) information and belief.

## I.      INTRODUCTION

2.      This civil action seeks monetary damages to remedy the effects of the unlawful

delay of generic entry into the U.S. market for Gleevec (imatinib mesylate), an FDA-approved

prescription drug that radically improves the lives of the thousands of patients suffering chronic

myeloid leukemia (CML), a cancer of the blood and bone marrow.  For twelve years, Novartis

properly sold Gleevec without generic competition, earning over $13 billion dollars in the U.S.

alone.

3.      Generic Gleevec should have been available starting July 5, 2015.  The period of

lawful exclusivity from the basic imatinib patent expired on July 4, 2015, and the FDA had

cleared two generic applications.  But Novartis obtained a follow-on patent through fraud,

unlawfully listed the invalid follow-on patent in the FDA's Orange Book, frivolously sued first-

in-line generic Sun Pharma for infringing that patent, and extracted from Sun a promise not to

launch its generic for seven extra months beyond the compound patent's expiration – in the guise

of settling the bogus infringement lawsuit.

4.      Novartis appropriately enjoyed exclusivity for Gleevec through the expiry of the

original compound patent in early July 2015 (U.S. sales of Gleevec yielded about $2 billion per

year before a generic eventually entered).  Unsatisfied with its years of monopoly, however,

1

Novartis has engaged in patent gamesmanship and frivolous litigation for the sole purpose of delaying generic entry.  This conduct violates basic principles of antitrust law and foists high prices upon purchasers who would have otherwise been able to purchase less expensive generic medications.

5.     In the absence of Novartis's fraudulently procured and invalid patent, Novartis's original period of exclusivity over Gleevec would have expired earlier.  Novartis procured a follow-on polymorph patent ("the '051 patent"), which purported to cover the beta-crystal form of the mesylate salt of imatinib.  But in doing so, Novartis intentionally made misrepresentations about both the salt and crystal forms of its earlier patented compound.  Novartis also failed to provide invalidating prior art to the Patent and Trademark Office ("PTO"), providing only *some* of that art only *after* receiving notice that the PTO was going to issue the patent.  Novartis then misrepresented that the Board of Patent Appeals and Interferences (Patent Board) had already determined that the art was not invalidating.  The PTO relied on Novartis's misrepresentations and omissions in issuing the '051 patent; the PTO would not have issued the patent in the absence of Novartis's misrepresentations and omissions.

6.     Crucially, in granting approval to the '051 patent, the Patent Board *did not address the question relevant to this antitrust case*:  whether the claims in the '051 patent were obvious or anticipated.  Rather, the Patent Board reversed because the examiner applied the wrong burden-shifting standard.  And after the appeal, the examiner simply issued the patent, apparently without further proceedings.

7.     Novartis's misconduct before the PTO renders the follow-on patent invalid and unenforceable.  Separate and apart from Novartis's wrongdoing during the prosecution, the mesylate salt β-crystal form disclosed in the '051 patent was a result of Novartis's long-ago

routine lab work and obvious in light of the prior art.  No reasonable pharmaceutical company in Novartis's position would have had a realistic expectation of succeeding on the merits in a lawsuit alleging infringement of the '051 patent because the stark light of litigation would have revealed both Novartis's misdeeds and the obviousness of the invention.

8.      The plaintiffs have suffered antitrust injury here because they paid and continue to pay supracompetitive prices for more-expensive branded Gleevec beyond July 5, 2015, when, in the absence of Novartis's anticompetitive conduct, a generic equivalent would have entered the market.

9.      This lawsuit, brought under state antitrust and unfair trade practice statutes, seeks money damages and equitable relief on behalf of plaintiffs and other end payers who were denied the right to purchase generic versions of Gleevec as a result of Novartis's anticompetitive practices.

## II.      JURISDICTION AND VENUE

10.     This lawsuit arises under the antitrust and unfair trade practices statutes of 23 states – Arizona, California, Florida, Iowa, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin – and the District of Columbia.  The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d).

11.     This Court has personal jurisdiction over Novartis because Novartis transacts business within this District, carries out interstate trade and commerce in substantial part in this District, has agents in this District, and can be found in this District.

12.     Venue is appropriate within this District under 28 U.S.C. §§ 1391(b) and (c).

3

## III.   PARTIES

13.     Plaintiff Laborers Health and Welfare Trust Fund for Northern California is a trust fund administered pursuant to the Taft-Hartley Act, 29 U.S.C. § 186, by an equal number of trustees appointed by labor representatives and union representatives; it is an employee welfare benefit plan maintained pursuant to Section 302(c)(5), and as defined by Sections 1002(1) and (3) of ERISA, 29 U.S.C. § 1001, *et seq.*  Laborers Trust Fund maintains its office in Fairfield, California.  Since July 5, 2015, Laborers Trust Fund has paid some or all of the price of 100 mg and 400 mg Gleevec tablets, on behalf of its plan participants, in at least California.  Laborers Trust Fund has paid more for Gleevec than it would have absent Novartis's unlawful scheme to prevent and delay generic entry.

14.     Plaintiff Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a domestic health insurance corporation licensed to conduct business in the State of Louisiana and is involved in the business of providing health benefits, among others, to covered lives.  Since July 5, 2015, BCBSLA has paid some or all of the price of 100 mg and 400 mg Gleevec tablets, on behalf of its plan participants, in at least the following states: Florida, Mississippi, and Tennessee.  BCBSLA has paid more for Gleevec than it would have absent Novartis's unlawful scheme to prevent and delay generic entry.  Since February 2016, BCBSLA has paid some or all of the price of generic imatinib mesylate on behalf of its plan participants.

15.     Defendant Novartis Pharmaceuticals Corporation is a corporation organized and existing under the laws of the State of Delaware.   Novartis Pharmaceuticals Corporation is a subsidiary of Defendant Novartis AG and the NDA holder/applicant as well as a distributor for the prescription drug Gleevec.

16.     Novartis Pharmaceuticals Corporation purports that its principal place of business is at 59 Route 10, East Hanover, New Jersey 07936.  Novartis Pharmaceuticals Corporation occupies 1.2 million square feet of office and laboratory space in Cambridge, Massachusetts, with construction underway to add another 550,000 square feet along Massachusetts Avenue, and it is one of the largest corporate employers in Cambridge, MA (employing over 2,000 associates).  Novartis's global research headquarters is located in Cambridge.  The Cambridge campus is also home to the Novartis Institutes for BioMedical Research, Novartis Vaccines and Diagnostics, and the U.S. office of the Novartis Venture Funds.

17.     Defendant Novartis AG is a corporation organized and existing under the laws of Switzerland, having an office and a place of business at Lichtstrasse 35, CH-4056, Basel, Switzerland.

18.     Defendant Novartis Corporation is a corporation organized and existing under the laws of the State of New York, having its principal place of business at 608 Fifth Avenue, New York, New York 10020.  Novartis Corporation is the assignee of the '184 patent (discussed below).

19.     As used herein, "Novartis" refers to any or all defendants.  The actions attributed to Novartis were taken by employees, lawyers, and agents of Novartis as disclosed on the face of the relevant patent file wrappers and patent infringement pleadings, or individuals otherwise known only to Novartis.  These include, but are not limited to, the inventors and individuals identified in this complaint as well as attorney George R. Dohman.

20.     All of Novartis's actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Novartis's various officers, agents, employees, or other representatives while actively

engaged in the management of Novartis's affairs within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Novartis.

## IV.    REGULATORY BACKGROUND

21.    Brand drug companies can, and do, obtain valid patents that cover their new prescription drug products.  Such patents encourage discovery and development of new medicines, providing protection from competition by other drug companies for a length of time set under a statute by Congress.

22.    Once the lawful periods of exclusivity expire on brand products, generic companies can seek FDA approval to sell generic versions of the brand, allowing the generic companies to manufacture generic products that are just as safe and effective, but far less expensive than the brand.  The medication becomes affordable for all, and purchasers are no longer burdened by the high cost of the brand drug.

23.    The American system of access to prescription drugs balances the desire to reward innovation with the desire to provide access to affordable drugs.  Brand companies have a statutory period of time – generally 20 years from the time of filing the patent – to charge very high prices for medications that, in fact, cost little to manufacture.  But, after that period elapses, generic companies can compete with low-cost substitutes.  From this basic principle emerges a simple rule:  a brand company may not assert invalid, unenforceable, or uninfringed patents in order to delay entry of less-expensive, but therapeutically equivalent, generic medications.

24.    This case involves Novartis's breach of this basic rule.

## A.    The Regulatory Structure for Approval of New Drugs

### 1.    Basic Principles of Pharmaceutical Formulation

25.    In developing a new drug, it is not enough to discover a chemical that has a desired effect when tested in vitro.  The chemical must be developed into an acceptable

pharmaceutical compound (or "active pharmaceutical ingredient") that is, among other things, stable and able to be manufactured in commercial quantities. A standard operating procedure in drug development is the selection of the salt and polymorphic form to be used for this purpose.

### a. The Salt Selection

26. Active pharmaceutical ingredients in free base form often do not exhibit the range of physical properties that are suitable for development. One common method of modifying the characteristics of drug substance is to create a salt.

27. Choosing the salt form is one of the most important decisions made during the drug development process. A guideline of good pharmaceutical processes is that a salt should be selected, and that the selected salt should be used for the further formulation, development, and testing processes.

28. Different salts can have different solubilities, dissolution rates, melting points, chemical stability, hygroscopicity, and mechanical properties. The benefits of using salt forms as active pharmaceutical ingredients are well known, and represent one means to increase the solubility of otherwise intractable substances, salt forms may also increase bioavailability (the amount of drug that makes its way into the blood).

29. The goal of salt selection is to identify a molecule that can optimally be used in the myriad activities needed to study, register, and manufacture a drug. Selecting a salt involves input from a number of different groups. Process chemists consider the yield, rate, and quality of the crystallization, as well as cost. Formulation chemists are concerned with hygroscopicity (*i.e.*, how readily the compound takes up or retains moisture), stability, solubility, and processability of the salt form. The drug metabolism and safety assessment groups focus on the pharmacokinetic aspects and the safety (*e.g.*, toxicology effects) of a particular salt form. Given these competing interests, the final choice of salt form is often a compromise. Since at least the

mid-1980s, scientific literature has discussed how such compromises should be approached, as well as the pros and cons of particular salt forms.

### b. Basic Compounds are Often Formulated as Mesylate Salts

30.     One consideration in choosing a salt is the basicity or acidity of the compound. Acidic compounds are often formulated as sodium salts.  Basic compounds are often formulated as "acid addition salts," salts formed by adding hydrochloric, sulfuric, nitric, methanesulfonic, or other acids.

31.     There are not many acid addition salts that are both environmentally safe when produced in large, commercial quantities and also safe for individual consumption.  As an example:  hydrochloric acid can be well tolerated in the human body but it can corrode stainless steel, cause unacceptable levels of corrosion in factory settings, and require very expensive, specialized equipment.

32.     For a "basic" compound (*i.e.*, one that contains one or more atoms, like a nitrogen, capable of being protonated), routine screening for pharmaceutically acceptable addition salts is typically done by mixing the parent compounds with an acid that is "generally regarded as safe" in a suitable solvent.  The list of acids typically screened is limited, but usually includes inorganic acids (hydrochloric acid, hydrobromic acid, phosphoric acid, sulphuric acid), strong organic acids (methanesulfonic acid, benzenesulfonic acid, toluenesulfonic acid), and weak organic acids (acetic acid, citric acid, maleic acid).

33.     A salt of methane sulfonic acid ($CH_3SO_3H$) is called a "mesylate."  Mesylates are a common form of acid addition salts.  As far back as 1974, mesylates made up more than 2.0 % of all FDA-approved commercially marketed salts.  (2% was a significant number, as about half of marketed salts used hydrochloric acid (HCl), and use of other salts rarely topped 1%.) Mesylates are commonly used in the pharmaceutical industry for enhanced water solubility as

compared with the free base form of a compound, as well as for their stable crystalline forms, which may have better handling properties that are useful for large-scale production.

34.     In the early 1990s, among the first salts that one skilled in the art of drug formulation would look at for a compound would be HCl and methanesulfonic acid salts – HCl salts because stomach acid already contains HCl, and methanesulfonic acid because mesylate salts were known to be well behaved and well suited for use in drugs.

### c.     Formulation Chemists and Engineers Prefer Non-Needle Shaped Crystal Habits

35.     A separate but related decision is the choice of a suitable polymorphic form of the selected salt.  Polymorphism is the ability of a solid material to exist in more than one form or crystal structure.  Polymorphism is important in the development of pharmaceutical ingredients.

36.     Salts can exist in amorphous or crystalline form.  Salts can crystallize in a variety of shapes, depending on conditions like temperature, solvent, and degree of supersaturation, and some of the forms are preferable over others for pharmaceutical industry use.

37.     Molecules can exist as crystalline solids in which a network of individual molecules forms a lattice.  The external shape that a crystal takes is referred to as the "crystal habit."  As an example, consider when water freezes to form ice or snow.  Depending on the conditions of crystallization, water can crystallize as plates, needles, columns, prisms, dendrites, or (the most common form of snow) irregular crystals that are small and clumped together.

38.     Meteorologists can predict, based on atmospheric conditions, what type of snow to expect (*e.g.*, dry powder versus heavy/wet snow), as shown in Figure 1.   Likewise, a chemist can often predict the expected crystal habit, or properties of a crystal habit, in the laboratory.

**Figure 1:  Snow crystal habit as a function of temperature and the supply of water vapor in clouds where the crystals grow (supersaturation), from Ken Libbrecht's Field Guide to Snowflakes, Voyager Press, 2006**



39.     In selecting a pharmaceutical form, the goal is to identify a physical form of the active pharmaceutical ingredient that handles well and performs consistently as larger and larger batches of material are prepared and stored.  Criteria include room temperature stability (*i.e.*, the form will not change while being stored), hygroscopicity, friability, and dissolution rate, as well as properties relating to how well the materials can be formulated as a tablet.  Other practical considerations, given the goal of large scale mass production, include flow properties (static nature), compressibility, bulk density, and particle size.

40.     Forms with inherently poor properties would not be chosen for development. Instead, more appropriate forms would be selected or engineered.

41.     Needle-shaped crystals, which are long and very thin as their name implies, are often the first products of supersaturation.  Well before the early 1990s it was known in the industry that needle-shaped crystals are very difficult to handle both in the laboratory and in commercial production due to the slow filtration and flow problems associated with the needle

shape:  needles behave like fiberglass, glass wool insulation, or cotton candy.  Imagine pouring cotton candy into a hopper; one would not expect it to flow like sand.

42.      Any trained pharmaceutical formulation chemist developing a new product in the 1990s would have known that a needle-shaped crystal would not be acceptable and would have chosen a non-needle form if one was observed, or sought a non-needle form by standard laboratory procedures.

43.      If a non-needle form had not yet been observed, scientists would convert existing needle forms by modifying the crystal habit.  Chemists routinely modify crystal habits by varying temperature and degree of supersaturation, solvent, nucleation, and mechanical means.  Often, needle-forms are converted to more dense plates by suspending needles in a solvent and stirring overnight.

44.      Any trained pharmaceutical formulation chemist developing a new product in the 1990s would have been motivated to prepare a form of the compound that was stable, had good flow properties, and was suitable for mass production.

45.      A trained pharmaceutical formulation chemist developing a new product in the 1990s would have perceived a reasonable expectation of success in making a non-needle form in light of the prior art.

### 2.      Patent Protection for New Drugs

46.      There is a predictable pattern to the way brand drug companies develop their patent portfolios for blockbuster drugs.  The first group of patents in the brand drug company's portfolio for the drug may reflect a genuine technological breakthrough that may later contribute to the success of the drug; these initial patents usually cover the active compound in a prescription drug or a particular pharmaceutical composition, and are correspondingly robust.

11

47.     After filing applications for the original patents, the company continues its

research and development efforts to develop a drug product that could, eventually, be approved

by the FDA.  As the company's research matures, the patent filings continue, often for narrow

modifications relating to specific formulations (*e.g.*, for a specific salt, extended dissolution

profile, or enantiomer), methods of using the drug, or processes for creating the drug product

disclosed in the original patent filings.  But the original patent filings are now in the "prior art"

and thus limit the scope of follow-on patents that can be obtained legitimately.  New patents can

be obtained for features of the drug only if the brand drug company can show that the new

features are non-obvious improvements over the growing body of prior art, which includes

patents and printed publications, among other things.  Often, methods of using the earlier

invention are disclosed by the earlier compound or composition patent.  To lawfully acquire one

of these secondary patents, the patentee must disclose to the PTO all material prior art so as to

assure that the application for the secondary patent is not just an effort to gain a patent for a

modification that would be obvious to a person skilled in the art from reading disclosures already

publicly available.

48.     Patents present, at minimum, obstacles for would-be generic competitors to

design around.  Some patents broadly cover a drug's active ingredient and – if valid and

enforceable – may prove impossible to design around while also meeting the FDA's criteria for

generic equivalence.  While approved generic versions of the brand product may be able to enter

the market before all patents expire, once all the valid patents covering its blockbuster drug have

expired, the brand drug company has no lawful means of preventing competitors from entering

the market.

49.     Therefore, a typical patent portfolio for a brand drug has its most significant

patent issuing first; later, secondary patents are (and should be) more difficult to obtain.  Even if

the secondary patent is obtained, these later-issuing patents are more vulnerable to attack as

invalid for covering subject matter that is old or obvious.  They may also be relatively easy to

design-around, and thus not infringed.

50.     In patent cases, prior art may include items that were publicly known or used or

offered for sale, publications, or patents that disclose the claimed invention or elements of the

claimed invention.  To be prior art, the item or reference must have been published, patented,

publicly known, offered for sale, or publicly used either before the invention was made or before

the filing date of the priority patent application.

51.     A patent is obvious if the differences between the subject matter sought to be

patented and the prior art are such that the subject matter as a whole would have been obvious at

the time the invention was made to a person having ordinary skill in the art to which said subject

matter pertains.

52.     When developing a new drug, often the need arises to improve or modify an

aspect of the active ingredient, and a formulation chemist can look at how other prior art items

that had the same need were addressed.  In the pharmaceutical field, various problems and their

solutions have been well documented.  If the ingredient is not very soluble (and hence hard to

absorb), there are well-known techniques for making it soluble:  changing the associated salt of

the drug, or formulating it using some carrier or vehicle.  New salts and/or polymorphic forms

can always be made or attempted.  However, when the evidence shows that a skilled chemist at

the time would simply have made an already-known pharmaceutically-acceptable salt of

whatever active ingredient with which he or she was working at the time, the "new" associated salt or form of the drug is obvious and non-patentable.

### 3.     FDA Approval of New Drugs

53.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a branded drug manufacturer obtains FDA approval to market a drug product by filing a New Drug Application ("NDA").[1]

54.     The FDA may not approve an NDA if the data and test results provided fail to show that the drug is safe or if there is a lack of substantial evidence that the drug will be effective to treat the conditions suggested in the proposed labeling.  The FDA approves new drugs based on their ability to satisfy the minimum regulatory requirements, *i.e.*, show that they are safe and effective to treat a particular indication.  New drug applicants are not required to, and usually do not try to, show that their new drug product is better than other similar, already approved, products.

### 4.     Brand Companies List Patents in the FDA's "Orange Book"

55.     To notify other drug manufacturers about potential proprietary intellectual property claims for newly approved drugs, a manufacturer of a new drug product must tell the FDA about patents that it believes cover its drug products.  The FDA publishes a list of those patents and the corresponding drugs in the publicly-available compendium, *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly known as the "Orange Book." Patents issued after NDA approval may be listed in the Orange Book within 30 days of issuance. Once patents are listed in the Orange Book, potential generic competitors are on notice regarding the patents that are claimed to relate to the brand-name drug.

---

[1] 21 U.S.C. §§ 301–392.

56.     The brand-name drug manufacturer can list its patents in the Orange Book by

filing a Form 3542 with the FDA.  Under the FDA rules, the branded manufacturer is only

permitted to list patents that are *reasonably enforceable*.  Form 3542 expressly asks the applicant

whether the drug presents a "No Relevant Patent" situation (*i.e.*, a situation where there are no

patents that could be *reasonably asserted* in an infringement lawsuit).  Form 3542 likewise

requires the signatory to affirm, under penalty of perjury, the completeness and accuracy of all

the patent information submitted to the FDA on each patent that claims the drug substance, drug

product, or method of use that is the subject of the approved NDA or supplement.

57.     The FDA relies completely on the manufacturer's truthfulness about patent

validity and applicability, as it does not have the resources or authority to verify the

manufacturer's representations.  The FDA performs only a ministerial act in listing the patents

identified by the manufacturer in the Orange Book.

**B.      The Regulatory Structure for Approval of Generic Drugs**

**1.      Congress's Effort to Get Generics to Market Sooner**

58.     In 1984, Congress passed the Hatch-Waxman Amendments to the FDCA.  The

Hatch-Waxman Amendments were designed to speed introduction of low-cost generic drugs to

market by permitting generic manufacturers to file abbreviated new drug applications (ANDAs)

relying on the scientific findings of safety and effectiveness included in the brand-name drug

manufacturer's original NDA.  The FDA requires only a showing that the generic drug is

pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the

brand-name drug.  The premise – codified by Congress and implemented by the FDA for the past

thirty years – is that two drug products containing the same active pharmaceutical ingredient, in

the same dose, delivered in the same way, and absorbed into the bloodstream at a similar rate

over a similar period of time, are expected to be equally safe and effective.

59.     At the same time, the Hatch-Waxman Amendments sought to protect pharmaceutical companies' incentives to create new and innovative products, by, among other things, permitting a brand company to file a legitimate patent infringement lawsuit against a generic manufacturer before the generic actually brings its product to market.

60.     The Hatch-Waxman Amendments achieved these goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand-name pharmaceutical companies.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion, with generic drugs accounting for 18.6% of prescriptions.  By 2013, total prescription drug revenue had soared to over $329 billion, with generic drugs accounting for 84% of prescriptions filled.

## 2.     Hatch-Waxman Encourages Generics to Challenge Questionable Patents

61.     The Hatch-Waxman Amendments also created a mechanism to resolve patent disputes between brand and generic manufacturers before generic products launched, in the hopes of resolving patent challenges in advance of the generic launch (so that generic launch is not unnecessarily delayed while patent squabbles play out).

### a.     Paragraph IV Certifications

62.     Once one or more patents are listed in the Orange Book for a particular drug, a generic manufacturer seeking FDA approval of an ANDA must certify that the proposed generic drug will not infringe any of those patents.  A generic manufacturer can make one of four certifications:

i.      that no patent for the brand-name drug has been filed with the FDA;

ii.     that the patent for the brand-name drug has expired;

iii.    that the patent for the brand-name drug will expire on a particular date and

16

the generic company does not seek to market its generic product before that date; or

iv.    that the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV" certification).

63.    If a generic manufacturer files a Paragraph IV certification, a brand-name manufacturer can sue the ANDA applicant for patent infringement immediately.  If the brand-name manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification ("Hatch-Waxman Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the entry of a final judgment on a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.  Until one of those conditions occurs, the FDA cannot authorize the generic manufacturer to go to market with its product.

64.    If a brand company sues a generic company for patent infringement in response to receiving a Paragraph IV certification, the generic company may defend itself by showing (i) that the asserted patent is invalid or unenforceable or (ii) that the generic product does not infringe the patent.

### b.    Patents are Not Bulletproof

65.    Patents are not bulletproof.  Patents are routinely invalidated or held unenforceable, either upon reexamination by the PTO, by court decision, or by jury verdict.

66.    One way that a generic can prevail in patent infringment litigation is to show that its product does not infringe the patent.  Another is to show that the patent is invalid or unenforceable.  For example, a patent is invalid or unenforceable when the disclosed invention is obvious in light of earlier prior art.  A patent is also invalid or unenforceable when an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or

17

deceive the PTO, fails to disclose to the PTO material information known to that person to be material, or submits materially false information to the PTO during prosecution.

67.     In those circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

68.     As a statistical matter, if the parties litigate to a decision on the merits it is more likely that a challenged patent will be found invalid or not infringed than upheld.  The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[2]  An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[3]

69.     When generic pharmaceutical companies are forced to defend themselves in sham patent infringement litigation by challenging the validity of the asserted patent, the pat phrase "presumption of patent validity" does not bear out.  As the Federal Circuit has noted, the presumption of patent validity is "a procedural device, not a substantive rule."[4]  To be sure, in an infringement action, the presumption gives the burden of persuasion to the party who attacks the patent's validity.  But it serves no function in an antitrust case alleging that a patent was

---

[2] FTC, *Generic Drug Entry Prior to patent Expiration* at vi-vii (July 2002) (*available at* http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf).

[3] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014) ("patentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago).

[4] *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F. 2d 1144, 1147 n. 2 (Fed. Cir. 1983).  *See also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F. 2d 1530, 1534 (Fed. Cir. 1983).

wrongfully obtained or improperly asserted, nor could it:  both *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* ("PRE")[5] and *Walker Process Equipment. Inc. v. Food Machinery & Chemical Corp.*[6] involve challenges to enforcement of "presumptively valid" patents.

70.     As the Third Circuit recently observed in a generic-delay antitrust case, "[t]his presumption [of patent validity] assumes away the question being litigated in the underlying patent suit, enforcing a presumption that the patent holder would have prevailed.  We can identify no significant support for such a policy."[7]  Judge Young likewise noted in the *Nexium Antitrust* case, "[T]he presumptive validity accorded to patents upon issuance has been cast in significant doubt by judges and empiricists alike, and although patent holders enjoy broad exclusionary rights, these rights are not limitless."[8]

71.     Again, when "presumptively valid" patents are tested in litigation, they are held invalid more often than not.

### c.     Tentative Approval

72.     When an ANDA otherwise meets the substantive requirements for approval, but cannot receive effective approval because of pending Hatch-Waxman litigation or some form of exclusivity (*e.g.*, a 30-month stay, an unchallenged patent, or another marketing exclusivity), the FDA may grant the application "tentative approval."[9]

---

[5] 508 U.S. 49 (1993).

[6] 382 U.S. 172 (1965).

[7] *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 214 (3d Cir. 2012).

[8] *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 393 (D. Mass. 2013) (citing *Standard Oil Co. (Ind.) v. United States*, 283 U.S. 163, 169 (1931)) (some citations omitted).

[9] 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA); 21 C.F.R. § 314.107(b)(3)(v).

73.     To receive tentative approval, an ANDA must meet all of the requirements for approval generally; that is, the *only* barrier to outright approval must be the pendency of litigation or an exclusivity period.[10]   Therefore, an ANDA may not receive tentative approval if, for example, bioequivalence has not been shown, or if the manufacturer's compliance with current Good Manufacturing Practices (cGMP) has not been established.

74.     An ANDA that has received tentative approval may not legally be marketed until the FDA issues a final approval letter.[11]

### 3.     Hatch-Waxman's "First-to-File" Incentive

75.     Pursuant to the Hatch-Waxman Amendments, the first generic manufacturer to file an ANDA containing a Paragraph IV certification (discussed below) receives 180 days of market exclusivity.  This means that other generic manufacturers will not be able to launch their own generic products for at least six months after the first generic – known as the "first filer" – launches its product.[12]

76.     During the exclusivity period, the first filer is the only ANDA-approved generic manufacturer permitted on the market.  As recognized by the Supreme Court, it is often the case that most of a first filer's profits with respect to an ANDA product are earned during the exclusivity period.[13]

77.     If the only versions of a drug on the market are the brand and the first filer's product, then the first filer prices its product below the brand product, but not as low as if it were facing competition from other generics.  Because the branded company does not drop the brand

---

[10] 21 U.S.C. § 355(j)(5)(B)(iv)(dd)(AA).

[11] 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(BB); 21 C.F.R. §§ 314,105(d), 314.107(b)(3)(v).

[12] The "exclusivity" label is a bit of a misnomer because, while later ANDA-approved generic makers must wait six months after the first filer's market entry for FDA approval, a brand's "authorized" generic, marketed under the authority of the brand manufacturer's NDA, may enter at any time.

[13] *See Federal Trade Comm'n v. Actavis*, 133 S. Ct. 2223, 2229 (2013).

price to match the first filer, the first filer does not face the degree of price competition it will

when additional generic products are available.

### 4.      The Hatch-Waxman Scheme is Subject to Abuse

78.      The Hatch-Waxman regulatory scheme was intended to incentivize early generic

entry to market.   But brand and generic companies began abusing this scheme.   Recognizing that

the Hatch-Waxman scheme imposed no penalty on a first-to-file ANDA applicant that delayed

coming to market, brand-name companies would simply pay first-to-file generic companies to

stay off the market.

79.      Generic companies holding first-to-file exclusivity would leverage their first-to-

file status into a large payment from the brand company, often delaying substantially the timely

appearance of generic drugs in the marketplace.

80.      To prevent this abuse, Congress amended the FDCA, passing the Medicare

Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA").[14]   The MMA

codified the FDA's long-standing practice of issuing tentative approval for generic drugs

ensnared in litigation.   And it enumerated conditions under which a first-to-file ANDA applicant

may forfeit its 180 days of exclusivity.   Congress added these provisions in an effort to "ensure

that the 180-day exclusivity period enjoyed by the first generic to challenge a patent cannot be

used as a bottleneck to prevent additional generic competition."[15]

81.      A first-to-file generic applicant forfeits its 180-day exclusivity if: (i) it fails timely

to market the drug; (ii) it withdraws the ANDA, or the FDA constructively withdraws it on the

manufacturer's behalf because "the application does not meet the requirements for approval";

---

[14] Pub. L. No. 108-173, Stat. 2066 (Dec. 8, 2003).

[15] 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer).

(iii) it amends or withdraws its Paragraph IV certification; (iv) it fails to obtain tentative approval "within 30 months after the date on which the application is filed";[16] (v) it enters into an anticompetitive agreement with another applicant; or (vi) all valid patents over the brand version of the drug expire.[17]

82.     As a result of the MMA, to preserve its 180-day exclusivity period, a generic applicant generally must obtain at least tentative approval within 30 months of the date the ANDA was filed.  The FDA may grant exceptions to this deadline in special circumstances.

83.     The brand company may file patent infringement claims more than 45 days after receiving the Paragraph IV certification, but doing so does not trigger the automatic 30-month stay of approval.

### 5.     The Patent Information Submission

84.      Because, under most circumstances, the FDA cannot authorize marketing a generic drug that would infringe a patent, the timing of an ANDA's approval depends on the scope and duration of the patents covering the brand-name drug.[18]

85.     The FDA does not have the resources or authority to independently ascertain a drug's relevant patents and verify their validity and preclusive scope.  The FDA instead relies completely on branded drug manufacturers to submit such information.

86.     Under the Hatch-Waxman Amendments, brand manufacturers can only submit to the FDA the patent number and expiration date on a patent when the patent (i) "claims the drug for which the application was submitted or which claims a method of using such drug" and (ii)

---

[16] A narrow exception to this condition exists where "the failure [to obtain tentative approval within 30 months] is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed."  21 U.S.C. § 355(j)(5)(D)(i)(IV).

[17] 21 U.S.C. § 355(j)(5)(D)(i)(I)-(VI).

[18] See 21 U.S.C. § 355(j)(2)(A)(vii)-(viii).

"with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."[19] Whether the brand's patent submission is proper or not, the FDA is obliged to publish the information in the Orange Book.[20]

87.     The brand drug's patent information in the Orange Book is meant to serve as a frame of reference for ANDA applicants, who must assure the FDA that their generic drug will not infringe any patent.  An ANDA applicant provides this assurance by providing one of the four certifications mentioned above.  But, the Paragraph IV certification is the only certification among the four that would enable the generic to come to market before a listed patent's expiration date.

88.     When a generic certifies under Paragraph IV, the patent statute treats such a filing as itself an act of infringement, which gives the brand an immediate right to sue, citing 35 U.S.C. § 271(e)(2)(A).  If the brand files suit within 45 days after receiving notice of the ANDA applicant's Paragraph IV certification, the suit triggers an automatic stay of FDA approval of the ANDA for 30 months – a rough practical equivalent of an automatic preliminary injunction.[21] Furthermore, the Hatch-Waxman Amendments provide the first ANDA filer containing a Paragraph IV certification with a coveted 180-day exclusivity; that is, the FDA will not approve an ANDA with a later-filed Paragraph IV certification to the same patent as an earlier-filed ANDA for at least 180 days after the first commercial marketing of the drug under the first ANDA, provided there is not a forfeiture of exclusivity as defined under the statute.

---

[19] 21 U.S.C. § 355(b)(1)(G).

[20] If a patent is obtained after an NDA is approved, the NDA applicant can submit the patent information to the FDA within 30 days of the date of issuance of the patent.  *See* 21 U.S.C. § 355(c)(2); 21 C.F.R. § 314.53(d)(3).

[21] 21 U.S.C. § 355(j)(5)(B)(iii).

89.     When a brand manufacturer's 30-month stay or a first ANDA filer's 180-day exclusivity have yet to lapse (and have not been forfeited), a subsequent ANDA filer otherwise entitled to final marketing approval from the FDA cannot enter the market and thus may only be afforded "tentative approval."

90.     The statute is clear, however, that a generic's 180-day exclusivity and a brand's 30-month stay apply only vis-à-vis ANDAs containing Paragraph IV certifications.  If an ANDA applicant is seeking immediate approval without having to certify under Paragraph IV, there is no 30-month stay and the FDA can approve the ANDA without regard to whether any other ANDA applicant is otherwise entitled to a 180-day exclusivity period.

91.     There can thus be significant regulatory and competitive consequences that flow from a brand's listing of a patent in the Orange Book that would require an ANDA applicant to maintain a Paragraph IV certification as a condition to obtaining final marketing approval.

## C.     The Competitive Effects of AB-Rated Generic Competition

92.     Generic versions of brand-name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective as their brand-name counterparts.  The only material difference between generic drugs and their corresponding brand-name versions is their price.

93.     Because generic versions of a corresponding brand drug product are commodities that cannot be differentiated, the primary basis for generic competition is price.  Typically, generics are at least 25% less expensive than their brand-name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given product.  Consequently, the launch of a generic drug usually results in significant cost savings to all drug purchasers.

94.     Since the passage of Hatch-Waxman, every state has adopted substitution laws that either require or permit pharmacies to substitute AB-rated generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise).  Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing.  Once a generic equivalent hits the market, the generic quickly captures sales of the corresponding brand drug, often capturing 80% or more of the market within the first six months.  This results in a loss of revenue for the brand drug company, but dramatic savings for the American public.

95.     In a recent study, the Federal Trade Commission ("FTC") found that on average, within a year of generic entry, generics had captured 90% of corresponding brand drug sales and (with multiple generics on the market) prices had dropped 85%.  As a result, competition from generic drugs is viewed by brand-name drug companies, such as Novartis, as a grave threat to their bottom lines.

96.     Generic competition enables purchasers to: (i) purchase generic versions of the drug at substantially lower prices; and/or (ii) purchase the brand drug at a reduced price.

97.     Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to profitably charge supracompetitive prices.  Brand manufacturers, such as Novartis, are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus seek to extend their monopolies for as long as possible, sometimes resorting to any means possible – including illegal means.

### 1.      The First AB-rated Generic is Priced Below the Brand

98.      Experience and economic research show that the first generic manufacturer to launch prices its product below the prices of its branded counterpart.  Every state either requires or permits a prescription written for the brand drug to be filled with an AB-rated generic.  Thus, the first generic manufacturer almost always captures a large share of sales from the branded form of the molecule.  At the same time, there is a reduction in average price paid for a prescription for the molecule.

### 2.      Later Generics Drive Prices Down Further

99.      When multiple generic competitors enter the market, competition accelerates and prices drop to their lowest levels.  Multiple generic sellers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.

100.     According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two.  In that situation, there are two commodities that compete on price.  Some typical estimates are that a single generic launch results in a near-term retail price reduction of at least 10%, but that with two generic entrants near-term retail price reduction is about 50%.

101.     Soon after generic competition begins, the vast majority of the sales formerly enjoyed by the brand shift to generic sellers.  In the end, total payments to the brand manufacturer of the drug decline to a small fraction of the prices paid prior to generic entry.  According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies.  Even more billions are saved when hospitals use generics.

**D.     Abuse of the Hatch-Waxman Scheme is Both Illegal and Widespread**

    **1.     Defrauding the PTO, Wrongfully Listing Patents in the Orange Book, and/or Filing Sham Lawsuits Benefit the Brand at Purchasers' Expense**

102.     Brand manufacturers have enormous incentives to use patents to unlawfully forestall generic entry.  Several anticompetitive practices are all too often used.

103.     For example, a brand-name manufacturer lists a patent in the Orange Book not eligible for listing (*e.g.*, because it does not actually cover the drug, because it was obtained by fraud, etc.).  The brand company then files a sham lawsuit, accusing a generic company of infringing the patent that should not have been listed in the first place.

104.     According to the FTC, brand-name manufacturers began exploiting this feature of the Hatch-Waxman Amendments starting in the late 1990s.[22]  In its 2002 report, the FTC found that brand manufacturers inappropriately submitted patents for listing in the Orange Book when, for example, there was no reasonable basis to believe the patent could be asserted in patent litigation and withstand a challenge to its validity, enforceability, or preclusive scope.[23]  Indeed, the report found that generic manufacturers prevail in Paragraph IV litigation in nearly three-quarters of all such cases involving a decision by the court, by obtaining a judgment of invalidity or non-infringement.

105.     But brand manufacturers know that they need not win the patent lawsuit to obtain the desired anticompetitive result – they just need to file it.  By suing the generic for infringement, the brand immediately accomplishes two things:  first, it triggers the 30-month stay ensuring that the FDA cannot approve a generic for two-and-a-half years.  Second, it creates the

---

[22] *See generally* FTC, Generic Drug Entry Prior to patent Expiration: An FTC Study (July 2002) (Generic Drug Entry) (discussing manufacturers' anticompetitive behavior); *Caraco*, 132 S. Ct. at 1678 (explaining the FTC study).

[23] 21 U.S.C. § 355(b)(1)(G).

possibility of "settling" the sham lawsuit; a settlement may or may not run afoul of the antitrust

laws (discussed below), but no settlement would exist without the sham lawsuit.

106.    As another example of how the Hatch-Waxman scheme can be manipulated,

brand-name and first-filer generic manufacturers sometimes agree to "settle" the Paragraph IV

litigation with an exclusion payment:  the brand manufacturer pays the first-filer generic

manufacturer to stay off the market, thus (i) withdrawing that competitive threat from the market,

and (ii) at times, "bottlenecking" approval for other would-be generic competitors.  The unlawful

preservation of the enormous monopoly profits enjoyed by brand-name manufacturers provides

ample revenue to permit the brand-name manufacturers to share some of their profits with the

conspiring generic competitors, rather than having the total revenues available for both parties

lessened by the falling prices that generic competition would engender.

**2.    A Generic Can Overcome Patent Infringement Allegations through Litigation, Settlement, or At-Risk Launch**

107.    When sued for infringement, a generic drug company can litigate, settle, or launch

"at risk."

108.    *Litigate*.  The FTC reports that generics prevailed in 73% of Hatch- Waxman

patent litigation resolved on the merits between 1992 and 2002.  Another study reports that the

generic wins 74% of the time.  And winning triggers the first filer's launch.[24]

109.    *Settle*.  A generic company can settle on pro-competitive terms that genuinely

speed generic entry.   The FDA times its key decisions and prioritizes ANDA approvals

according to when a generic is scheduled to enter the market.

---

[24] *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa)(AA)-(BB).

110.     *At-risk launch*.  If the generic choses to litigate, it need not wait until the case is resolved to go to market.  After 30 months, the FDA may approve the first filer's ANDA and the first filer can launch "at risk" – meaning, with the risk that it may later lose and have to pay damages for infringing sales.  At-risk launches are common – particularly by large and sophisticated generic companies.

## V.      FACTS

### A.      The 1950s – 1970s Facts

#### 1.      Scientists Discovered the Philadelphia Chromosome

111.     Chronic myeloid leukemia (CML) is a cancer of the blood and bone marrow in which the body produces cancerous white blood cells.  In 1959, the disease was universally fatal.  Most patients died within six years of their diagnosis.

112.     In 1959, a scientist at the University of Pennsylvania looked at a cell of a person with CML under a camera-equipped microscope – a hot commodity in the late 1950s – and noticed that one chromosome, chromosome 22, was shorter than it should be.  Stubby, even.  A piece was simply missing.

113.     Blood samples from six other CML patients had the same chromosomal abnormality.  What now is taken for granted was, back then, a radical observation:  a form of cancer was correlated with an abnormal chromosome.

114.     A year later, in 1960, the scientist and a colleague published three short paragraphs – 300 words – describing their discovery of what later came to be called "the Philadelphia chromosome."

#### 2.      Swiss Drug Companies Ciba and Geigy Merged

115.     In 1970, two Swiss drug companies merged to create Ciba-Geigy Ltd., a predecessor to Novartis.

### 3.    Scientists Linked Genetic Mutations, Kinases, and Cancer

116.    In 1972, a scientist at the University of Chicago noticed that the missing piece of chromosome 22 had attached itself to chromosome 9.  The DNA wasn't missing; it had moved. The movement was later referred to as "translocation."

117.    In 1978, a post-doctoral researcher at the University of Dundee in Scotland, Nick Lydon, learned from some scientists who worked down the hall that a cancer-causing gene (not the Philadelphia chromosome) encoded a form of protein called a kinase.  Kinases work by picking up one phosphate from an adenosine triphosphate ("ATP") molecule (found floating inside living cells).  The addition of that phosphate turns on the protein, and it starts doing whatever it is supposed to do.  Once it is done with its work, a different protein takes away the extra phosphate, and the kinase goes dormant.

### B.    The 1980s Facts

### 1.    Scientists Discovered that the Philadelphia Chromosome Encodes the Bcr-Abl Kinase

118.    In 1984, researchers at the University of California Los Angeles discovered that cells from a CML patient contained a tyrosine kinase, a type of protein that serves as an on/off switch for cellular processes, stuck in the "on position."  Meaning, the tyrosine kinase began plucking up phosphates from ATP molecules, kept growing, and never turned off.

119.    Also in 1984, scientists in Holland found that the Philadelphia chromosome translocation creates a fused gene that encodes a particular tyrosine kinase, called Bcr-Abl.

120.    So by 1984, it was known that the Philadelphia chromosome brought Bcr and Abl together, this fusion gene created a fusion protein, the fusion protein got stuck in a loop, and the continuous loop continuously triggered the excessive production of white blood cells.  There was

no proof that the always-on kinase caused CML, but a number of cancer researchers were thinking it might.

### 2.  Ciba-Geigy Starts Studying Kinases

121.    In the summer of 1984, Nick Lydon, then at Schering, read about the new research relating to tyrosine kinases.  Right around the same time, a former colleague of Lydon's – now at Ciba-Geigy – called to offer Lydon a chance to work with him on a new kinase inhibitor program.

122.    Though Ciba-Geigy had shut down its cancer research programs in the early 1980s (executives had concluded that the returns did not justify the required investment), the company agreed to fund a new kinase inhibition program and a specific laboratory to study tyrosine kinases.  The proposal approved by Ciba-Geigy was likely the first effort to design a drug to treat a specific target (a process sometimes known as "rational drug design," as it begins with the hypothesis that modulation or modification of a specific biological target may have therapeutic value).

123.    At the time, cancers were mostly treated with chemotherapy drugs that "carpet bombed the body in the hopes of hitting cancer cells."  In contrast, the Ciba-Geigy scientists, helmed by Lydon, set out to design a compound to shut down the specific over-firing kinase. The goal was to create a medication that would grab on to the misfunctioning kinase – in effect, covering it – and prevent it from picking up phosphates from ATP molecules (thereby preventing it from sparking the overproduction of white blood cells).  The key was to design a drug that perfectly interlocked with all the nooks and crannies of the kinase.

124.    By late 1985, the project included a group of chemists and a group of biologists (overseen by Lydon) working together to study anti-kinase activity.

**C.      The 1990 Facts**

125.      Chemist Jurg Zimmermann began working on making kinase inhibitors at Ciba-Geigy in 1990.  When the chemists managed to create a compound that was both selective (targeting one form of kinase only) and sufficiently potent, they gave the candidate to the Ciba-Geigy biologists (including Elisabeth Buchdunger) for testing, to see if it could cause the death of cancer cells.  To be considered a drug candidate, a compound had to be selective, potent, and active.

126.      Also in 1990, a scientist in a lab in Baltimore conducted experiments in mice that proved the Philadelphia chromosome was the sole cause of CML.  This discovery made CML a perfect test case for rational drug design:  if a patient took a Bcr-Abl kinase inhibitor and his cancer stopped progressing, the scientists would know that the drug was responsible for the improvement because there were no other confounding variables.

127.      Brian Druker, an oncologist working at the Dana Farber Cancer Clinic in Boston had been following the Ciba-Geigy team's work on CML and the signaling pathway triggered by the Bcr-Abl kinase through his friendship with Nick Lydon.  Druker and Lydon shared a keen interest in the Bcr-Abl kinase and its role in CML.

128.      But in 1990, Dana Farber entered into an agreement with then Ciba-Geigy rival Sandoz that forbid Druker from reaching out to or otherwise collaborating with Lydon.

**D.      The 1992 Facts**

**1.      Ciba-Geigy Developed CGP 57148, a Bcr-Abl Kinase Inhibitor**

129.      In or around 1992, Zimmermann and the other Ciba-Geigy cancer scientists developed a compound that seemed to inhibit the activity of the Bcr-Abl kinase.

130.      When biologist Buchdunger observed the activity of the compound, she saw that it had strong activity against Abl.

32

131.    The Ciba-Geigy chemists started with an already existing chemical called 2-phenylaminopyrimidine, a compound with anti-inflammatory effects.  When tested against protein kinase C ("PKC") (one of the three kinases the company was originally targeting), the biologists observed that the protein was blocked but the effect was weak; it would have required massive doses that were impractical.  So the chemists added a 3'-pyridyl molecule, and the biologists observed that it blocked the kinase more effectively.  Next, the chemists added a benzamide group, and the biologists saw that the molecule was even more active against multiple kinases – including Abl, part of the kinase involved in CML.  Finally, the chemists added a flag methyl, a portion of a methyl group, in the middle of the compound's "backbone." They named the resulting compound "imatinib," and referred to it by its code name:  "CGP 57148."

132.    The Ciba-Geigy team synthesized a number of different salt forms of the CGP 57148 compound, including the methane sulfonate acid addition salt.  They referred to this as "CGP 57148B" and eventually gave it the generic name "imatinib mesylate."  The final molecular formula for the mesylate salt form was 4-[(4-methyl-1-piperazinyl) methyl]-N-[4-methyl-3-[[4-(3-pyridinyl)-2-pyrimidinyl] amino]-phenyl] benzamide methanesulfonate.

133.    In or around this time, the Ciba-Geigy team also determined a polymorphic form to be used for imatinib mesylate.

## 2.    Ciba-Geigy Developed the Mesylate Salt Form, Called CGP 57148B

134.    As described above, pharmaceutical companies employ salt forms of chemical substances to modify important characteristics such as aqueous solubility, dissolution rate, solution pH, crystal form, hygroscopicity, chemical stability, melting point, and even mechanical properties.  The benefits of using salt forms as active pharmaceutical ingredients are well known to increase the solubility of otherwise intractable substances, and hopefully to increase bioavailability.

135.     According to Ciba-Geigy, under some conditions the methanesulfonic acid addition salt of imatinib forms as needle-shaped crystals.  As described above, a needle-shaped form is not optimal for drug development as the needles often make it quite difficult to perform various formulation and manufacturing steps due to difficulties of slow filtration and flow.  (It is not known what the Ciba-Geigy chemists called the needle-shaped form of methanesulfonic acid addition salt of imatinib at that time; in a much later patent application they would refer to it as the "α-crystal" form.)

136.     Addressing an undesired polymorphism is a not uncommon step in pharmaceutical development, and in the 1990s known techniques were available to obtain a different, more desirable crystal shape.  The handling problems of "needle" forms of crystalline materials would have made searching for and choosing a non-needle form of a crystal obvious to any person skilled in the art in the early 1990s.  And there was nothing about the structure or composition of methanesulfonic acid addition salt of imatinib that would have dissuaded a person skilled in the art from seeking to use known techniques to obtain a more desired crystal form.

137.     The Ciba-Geigy chemists developed a non-needle shaped crystal form methanesulfonic acid addition salt of imatinib.  Apparently they used at least one of two known techniques.  In one, a crystal or amorphous form of the methanesulfonic acid addition salt of imatinib is digested with a suitable polar solvent (usually methanol) in a suspension.  In the other, a crystal or amorphous form of the methanesulfonic acid addition salt of imatinib is dissolved in a polar solvent (usually methanol) at a suitable heated temperature up to the reflux temperature of the reaction mixture, and then crystallization is initiated by adding a small amount of the non-needle form as seed crystal to the supersaturated solution.

138.    The development of the non-needle form of the methanesulfonic acid addition salt of imatinib mesylate involved routine steps, employed with a known goal, and arrived at an expected result of achieving a non-needle shaped form.  There was no unusual skill or undue degree of experimentation required to discover the non-needle form of the methanesulfonic acid addition salt of the compound.  The resultant characteristics of a non-needle shape (better flow, less hygroscopic, and potentially increased stability) were the desired and expected features of such a polymorphic form.

139.    After development of the non-needle form methanesulfonic acid addition salt of imatinib, it appears that Ciba-Geigy terminology simply used "CGP 57148" or "CGP 57148B" or "imatinib mesylate" or "methanesulfonic acid addition salt of imatinib" to refer to methanesulfonic acid addition salt of imatinib in the non-needle crystal form; those terms were not used for the imatinib mesylate in any other polymorphic forms.  (In a much later patent application, Novartis would refer to the non-needle shape as the "β-crystal" form of imatinib mesylate.)  (This complaint uses the Ciba-Geigy terminology, *i.e.*, the imatinib mesylate salt is always presumed to be in the non-needle shape unless otherwise indicated.)

140.    The compound imatinib mesylate, the mesylate salt form of imatinib (later given the tradename Gleevec), is a heterocyclic tyrosine kinase inhibitor containing basic nitrogen functional groups.

141.    In or around early 1992, Ciba-Geigy scientists concluded that the results of tests showed that the CGP 57148 compound was potent, selective, and cellularly active against Abl.

**3.    Ciba-Geigy Applied for a Swiss Patent**

142.    On April 3, 1992, Ciba-Geigy filed Swiss patent application 1083/92 for imatinib (CGP 57148) and its salts.

143.    Subsequently, on October 1, 1993, Ciba-Geigy filed a second Swiss patent application, number 2966/93, which was also for imatinib and its salts, including the mesylate salt.  In describing salt forming groups of the compound, the application refers to methane-sulfonic acid.

144.    The Swiss patent application came into the public domain on October 6, 1993 with publication of European equivalent patent EP-A-O 564409.

E.    **The 1993 – 1994 Facts**

1.    **Druker Tests CGP 57148B in CML Cells**

145.    In 1993, shortly after deciding to leave Dana Farber, Druker called Lydon and asked whether the Ciba-Geigy group had any Bcr-Abl kinase inhibitors.  Lydon told Druker that they had a candidate with strong activity against Abl.  The candidate had been screened only against Abl, the naturally occurring enzyme, and not against the fused Bcr-Abl protein that existed inside CML cells.  Lydon asked Druker if Druker wanted to test the candidate in CML cells.

146.    In or around August 1993, Druker's new laboratory at Oregon Health Sciences University received samples of CGP 57148B (*i.e.*, imatinib mesylate) and three other compounds from Ciba-Geigy, and began testing those compounds.

147.    In February 1994, Druker reported to the Ciba-Geigy team that his test results showed that CGP 57148B inhibited 90% of CML cells in vitro.  Druker also informed Lydon, Zimmerman, Buchdunger, and others that the compound was killing only the cells with the Bcr-Abl kinase and not affecting the normal blood cells.

2. **Ciba-Geigy Applied for a U.S. Patent that Claimed Imatinib, Including the Mesylate Salt Form**

148. On April 28, 1994, Ciba-Geigy filed the first U.S. patent application for imatinib, numbered 08/234,889 ("the '889 application"), entitled Pyrimidine Derivatives and Processes for the Preparation Thereof, claiming priority to Swiss application 1083/92, and listing Zimmermann as the inventor.

149. The '889 application disclosed a number of N-phenyl-2-pyrimidine-amine derivatives, including imatinib in free base form, as well as pharmaceutically acceptable salts thereof, and their use as tumor-inhibiting agents.

150. The '889 application disclosed that "Compounds having at least one basic group [such as imatinib] . . . may form acid addition salts," and then, by way of example, named a number of acids that may be used to create suitable pharmaceutical salts.

151. The '889 application expressly stated that the compounds disclosed therein included their respective salts.  In the specification, the application stated that "[o]wing to the close relationship between the novel compounds in free form and in the form of their salts, including those salts that can be used as intermediates, for example in the purification of the novel compounds or for the identification thereof, hereinbefore and hereinafter *any reference to the free compounds should be understood as including the corresponding salts*, where appropriate and expedient."

152. The patent specification specifically referred to salts formed with methane sulfonic acid:

> Salt-forming groups in a compound of formula I are groups or radicals having basic or acidic properties. *Compounds having at least one basic group . . .  may form acid addition salts*, for example with . . . *aliphatic sulfonic acids, such as methane-*, ethane- or 2-hydroxyethane-*sulfonic acid . . .*   When several basic

groups are present mono- or poly-acid addition salts may be formed.

153.    Each of the 23 claims in the '889 application included – in addition to the free base form of the compound – the limitation "or a salt" or "or a pharmaceutically acceptable salt of such a compound having at least one salt-forming group."

154.    Claim 21 of the '889 application specifically claimed imatinib and its salts, stating "a pharmaceutical composition for the treatment of tumours in warm-blooded animals including humans, comprising, in a dose effective against tumours, a compound of [imatinib] or a pharmaceutically acceptable salt of such a compound having at least one salt-forming group, together with a pharmaceutical carrier."

## F.    The 1995 Facts

### 1.    Ciba-Geigy Submitted Articles Disclosing their Discoveries

155.    In or around 1994 or 1995, Druker and the Ciba-Geigy scientists submitted papers based on Druker's 1993-94 testing of imatinib mesylate to the journals *Science* and *Nature*.  Both were rejected.

156.    On July 31, 1995, Buchdunger, Zimmermann, Lydon, and Druker submitted an article to *Cancer Research* entitled, "Inhibition of the Ab1 Protein-Tyrosine Kinase in vitro and in vivo by a 2-Phenylaminopyrimidine Derivative."  (The article was ultimately published in 1996, and is discussed below.)

### 2.    Druker Presented His Findings to the American Society of Hematology

157.    On December 4, 1995, Druker gave a talk on CGP 57148 at the American Society of Hematology's 37th annual meeting in Seattle, Washington, entitled "Preclinical evaluation of a selective inhibitor of the Abl tyrosine kinase as a therapeutical agent for chronic myelogenous

leukemia."  Scientists from the Oncology Research Department of Ciba-Geigy Limited, Basel, Switzerland, were listed as co-authors of the study under discussion.

158.    The presentation abstract particularly disclosed CGP 57148 as a "potent and specific inhibitor of the ABL protein tyrosein kinase" demonstrating "specific killing of the BCR-ABL expressing cells by CGP 57148" in vitro and in vivo, and concluded that the compound "may be useful in the treatment of CML and other BCR-ABL positive leukemias."

## G.    The 1996 Facts

### 1.    Ciba-Geigy Discloses the Methane-Sulfonate Salt Form in *Cancer Research*

159.    On January 1, 1996, *Cancer Research* published the article by Ciba-Geigy scientists Buchdunger, Zimmermann, Lydon, Druker, and others titled, "Inhibition of the Ab1 Protein-Tyrosine Kinase in vitro and in vivo by a 2-Phenylaminopyrimidine Derivative."

160.    The article mentioned that Ciba-Geigy scientists had made a series of compounds that inhibited tyrosine kinases, and went on to describe a single compound, CGP 57148 (*i.e.*, imatinib) that showed potent inhibition of the Abl kinase associated with CML.  CGP 57148 was one of the group of compounds covered by the pending '899 patent application.

161.    Buchdunger went on to explain that Ciba-Geigy scientists had also synthesized a methane sulfonate salt form of CGP 57148, referred to as CGP 57148B:  "CGP 57148 and its methane sulfonate salt (CGP 57148B) were synthesized by CIBA Pharmaceuticals Divisions, as will be described elsewhere," citing "J. Zimmerman, manuscript in preparation."

162.    Importantly for these purposes, Buchdunger and her colleagues disclosed publicly that they had made a mesylate salt form of CGP 57148 sometime well before July 31, 1995 (the date the article was originally submitted).

163.    Not only had they made the mesylate salt, the scientists used the mesylate salt form in all of the *in vivo* experiments described in the article: "All *in vivo* experiments were

performed using CGP 57148B."  Druker first began his *in vivo* experiments in and around

August of 1993 and reported the preliminary results internally to Ciba-Geigy in February 1994,

before Ciba-Geigy filed the '889 application (in April 1994).

164.    The January 1996 *Cancer Research* article described preparation of the imatinib

mesylate compound, storage of the compound, purification of the compound, and in vitro and in

vivo testing of the compound.  It reported that "CGP 57148 selectively inhibited the *in vitro*

activities" of the kinase involved in CML, and that *in vivo* antitumor efficacy was obtained.  It

specifically suggested that the compound might be used in treatment of Philadelphia

chromosome-positive leukemias.

### 2.    Ciba-Geigy Discloses Crystalline Derivates and Typical Synthesis Processes in *Bioorganic & Medicinal Chemistry Letters*

165.    Also in 1996, the British journal *Bioorganic & Medicinal Chemistry Letters*

published an article by Zimmermann, Buchdunger, Lydon, and others from Ciba-Geigy, entitled

"Phenylamino-Pyrimidine (PAP) – Derivatives:  A New Class of Potent and Highly Selective

PDGF-Receptor Autophosphorylation Inhibitors."  In that article, Zimmermann noted that the

phenylamino-pyrimidine compounds "show poor solubility in water . . . but are soluble under

acidic conditions (4: HCl 0.1N = 3.3 g/l)," and noted, "The crystalline derivatives are slightly

basic and are rather lipophilic."

166.    In a footnote, the authors described a "typical synthesis" of the phenylamino-

pyrimidine compounds, concluding "Filtration, evaporation and crystallization (methlenchloride)

gave N-(3-amino-phenyl)-4-(3-pyridyl)-2-pyrimidinamine (9.3 g, 60.9%).  A solution of this

amine (9.3 g, 35.3 mMol) and benzoylchloride (7.57 g, 53.9 mmol) in pyridine (300 ml) was

stirred at rt for 23 h.  Evaporation and crystallization (dimethylformamide, water) gave 2.37 g

(18.3 %) of l as a yellowish solid."

167.    In 1996, the existence of crystalline derivatives and "evaporation and crystallization" as part of the "typical synthesis" process were so routine as to be relegated to a footnote.

### 3.    Ciba-Geigy and Sandoz Merged to Create Novartis

168.    In March of 1996, Ciba-Geigy and Sandoz merged to form Novartis, then one of the largest corporate mergers in history.

169.    As a result of the merger, the naming conventions for investigative drugs changed.  CGP 57148B (*i.e.*, imatinib mesylate) was re-named STI-571, but the compound itself was unchanged.

170.    Upon information and belief, from early preclinical testing through the subsequent clinical testing in human subjects, STI-571 has maintained the same chemical formula, structure, and polymorphic form.  All clinical trials of STI-571 used the non-needle β-crystal salt formulation of imatinib methylsulfate.

171.    The Ciba-Geigy scientists used known methods to create the β-crystal form of imatinib methylsulfate.

### 4.    Ciba-Geigy Published More About its Discovery in *Nature Medicine*

172.    On May 1, 1996, *Nature Medicine* published an article by Druker, Buchdunger, Zimmermann, Lydon, and others entitled "Effects of a Selective Inhibitor of the Abl Tyrosine Kinase on the Growth of Bcr-Ab1 Positive Cells," detailing the design of CGP 57148 and its effect of selectively inhibiting proliferation of Bcr-Abl expressing cells in vitro and in vivo.  It described the preclinical studies of the compound and demonstrated that CGP 57148 selectively inhibits the proliferation of the BCR-ABL expressing cells both in vitro and in vivo.

### 5. The Compound Patent Issued, Protecting Gleevec until July 4, 2015

173. On May 28, 1996, the '889 application issued as U.S. patent No. 5,521,184 ("the '184 patent," the "Zimmermann patent," or the "compound patent") and was assigned to Ciba-Geigy.

174. Jurg Zimmermann was the sole inventor listed.

175. Novartis listed the '184 patent in the Orange Book.

176. Novartis Corporation is the current assignee of the '184 patent.

177. With extensions (discussed later), the Zimmermann patent protected imatinib mesylate (later brand-named Gleevec) from competition for nineteen years and one month, from May 28, 1996 through July 4, 2015.

### H. The 1997 - 1998 Facts

#### 1. Novartis Published Another Article, in *Bioorganic & Medicinal Chemistry Letters*

178. In early 1997, *Bioorganic & Medicinal Chemistry Letters* published a second paper by Zimmermann, Buchdunger, and others from Ciba-Geigy's Oncology Research Department entitled "Potent and Selective Inhibitors of the Abl-Kinase: Phenylamino-Pyrimidine (PAP) Derivatives."

179. The article had been submitted for publication on August 21, 1996. It described development and optimization of the new class of phenylamino-pyrimidine (PAP) derivatives that yielded highly potent and selective Bcr-Abl kinase inhibitors.

180. Notably, the article specifically advised that, in one particular series of the PAP derivatives, "improvement of the aqueous solubility can be accomplished by attachment of a salt forming group on the indole side chain." The article suggested that the compound might be a development candidate for use in treatment of Philadelphia chromosome-positive leukemias.

2.      **Novartis Filed a New Swiss Patent Application for the Mesylate Salt and Beta-Crystal Form**

181.    Apparently sometime after the 1996 formation of Novartis, discussions within that organization looked into the existing patent protection for its current portfolio, or at least did so for imatinib mesylate.  At the time, Novartis had patent protection for the imatinib compound generally, including pharmaceutically acceptable salts, and among those the mesylate.  It knew that the scientists who invented imatinib had not only written articles about it, but that those articles had also publicly disclosed the specific salt form, imatinib mesylate.  And they knew that the polymorphic form of that salt, the non-needle form, was either inherent in imatinib mesylate or had been achieved using common formulation techniques resulting in characteristics expected of a non-needle form of the salt.

182.    Despite all of this, Novartis proceeded to seek a follow-on, secondary patent for imatinib mesylate.  Although it already had a patent that covered imatinib and its salts, Novartis sought a further patent, this time for the mesylate salt of imatinib in a non-needle crystal form.  In seeking the follow-on polymorph patent, Novartis was attempting to extend its patent protection on the imatinib mesylate molecule beyond the life of the compound patent.  If successful, Novartis might be able to delay entry of generic competition, maintaining its monopoly on imatinib mesylate longer that it would otherwise be entitled, and causing U.S. drug purchasers to pay the significantly higher price for a longer period of time.

183.    On July 18, 1997, more than a year after the Zimmermann patent issued, more than a year after Druker's presentation at the American Society of Hematology annual meeting, more than a year after the Buchdunger and Druker articles disclosing the scientists use of the β-crystal form of the mesylate salt were published, and significantly after the 1997 Zimmermann paper appeared, Novartis filed Swiss patent application 1764/97.

184.     The following year, Novartis filed PCT application PCT/EP98/04427.  Both of these patent applications claimed a "beta" crystalline form of imatinib mesylate as a "new" invention, even though the mesylate salt had been in the public realm for well over two years and even though employing a non-needle crystalline form was an obvious choice that had been in use from at least the time of Druker's clinical testing in 1993.

185.     These two applications for a follow-on, or secondary, patent were filed for the sole purpose of extending the life of the original imatinib mesylate patent in order to keep generic competitors from entering the market, and they succeeded in doing so.

### 3.     Novartis Publishes Two More Articles, in *Blood*

186.     In November and December 1997, two additional articles discussing CGP-57148B were published in the journal *Blood*, the journal of the American Society of Hematology.

187.     The first of these 1997 articles appeared in the November 1, 1997, issue.  In that article, entitled "The Tyrosine Kinase Inhibitor CGP57148B Selectively Inhibits the Growth of BCR-ABL-Positive Cells," Michael Deininger and three other scientists, including Dr. Lydon from Novartis, again publicly disclosed that CGP 57148B, the mesylate salt of imatinib, was the compound under consideration and testing for its likely "significant therapeutic applications."

188.     The second of the 1997 articles appeared in the December 15, 1997, issue of *Blood*.  That article, entitled "CGP 57148, a Tyrosine Kinase Inhibitor, Inhibits the Growth of Cells Expressing BCR-ABL, TEL-ABL, and TEL-PDGFR Fusion Proteins," was authored by Martin Carroll and others including Buchdunger, Zimmermann, Lydon, and Druker.  This article, while purporting to describe the effects of "CGP 57148," in fact discussed preparation of "[a] stock solution of CGP 57148B" and the effects of that solution on the various cancer-related kinases.

44

189.    On information and belief, from August 1993 forward, the beta crystal mesylate salt form of imatinib, CGP 57148B, was uniformly used in laboratory and clinical testing of imatinib, whether labeled and referenced as "CGP 57148" or "CGP 57148B" or "STI-571."

### 4.    Novartis Began Clinical Trials of Imatinib Mesylate

190.    In June 1998, Novartis began Phase I clinical trials of CGP 57148B (*i.e.*, imatinib mesylate in the beta form, now renamed STI-571) at three sites in the United States.

## I.    The 2000 Facts

### 1.    Novartis Applied for a U.S. Patent Covering the Mesylate Salt and β-Crystal Form

191.    On January 18, 2000, Novartis filed U.S. patent application number 09/463,097 ("the '097 application") seeking a follow-on polymorph patent ostensibly to claim the specific mesylate salt of imatinib in the non-needle crystal form.  Like its Swiss and PCT counterparts, purported to disclose a "Crystal modification of a N-Phenyl-2-Pyrimidineamine Derivative and Processes for its manufacture and use" as a new invention.  The '097 application claimed priority to both the Swiss patent application and the PCT application.

192.    Like its Swiss and PCT counterparts, the '097 application purported to disclose, and claimed, the methanesulfonate salt of imatinib, along with a particular polymorphism (the "β-crystalline" form).  Its abstract read, "The invention relates to a new crystalline form of the methanesulfonic acid addition salt of 4-(4-methylpiperazin-1-ylmethyl)-N-[4-methyl-3-(4-pyridin-3-yl)pyrimidin-2-ylamino)phenyl]bensamide of formula 1, which may be used for example for tumor therapy."

193.    The '097 application also described the invention as relating to "an acid addition salt of a compound of formula I comprising non-needle-shaped crystals, especially the β-crystal form of the methanesulfonic acid addition salt of the compound of formula I."

### a.   The Specification Contained Misleading Statements

194.   In a section entitled "Background to the Invention, Novartis acknowledged that the imatinib compound had been disclosed in the Zimmermann, but represented that the earlier Zimmermann patent had not "exemplified" any of the salts of imatinib, stating:

> The preparation of [imatinib] and the use thereof . . . are described in Example 21 [the prior compound patent and other] applications in numerous other countries. This compound is exemplified in these publications only in free form (not as a salt).

195.   This representation was misleading, if not false.  While the *examples* in the Zimmermann patent did not use the salt form of imatinib, the patent repeatedly disclosed as part of the invention pharmaceutically acceptable salts of imatinib, and the Zimmermann patent listed amongst the acceptable salts the methanesulfonic acid addition salt.  And in any event, Zimmermann and the other Ciba-Geigy scientists had already long before publicly disclosed the specific salt form to be used — imatinib mesylate.

196.   Also in the background section of the application, Novartis represented that it had recently "surprisingly" found that imatinib mesylate could be made in a different form, stating:

> It has now been surprisingly found that a crystal form may under certain conditions be found in the methanesulfonate salt of this compound, which is described hereinafter as β-crystal form, and which has very advantageous properties.

197.   This representation was misleading, if not false.  The mesylate salt form of imatinib had been formulated in 1992, had been identified at least as early as August 1993 (when it was provided to Dr. Druker for testing), and publicly disclosed by at least July 31, 1995, when the Buchdunger paper was submitted to *Cancer Research* for publication.

198.   In the application, Novartis disclosed that a useful shorthand for the β-crystal form of the methanesulfonic acid addition salt form of imatinib is simply to call it imatinib

mesylate.  As Novartis said, the "the methanesulfonic acid addition salt is always taken to mean the β-crystal form."

### b.    The Specification Did Not Disclose that Imatinib Mesylate Had Been Disclosed Years Earlier

199.    The '097 application did not disclose the above-mentioned Druker, Buchdunger, or Zimmermann articles, nor did it disclose Druker's presentation at the American Society of Hematology, nor did it disclose that the Buchdunger article expressly described the mesylate salt form years before Novartis applied for the '097 application in the U.S.

### c.    The Specification Did Not Disclose That Mesylate Salts Are Common

200.    The choice of a methanesulfonate addition salt for use in formulation of an oral solid (tablet) dosage form was not unusual or novel at the time of the '097 application.  Novartis marketed at least four drugs in mesylate salt form that were approved decades before Novartis submitted January 18, 2000: Hydergine, Desferal, Parlodel, and Hydergine LC.  Examples of drugs using mesylate salts that were approved by the FDA before Novartis submitted the '097 application include:

- D.H.E. 45 (dihydroergotamine mesylate, approved April 12, 1946, injection),

- Regitine (phentolamine mesylate, approved January 30, 1952, injection),

- Hydergine (ergoloid mesylates, approved November 5, 1953, tablet, marketed by Novartis),

- Cogentin (benztropine mesylate, approved March 5, 1954, tablet),

- Desferal (deferozamine mesylate, approved April 1, 1968, injection, marketed by Novartis),

- Parlodel (bromocriptine mesylate, approved June 28, 1978, tablet, marketed by Novartis),

- Hydergine LC (ergoloid mesylates, approved January 18, 1983, capsule, marketed by Novartis),

- isoetharine mesylate (approved August 21, 1984, inhaler),

- Cardura (doxazosin mesylate, approved in Nov. 2, 1990, tablet),

- Tornalate (bitolerol mesylate, approved December 28, 1994, inhaler),

- Invirase (saquinavir mesylate, approved December 6, 1995, capsule),

- Viracept (nelfinavir mesylate, approved March 14, 1997, tablet),

- Rescriptor (delaviridine mesylate, approved April 4, 1997, tablet),

- Corlopam (fenoldopam mesylate, approved September 23, 1997, injection),

- Anzemet (dolasetron mesylate, approved September 11, 1997, tablet),

- Migranal (dihydroergotamine mesylate, approved December 8, 1997, inhaler),

- Trovan (trovafloxacin mesylate, approved December 18, 1997, tablet),

- Tevaten (eprosartan mesylate, approved December 22, 1997, tablet), and

- Permax (pergolide mesylate, December 30, 1998, tablet).

### d. The Specification Did Not Claim that the β-Crystal Form Required Undue Experimentation

201.    During the prosecution of the '097 application, Novartis would have been motivated to make any and all arguments it could in support of patentability of the mesylate salt in the β-crystal form.  The original compound patent had already described (at column 3) how to make salt forms of the patented compounds through routine, ordinary, steps, and it explicitly referred to a methane sulfonate salt (or mesylate) of imatinib.  And so Novartis was motivated to describe how its efforts to arrive at the non-needle form of imatinib mesylate were inventive, such as (i) that it took Novartis's scientists an unreasonably long time to develop the mesylate salt and/or the beta crystal form, (ii) that the state of the art taught away from mesylate salts and/or non-needle forms, or (iii) that it was surprising and unexpected to discover that imatinib

could form the β-crystal form, or that it was surprising and unexpected that the non-needle form had certain properties (*e.g.*, better flow properties and less hygroscopicity).

202.    However, neither the specification nor prosecution history made any claim of any unusual skill or undue degree of experimentation that were required to develop the β-crystal form of the methanesulfonic acid addition salt of the compound.  The only reasonable inference that can be drawn from the fact that Novartis did *not* make any of these arguments is that it would have been untrue to do so.

203.    In fact, (i) it did not take Novartis's scientists an unreasonably long time to develop the mesylate salt and/or the β-crystal form, (ii) the state of the art did not teach away from mesylate salts and/or non-needle forms, and (iii) it was neither surprising nor unexpected to discover the β-crystal form, nor was it surprising or unexpected that the non-needle form offered better flow properties and less hygroscopicity.

       **e.**        **One Skilled in the Art Would Have Sought a Non-Needle, Less-Hygroscopic Crystal Form**

204.    In the description section, Novartis described the "α-crystal" form of the compound as "characterised by needle-shaped crystals" and "hygroscopic" and thus "not particularly well-suited to pharmaceutical formulation as solid dosage forms" because of its physical properties particularly "flow characteristics" are unfavorable.  And it pointed out that "it is possible to obtain" imatinib methanesulfonate "in a crystal form which is not needle-shaped." In the application, Novartis called this the "β-crystal form."

205.    The handling problems of "needle" forms of crystalline materials would have made searching for and choosing a non-needle form of a crystal obvious to any person skilled in the art at the time of the '097 application.

206.    In the application, Novartis also pointed to three advantages of the non-needle crystal form.  Due to that form having a "more compact crystal form," the non-needle crystal form "results in substantially more beneficial flow properties and thus in better processability . . . versus the α-crystal form."  And while the α-crystal, or needle, form is "metastable at room temperature," the β-crystal form "is the thermodynamically stable form at room temperature," and "greater stability is thus to be expected."  Finally, the β-crystal form is "less hygroscopic" than the α-crystal form.

207.    Any person skilled in the art at the time the '097 application would have tried to find a crystal form that had acceptable flow properties, was stable at room temperature, and absorbed less moisture from the air (*i.e.*, was less hygroscopic).  These are basic requirements for the development of a pharmaceutical product that is to be produced in commercial quantities.

208.    Identifying that the "β-crystal" form possessed these qualities does not make the β-crystal form patentable.  Anyone skilled in the art at the time would have set out to find a crystal habit with these properties.  Put differently, anyone skilled in the art would have known that the needle-shaped crystal form was not suitable for large scale commercial development of a prescription drug, and would have undertaken to find a more suitable, non-needle-shaped crystal form.

209.    Novartis did not claim that it is unexpected for a non-needle shaped crystal to possess the advantages of the "β-crystal" form.  At the time, non-needle shaped crystals were known to have better flow properties and to be "more compact."

### f.    Novartis Used Common Methods to Make the β-Crystal Form

210.    In the follow-on polymorph application, Novartis described two ways to make the β-crystal form of imatinib mesylate.  In one, a crystal or amorphous form of the methanesulfonic acid addition salt of imatinib is digested with a suitable polar solvent (usually methanol) in

suspension at a heated temperature.  In the other, a crystal or amorphous form of the methanesulfonic acid addition salt of imatinib is dissolved in a polar solvent (usually methanol) at a suitable heated temperature up to the reflux temperature of the reaction mixture, and then crystallization is initiated by adding a small amount of the β-crystal form as seed crystal at a heated temperature.

211.    These two techniques were, at the time, commonly known methods for developing alternate crystal forms.

### g.    The Specification Disclosed Many Potential Indications

212.    In the application, Novartis described a long list of uses for imatinib (not limited to any particular salt or polymorphic form).  Novartis stated that imatinib (i) is "suitable for the treatment of tumour diseases, such as gliomas, sarcomas, prostate tumours, and tumours of the colon, breast, and ovary," (ii) may "be used as an agent to treat non-malignant proliferative disorders, such as atherosclerosis, thrombosis, psoriasis, scleroderma, and fibrosis, as well as for the protection of stem cells," (iii) is "suitable for the treatment of BCR-abl-positive cancer and tumour diseases, such as leukaemias (especially chronic myeloid leukaemia and acute lymphoblastic leukaemia, where especially apoptotic mechanisms of action are found)," (iv) "shows effects on the subgroup of leukaemic stem cells as well as potential for the purification of these cells in vitro after removal of said calls (for example, bone marrow removal) and reimplantation of the cells once they have been cleared of cancer cells (for example, reimplantation of purified bone marrow cells), (iv) has "useful effects in the treatment of disorders arising as a result of transplantation, for example, allogenic transplantation, especially tissue rejection, (v) is "effective in diseases associated with vascular smooth-muscle cell migration and proliferation . . . such as restenosis and atherosclerosis", and (vi) is "capable of inhibiting angiogenesis."

213.     By disclosing these conditions without claiming methods of using imatinib to treat them, Novartis functionally and purposefully precluded others from patenting imatinib to treat these conditions.

### 2.     The Examiner Rejects All Claims

214.     On September 28, 2000, the PTO issued a non-final rejection of all of the '097 application's twelve claims.

215.     The patent examiner concluded that the claims in the '097 application were both anticipated and rendered obvious by the Zimmermann patent.

216.     The examiner stated, as part of her reasoning for denying the patent on anticipation grounds, that the applicant must show that the common procedures described in the Zimmermann patent for making the mesylate salt did not "inherently" produce the β-crystal form: "applicant must show that employing routine procedures for making the Ms salt as relied on by Zimmermann (see col.19), the instant beta form is not inherently produced."  The examiner thus shifted the burden to the applicant to show that the β-crystal form of the mesylate salt is not anticipated by inherency.

217.     The examiner also rejected all claims on obviousness grounds, and referred to her anticipation arguments but did not offer a separate detailed explanation for her conclusions.

## J.     The 2001 Facts

### 1.     Novartis Amended its Claims and Responded to the Rejection for the Follow-On Polymorph Patent

218.     On March 28, 2001, Novartis responded to the rejection, arguing that its claims were neither anticipated nor obvious, and it cancelled and amended some of its claims.

219.     Once again, Novartis's response did not disclose the 1996 and 1997 articles disclosing the mesylate salt form, nor did it disclose Druker's presentation at the American

Society of Hematology, nor did Novartis's response claim that unusual skill or an undue degree of experimentation were required to discover the β-crystal form of the methanesulfonic acid addition salt of the compound.

220.    Novartis argued that the mesylate salt was not anticipated because the disclosure of mesylate salt in column 3 of the compound patent was not specific to any compound claimed in the '051 patent, and therefore did not "teach" any specific salt of any compound.  Novartis also argued that the compound patent did not teach a preference for a particular salt form, that there are myriad possibilities for salt forms, and that column 3 discloses far more than 32 salts. (In doing so, Novartis did not disclose to the PTO that the specific salt, imatinib mesylate, had been publicly disclosed elsewhere).

221.    Novartis argued that even if the mesylate salt was anticipated, the specific form of the salt covered by the claims is non-hygroscopic, and the specification also discloses a form that is not non-hygroscopic (presumably referring to the α-crystal form).

222.    Novartis then, disingenuously, implied that the mesylate salt of imatinib was not actually included in Zimmermann.  But Ciba-Geigy developed the mesylate salt of imatinib back in 1992, Zimmermann was one of the scientists who developed it, and the '184 patent specification mentioned the mesylate salt.  In its comments to the examiner, Novartis worded its argument very carefully to falsely suggest that the mesylate salt may not have actually been developed as of the time the Zimmermann patent issued:

> Applicants further note that the anticipation rejection does not assert that the mesylate salt of the present compound was actually prepared in Zimmerman.  Therefore, the existence of presently claimed [beta] crystal modification is neither taught nor suggested by the reference.

223.    Novartis never argued that the properties of the β-crystal form were unexpected, or that creating the β-crystal form required undue time or skill.

2.      **Novartis Sought Orphan Drug Exclusivity for Gleevec**

224.    Novartis also sought Orphan Drug Exclusivity for Gleevec from the FDA in 2001. On January 31, 2001, the FDA designated imatinib as an orphan drug for treatment of CML and afforded it market exclusivity for this purpose until May 10, 2008.

3.      **The FDA Approved Gleevec Capsules**

225.    On May 10, 2001, the FDA approved Novartis's NDA for the capsule form of Gleevec.  Shortly thereafter, Gleevec capsules were launched into the U.S. marketplace.

226.    The PTO later approved Novartis's application under 35 U.S.C. § 156 for an extension of the term of the '184 patent based on the time it took the FDA to review the Gleevec NDA.

4.      **Back at the PTO, the Examiner Issued a Final Rejection of the Follow-On Polymorph Patent**

227.    On July 5, 2001, the patent examiner issued a final office action on the '097 application, maintaining her anticipation and obviousness rejections.  "Applicants' traverse to the above rejections is not persuasive," she said, disagreeing with Novartis's argument that the salt forms of the invention were not particularly contemplated in the Zimmermann patent.

228.    The examiner determined that the present claims were still anticipated by Zimmermann (for the same reasons), still obvious in light of Zimmermann (for the same reasons), and that claim 12 regarding the β-crystal salt was still obvious in light of Zimmermann and another 1999 U.S. patent, referred to as "Yu" (the first inventor's last name).

229.    The examiner did not agree with Novartis's contention that the salt forms in column 3 are not particularly contemplated, and quoted language from the compound patent specification that "any reference to the free compounds should be understood as including the corresponding salts."

230.     The examiner noted that it does not matter whether the salt form compound was actually made in Zimmermann; rather, the relevant question is whether its preparation is within the knowledge of those of ordinary skill (citing *Petering*, where isomers of 20 preferred compounds were considered anticipated).

231.     In her rejection, the examiner stated "The burden is on applicants not the examiner to show that their particular salt form (the beta form) cannot be made following routine conditions."

232.     With the exception of her rejection of claim 12 over Zimmermann in view of Yu, the examiner limited her anticipation and obviousness rejections of the other claims to the Zimmermann patent alone.  Meaning, she did not consider any other prior art references.

233.     On November 5, 2001, Novartis appealed the examiner's rejection of its claims in the '097 application to the Patent Board.

**K.     The 2002 Facts**

**1.     Novartis Appeals the Examiner's Final Rejection of the Follow-On Polymorph Patent**

234.     In its appeal brief, filed on January 7, 2002 and signed by attorney George R. Dohman, Novartis acknowledged that the claims were limited to a specific crystalline form of imatinib mesylate, and "do not claim imatinib mesylate *per se*."  Novartis stated that "the present claims would not prevent a third party from making, using, and selling what the examiner asserts is anticipated by Zimmermann – the mesylate salt of the subject compound.  Such claims only prevent the making, using and selling (etc.) of the claimed crystalline form."

235.     But Novartis did not disclose the Druker, Buchdunger, or Zimmermann articles, nor did it disclose Druker's presentation at the American Society of Hematology.  Instead,

Novartis misleadingly stated, "the prior art does not suggest any particular form of imatinib mesylate or suggest that any particular form could be made by a particular method."

236.    Novartis also made no claim of any unusual skill or undue degree of experimentation that were required to discovery the β-crystal form of the methanesulfonic acid addition salt of the compound.

### 2.    The Examiner Opposes Novartis's Appeal

237.     On March 12, 2002, the examiner filed her answer to Novartis's appeal brief. The examiner repeated her arguments for rejecting all claims on anticipation and obviousness grounds.

238.    As to anticipation, the examiner stated, "[t]he burden is on appellants not the examiner to show that their particular salt form (the beta form) cannot be made following routine conditions," and "[t]he examiner has correctly put the burden on appellants to show that their compound cannot be made employing routine reaction conditions that would (with some trial and error) ultimately produce the crystalline form claimed herein for which applicants' assignee continues to enjoy a monopoly."

## L.    The 2003 Facts

### 1.    The FDA Approved Gleevec Tablets

239.    On April 19, 2003, the FDA approved Novartis's NDA for the tablet form of Gleevec.  In 2003, Gleevec tablets were launched into the U.S. marketplace.

### 2.    The Patent Board Did Not Sustain the Examiner's Rejection

240.    On November 24, 2003, the Patent Board issued its decision.

241.    In its decision, the Board simply assumed that the compound patent described the mesylate salt: "For the purposes of this appeal, we shall assume arguendo, without deciding that

Zimmermann describes the methanesulfonic acid addition salt of imatinib within the meaning of 35 U.S.C. § 102(b)."

242.    The Board then overruled the examiner's conclusion that the claims were anticipated by Zimmermann on the procedural basis that the examiner's having shifted the burden to inherency was inappropriate.

243.    As to obviousness, the Board again simply assumed that the compound patent described the mesylate salt:  "Again, we shall assume arguendo, without deciding, that Zimmermann described the methanesulfonic acid additional salt of imatinib."

244.    The Board then concluded that the record was not sufficiently developed to sustain an obviousness rejection: "*on this record*, the examiner has not *adequately explained* how a person having ordinary skill would have been led from 'here to there,' i.e., from the methanesulfonic acid addition salt of imatinib to the non-hygroscopic or β-crystalline form of that compound recited in the appealed claims."

245.    The Board "[did] not sustain" the examiner's rejections for anticipation or obviousness.  But neither did the Board order allowance of the patent.   Nor did the Board order or otherwise instruct the examiner to issue the patent.  Rather, the Board's decision sent the application back to the examiner for further proceedings.

**3.    Six Weeks Later, With No Further Proceedings, the Examiner Issued a Notice of Allowability**

246.    On December 31, 2003, New Year's Eve, the examiner issued a notice of allowance.

247.    Under the system in place at the time (before 2010), patent examiners received "counts" for specific actions and had to meet a quota every two-weeks.  The examiner was awarded one count when he issued an initial office action (*i.e.*, the examiner issues an allowance

or non-final rejection after reviewing the application for the first time) and a second count when he disposed of the case (*e.g.,* the examiner issues an allowance or receives an abandonment).  No counts are awarded for second or subsequent office action rejections.

248.    Examiners may receive awards ranging from 1% to 6% of their base salaries based, in part, on exceeding their quotas at the end of the year.

249.    The file wrapper does not reflect any further development of the record after the Board decision.  No telephone calls, no amendments, no briefs, no disclosures of additional prior art, no nothing.  The only other paper in the file wrapper from this five-week period is a notice that the patent term will be extended by 311 days due to the time during which the appeal to the Board was pending.  Five weeks after the Board's decision, on New Year's Eve, the notice of allowance simply issued, without any commentary.

250.    The Board's decision was based on an incomplete prior art record, in that at least two key pieces of prior art were not disclosed.  The examiner's subsequent decision to allow the patent to issue was wrong and not decided on the merits.

251.    No court has ever reviewed the substance of the '051 patent and upheld its validity after consideration of relevant prior art and the state of the art as of its priority date.

**4.    After the Appeal Decision and Notice of Allowability, Novartis Submits the Buchdunger and Zimmermann and Improperly Argues *Res Judicata***

252.    On March 26, 2004, after the Board issued its decision on the appeal and after the notice of allowance, Novartis submitted an Information Disclosure Statement (IDS) (signed by attorney George R. Dohman) that – for the first time –revealed the 1996 Buchdunger publication and the 1997 Zimmermann publication.  The Druker 1995 presentation, the Druker 1996 article, and other relevant prior art (including the articles discussed above) were not disclosed.

253.     In "remarks" filed with the IDS, Novartis argued that, because the Board assumed that the methane sulfonic acid addition salt of imatinib was described in the prior art and, with that assumption in mind, reversed the examiner's rejection, *res judicata* applied and the patent should issue without further deliberation:

> [T]he Board of Appeals decision in this file … clearly indicates that is decision assumes that the methane sulfonic acid addition salt of imatinib was described in the prior art within the meaning of 102(b).  Because the presently submitted publications disclose only what the Board of Appeals assumed was in the prior art, Applicants assert that the principles of *res judicata* require that the claims be allowed over the newly submitted publications.

254.     Novartis, its attorneys, and the inventor had a duty to disclose information material to patentability during the prosecution of the patent.[25]   There is no excuse for Novartis's belated disclosure of indisputably relevant prior art only after it had received a notice of allowability.

255.     Novartis compounded its failure to timely disclose this prior art by misrepresenting both the Board's decision and the effect of that decision.

256.     First, the Board did not assume that the public prior art disclosed the mesylate salt, it assumed – *without deciding* – that the Zimmermann patent, specifically, disclosed the mesylate salt.  That is, the Board accepted at face value – without deciding for itself – that the examiner was right about the Zimmermann patent referring to a mesylate salt and concluded (after making that assumption in the examiner's favor) that the examiner's burden-shifting argument was incorrect.  The Board did *not* consider whether other prior art disclosed the mesylate salt, in part because the examiner did not consider – let alone base her rejection on –

---

[25] *See* 37 C.F.R. 1.56.

the fact that, for example, the Buchdunger article disclosed the mesylate salt (because Novartis did not tell her).

257.    Second, the Board made this assumption for the very narrow purpose of addressing (i) the examiner's burden-shifting argument in the context of anticipation by inherency and (ii) the examiner's conclusion that the β-crystal form was obvious in light of Zimmermann (only).  The Board only addressed the issue of obviousness "on this record" and indicated that the examiner had not yet "adequately explained" how a skilled person would achieve the non-needle crystal.  In short, the Board concluded, only, that the basis for the anticipation and obviousness rejections put forward by the examiner was not at that point sufficient to reject the patent claims on grounds of obviousness.

258.    Put simply, the Board did not undertake a substantive review of the validity of the claims in light of the relevant and available prior art.  And, even if it had, the decision of the Board reversing the rejections would have been based on a limited record because Novartis withheld unquestionably relevant prior art.  The Board's decision could not possibly have been informed by the Novartis articles that disclosed the mesylate salt years earlier or by the fact that the 1996 Zimmermann publication disclosed crystalline forms of several selective protein tyrosine kinase inhibitors, because Novartis withheld those publications.  And all the Board ruled was that the record was inadequate at that stage.

**M.      The 2004-2005  Facts**

**1.      The PTO Extended the Term of the Original Compound Patent**

259.      On January 7, 2004, the PTO approved Novartis's application for an extension of

the term of the '184 patent under 35 U.S.C. § 156 "based on the regulatory review of the product

Gleevec (imatinib mesylate) by the Food and Drug Administration."[26]

260.      In its application for a patent term extension, Novartis represented that the '184

patent covered Gleevec.  Novartis stated that the '184 patent "claim[s] a compound or

compounds which include the approved product, <u>imatinib mesylate</u>," and that "claim 21 claims a

composition containing a compound or compounds which include the approved product, <u>imatinib

mesylate</u>."  Because the approved product, imatinib mesylate/Gleevec, was covered by the '184

patent, the '051 patent is invalid as obvious.

261.      The original May 28, 2013, expiration date was extended by 586 days.  The '184

patent expired on July 4, 2015 (including an approved six-month period of pediatric exclusivity).

**2.      The PTO Issued the Follow-On Polymorph Patent (the '051 patent)**

262.      On May 17, 2005, after yet another late-filed Information Disclosure Statement,

the '097 application issued as U.S. Patent No. 6,894,051.  The '051 patent expires on November

23, 2019.

263.      At all times the follow-on polymorph patent, the '051 patent, has been in

substance an invalid patent, for at least obviousness if not anticipation.  In the context of the *ex

parte* PTO proceedings where Novartis controlled the information given to reviewers, Novartis

was successful in having the PTO mistakenly issue the patent.  But Novartis knew that in the

---

[26] Under § 156, upon timely application, the first product containing a new active pharmaceutical ingredient is generally entitled to an extension of the patent term for a period of one-half of the testing phase for the product, less any period during which the applicant did not act with due diligence, plus the entirety of the FDA review period, the total extension not to exceed five years.

stark light of patent litigation in which the validity of the '051 patent was scrutinized, the patent would be held invalid.  The Gleevec compound *is* the β-crystalline form of the methanesulfonate salt of imatinib.  This was true when Novartis was calling it STI-571, and it was true when Ciba-Geigy was calling it CGP 57148B or CGP 57148.  From at least 1993 when Ciba-Geigy was internally researching CGP 57148B and when they provided it to Dr. Druker to test, they were researching the β-crystalline form of the methanesulfonate salt of imatinib.

264.    The '051 patent was and is invalid because the claimed invention was obvious or anticipated by prior art, in light of the '184 patent, the Buchdunger article, and what a person of ordinary skill in the art at the time knew.  Novartis knew when it submitted its application for the '051 patent that the claimed invention was obvious over prior art, and/or that the claimed invention merely described the same imatinib mesylate compound that was already covered by the '184 patent and other prior art references.

265.    Novartis knowingly and willfully misrepresented facts to the PTO in order to obtain and maintain a patent monopoly.  During the prosecution of the '051 patent, Novartis repeatedly made false statements, and omitted information, about the salt form and polymorphic form of its earlier patented compound. These include, but are not limited to, (i) misrepresenting that the mesylate salt of imatinib was not actually prepared in Zimmermann, (ii) misrepresenting that obviousness and anticipation depend on whether the salt form compound was actually made in Zimmermann (when the relevant question is whether its preparation is within the knowledge of those of ordinary skill in light of Zimmerman), (iii) failing to disclose that the specific salt, imatinib mesylate, had been publicly disclosed in publications authored by Novartis's own scientists (iv) withholding relevant prior art until after the PTO sent a notice of allowability, thereby failing to disclose information material to patentability during the prosecution of the

patent, (v)  misrepresenting, when it did finally disclose some material prior art, that the Board

had already decided that prior art disclosing the mesylate salt form would not invalidate the

patent (when the Board did *not* consider whether other prior art disclosed the mesylate salt, in

part because Novartis had not provided the relevant prior art).

266.    Novartis intended for the PTO to rely on its misrepresentations and omissions, as

can be inferred from its providing material prior art only after the fact, and then further

misrepresenting that the Board had already decided the issue.

267.    Novartis listed the '051 patent in the Orange Book.  By doing so, Novartis knew

that the '051 patent would be an impediment to the launch of generic imatinib mesylate even

though the patent had no realistic likelihood of ever being able to stand up in court as a valid

patent warranting the exclusion of otherwise infringing products.

**3.     Novartis's Misrepresentations and Omissions During Prosecution of the '051 patent**

268.    The misrepresentation and omissions that Novartis made during the prosecution

of the '051 patent  include those described above  (see paragraphs 206-228) and the following:

269.    In the specification, Novartis misrepresented that the mesylate salt form of

imatinib was no disclosed in prior publications.  In reality, the Zimmermann patent disclosed a

mesylate salt form and the mesylate salt form was publicly disclosed in presentations and articles

given by Novartis (including the 1996 Buchdunger article).

270.    Novartis misrepresented that it "surprisingly" found that imatinib mesylate could

be made in a β-crystal form.  In reality, the β-crystal form was achieved through routine lab

methods and, upon information and belief, was used by Novartis from August 1993 forward.  It

did not take Novartis an unreasonable amount of time to create the β-crystal form.  The state of

the art taught towards a non-needle form, not away.  And it was neither surprising nor unexpected that the β-crystal form had better flow and hygroscopic properties.

271.    Novartis did not disclose relevant prior art, ever, including the Druker 1995 presentation, the Druker 1996 article, that rendered the invention described in the '051 patent obvious or otherwise unpatentable.

272.    Novartis did not timely disclose prior art, including that generated by its own employees, including the 1996 Buchdunger publication and the 1997 Zimmermann publication, that rendered the invention described in the '051 patent obvious or otherwise unpatentable.

273.    Novartis represented that *res judicata* applied to the prior art listed in the IDS statement submitted after the notice of allowability.  In reality, the Board had not decided whether the late prior art references rendered the invention obvious or otherwise unpatentable (and Novartis knew this).

274.    The identity of the individuals making these misrepresentations are disclosed above, and/or in the patent file wrappers, and are known to Novartis.

275.    The withheld prior art references were known to the inventors who created or participated in those references.

276.    Upon information and belief, the attorneys prosecuting the application well before they submitted the late IDS, including George R. Dohmann.

277.    Novartis's misrepresentations and omissions were material; the '051 patent would not have issued otherwise.

### 4.    Novartis Intended to Deceive the PTO

278.    The '051 patent would not have issued in the absence of Novartis's misrepresentations and/or omissions.  Novartis knew this.

279.    Novartis's misrepresentations were made with the specific intent that the PTO rely on those claims in order to issue a follow-on patent, and with knowledge they were false and misleading.  Novartis's omissions of key prior art references prevented the PTO from fully considering whether the β-crystal form of the mesylate salt was obvious.

280.    Novartis intended that its misrepresentations be read as supporting patentability. Novartis intentionally omitted prior art statements that undercutting patentability.

281.    Novartis intentionally did not submit devastating relevant prior art, and submitted some other prior art at the very last minute, because it would have undercut its arguments in favor of patentability.  That Novartis did submit *some* prior art that disclosed the mesylate salt form only *after* the notice of allowability had issued – and then functionally told the examiner not to consider it – can only be interpreted as an after-the-fact effort to stick prior art that Novartis knew rendered its invention unpatentable in the patent prosecution file.

282.    Novartis's misrepresentation that it was "surprising" to find the β-crystal form was made to support patentability.  In order to be patentable, Novartis had to claim that its mesylate salt crystal form was somehow surprising or unexpected.  But it wasn't (as described above).  Novartis said that it was in order to avoid a rejection for obviousness and/or anticipation.

N.    **The 2006-2007 Facts**

1.    **Sun files an ANDA for Imatinib Mesylate.**

283.    On June 16, 2006, Sun Pharma filed an application with the FDA seeking approval to market 100 mg and 400 mg generic imatinib mesylate tablets, with Gleevec as its Reference Listed Drug.  In its ANDA, Sun addressed the Novartis patents by indicating (i) that it would await final approval until the expiration of the original compound patent, but (ii) the

follow-on polymorph patent was invalid and would not be infringed, and therefore Sun sought

final generic approval, and entry into the market, on July 5, 2015.

284.    Sun was the first company to file an ANDA with a Paragraph IV certification.

285.    On or around August 25, 2007, Sun gave Novartis notice of Sun's ANDA filing in

a letter that included "a detailed factual and legal statement as to why the '051 patent is invalid,

unenforceable, and/or not infringed by Sun's ANDA Products."  The notice included an offer of

confidential access to Sun's ANDA as required under Hatch-Waxman.

286.    On information and belief, Sun included a Paragraph III certification as to the

original compound patent.  Meaning, Sun told Novartis that it would wait to launch its generic

version of Gleevec until after the '184 compound patent expired on July 4, 2015.

287.    Novartis did not filed a lawsuit for infringement of the '051 patent within the 45-

day time period set forth in the statute.  Accordingly, no 30-month stay of FDA approval ever

went into effect for the Sun ANDA.

## 2.    Novartis Applied for a Third U.S. Gleevec Patent

288.    In 2006, Novartis submitted yet another application for a patent purportedly

covering Gleevec, though the invention still had not changed.  Novartis's application number

11/515,997 issued in 2009 as U.S. Patent No. 7,554,799 ("the '799 patent").

289.    Identically to the '051 patent, Novartis's application for the '799 patent, again

disclosed and claimed the methanesulfonate salt of imatinib, along with its β-crystalline form

polymorph.  The abstract read, in full, identically to that of the '051 patent:  "The invention

relates to a new crystalline form of the methanesulfonic acid addition salt of 4-(4-

methylpiperazin-1-ylmethyl)-N-[4-methyl-3-(4-pyridin-3-yl)pyrimidin-2-ylamino)phenyl]

bensamide of formula 1, which may be used for example for tumor therapy."

290.     In a section entitled "Background to the Invention," the '097 application stated that in the '184 patent, the compound is exemplified "only in free form (not as a salt).  It has now been surprisingly found that a crystal form may under certain conditions be found in the methanesulfonate salt of this compound, which is described hereinafter as β-crystal form, and which has very advantageous properties."  The '097 application also described the invention as relating to "an acid addition salt of a compound of formula I comprising non-needle-shaped crystals, especially the β-crystal form of the methanesulfonic acid addition salt of the compound of formula I."

291.     In its September 2006 application for the '799 patent, Novartis again claimed to be "surprised" by the finding that "a crystal form may under certain conditions be found in the methanesulfonate salt of this compound, which is described hereinafter as β-crystal form, and which has very advantageous properties," despite the fact that the same "new" and purportedly "surprising" finding had formed the basis of its January 18, 2000 application for the '051 patent, which was first filed as the Swiss patent application 1764/97 on July 18, 1997.  That same β-crystal form found in the methanesulfonate salt of the compound had, in fact, been known to have very advantageous properties at least as early as July 31, 1995.

292.     The '799 patent was Novartis's effort to state the claims of the '051 patent more broadly.  The '051 patent had claims limited to the imatinib mesylate where the crystal was non-hygroscopic under certain conditions, or which had a β-crystal.  The '799 patent (eventually) claimed a non-needle crystal of the imatinib mesylate.

293.     The '799 patent was repeatedly rejected by the examiner as obvious over Zimmermann (three times).  Novartis then pulled its *res judicata* argument (even more disingenuous than the last time), and with that and a terminal disclaimer the examiner relented.

The terminal disclaimer meant that the '799 patent would expire on the same day as the '051 patent, November 23, 2019.

294.    The '799 patent is invalid or unenforceable for the same reasons as the '051 patent.

295.    Novartis submitted all three patents (the '184 patent, the '051 patent, and the '799 patent) to the FDA for listing in the Orange Book as covering Gleevec. And again, in doing so Novartis knew that those patents would be an impediment to the launch of generic imatinib mesylate even though the patents had no realistic likelihood of ever being able to stand up in court as valid patents that could lawfully exclude of competing generic products from the U.S. market.

**O.    The 2009 – 2011 Facts**

**1.    The '799 Patent Issued**

296.     The '799 patent issued on June 9, 2009.  Novartis promptly listed the '799 patent in the Orange Book as covering Gleevec.

**2.    The FDA Granted Sun Tentative Approval**

297.    On November 13, 2009, the FDA granted tentative approval to Sun's ANDA for a generic version of Gleevec, indicating its determination that Sun's generic Gleevec was approvable, and satisfied all bioequivalence, CMC, and labeling requirements.

298.    Why tentative approval instead of final approval?  Because Sun had agreed that it would wait to launch its generic Gleevec until after the '184 compound patent expired in July 2015.  Put differently, in November 2009, the FDA had signed off on Sun's product, Novartis has not sued Sun for infringing the '051 patent, and the only thing preventing Sun from launching then and there was the last few years of protection afforded by the original compound patent.

### 3.      Novartis Sought Reissuance of the '799 Patent

299.    On September 21, 2011, Novartis applied for a reissuance of the '799 patent,

which it now described as a divisional application of the '051 patent.  Novartis's application for

reissuance of the '799 patent again disclosed and claimed the methanesulfonate salt of imatinib,

along with its β-crystalline form polymorph.

300.    The reissuance purported to correct the fact that the propriety chain described in

the '799 patent mistakenly included a patent that should not have been included.  Some prior art

references were reviewed during the reissuance proceedings, but there is no indication that the

obviousness issues previously addressed were revisited.

## P.      The 2013 – 2014 Facts

### 1.      The '799 Patent Reissued as the RE '932 Patent

301.    On January 15, 2013, the '799 patent reissued as U.S. Patent RE 43,932 ("the RE

'932 patent" or "the '932 patent").  Novartis listed the RE '932 patent in the Orange Book.

### 2.      India's Supreme Court Rejected Novartis's Application for a Beta-Crystal Imatinib Mesylate Patent

302.    On April 1, 2013, the Supreme Court of India affirmed the India Patent Office's

denial of Novartis's patent application for the beta-crystal salt form of imatinib mesylate.  The

Court found nothing new over prior art in the disclosure of the beta crystalline form and ruled

that the claimed invention was both anticipated and rendered obvious by the prior publication of

the Zimmermann patent.  The Court declared, "[W]e are completely unable to see how Imatinib

Mesylate can be said to be a new product . . . Imatinib Mesylate is all there in the Zimmermann

patent.  It is a known substance from the Zimmermann patent. . . .  [I]ts pharmacological

properties are also known in the Zimmermann patent and in the article published in the *Cancer*

*Research* journal."

3.      **Sun Sued For a Declaration of Non-Infringement or Invalidity**

303.     On June 7, 2013 – with Sun preparing for timely entry into the imatinib mesylate market only two years away in July 2015 when the '184 compound patent expired – Sun filed an action against Novartis in the United States District Court for the District of New Jersey (docketed as Civil Action No. 13-3542), seeking a declaratory judgment that Sun was not infringing the '051 patent and/or that the '051 patent was invalid or otherwise unenforceable.

304.     On July 26, 2013, Novartis filed counterclaims against Sun, alleging infringement of the '051 patent and also seeking a declaration that the '051 patent was valid and enforceable.

305.     Novartis never asserted the '799 patent or the RE '932 patent against Sun.

306.     At the time it filed its counterclaims against Sun for infringement of the '051 patent, Novartis knew that the '051 patent was invalid for obviousness or anticipation, in part because its supposed invention had been publicly known through publications by Novartis's own scientists since at least January 1, 1996, and because the non-needle crystal form was either inherent in the salt or was developed through obviously indicated routine processes.  Novartis also knew that it had very likely committed inequitable conduct before the PTO during the prosecution of the '051 patent.

307.     Novartis had enormous incentives to settle the patent infringement litigation and avoid competition.  By 2013, Gleevec was a roughly $2 billion drug.  Losing a substantial portion of that revenue stream – as Novartis would have if the patents were held by a court to be invalid, unenforceable, or not infringed – would have drastically affected Novartis's profits in 2013 and subsequent years.

4.      **Sun and Novartis Settled**

308.     On May 15, 2014, less than one year into that litigation and before any substantive rulings on the '051 patent, Novartis and Sun agreed to settle the patent lawsuit.  The

terms were not revealed, except that both parties announced to the press that under their agreement Sun would be permitted to launch its generic version of Gleevec as of February 1, 2016.  Shortly thereafter, the patent court dismissed the patent infringement case pending between Sun and Novartis regarding Gleevec.

309.    Of course, if Novartis had never brandished the '051 patent against Sun, there never would have been the need for the litigation between Novartis and Sun, there never would have been a settlement between them, and there would have been no agreement to delay the entry of Sun's generic imatinib into the U.S. marketplace from July of 2015 until February of 2016.

### 5.    The FDA Granted Apotex Tentative Approval

310.    On October 30, 2014, and again on December 18, 2015, the FDA tentatively approved an ANDA for generic Gleevec filed by Apotex.

### 6.    Novartis Faced Competition from Other Generics

311.    In or around 2014, other generics filed ANDAs for generic Gleevec that included Paragraph IV certifications as to some or all of the Orange Book-listed patents for Gleevec. These generics notified Novartis of their respective ANDAs and the Paragraph IV certifications, and Novartis filed suit against each of those generics.    As a result, Novartis has gained 30-month stays of FDA approval as to those ANDAs.

312.    Doctor Reddy's Laboratories ("DRL") sent Novartis a Paragraph IV certification on August 27, 2014.  Novartis sued DRL in the U.S. District Court for the District of Delaware (14-cv-157, 14-cv-387, 14-cv-1076, 14-cv-1283), with the first lawsuit filed on February 5, 2014.  The 30-month stay triggered by Novartis's lawsuit was set to expire on February 27, 2017.  DRL and Novartis settled on June 18, 2015.

313.    Ranbaxy sent Novartis a Paragraph IV certification on November 19, 2014. Novartis sued Ranbaxy in the District of Delaware (14-cv-1526) on December 29, 2014, triggering a 30-month stay set to expire on May 19, 2017.  Ranbaxy and Novartis settled on October 16, 2015.

314.    Novartis knew at the time of its filing of the application for the '051 patent, and at the time of filing the subsequent applications for the '799 patent and the reissue '932 patent, that the β-crystal form of the mesylate salt of imatinib was not a novel invention over imatinib.

315.    Novartis knew that its Orange Book listings for patents purported to cover Gleevec were false and that the patents were invalid and would not withstand the scrutiny of patent litigation.  Novartis's decision not to file a patent infringement lawsuit against Sun in 2007, its settlement of the lawsuit that Sun filed against it in 2013, and its settlements of its lawsuits against DRL and Ranbaxy in 2015, were all part of an overarching scheme to maintain its dominant power in the U.S. imatinib market and to delay generic competitors from entering that market.

316.    Novartis is currently also pursuing sham litigation to enforce the '051 patent and RE '932 patent against six other companies that have filed ANDAs for generic versions of Gleevec.

317.    Breckenridge sent Novartis a Paragraph IV certification on June 13, 2014. Novartis sued Breckenridge in the U.S. District Court for the Southern District of New York (14-cv-5729) on July 25, 2014.  Breckenridge's answer is due April 11, 2016.  The 30-month stay expires on December 13, 2017.

318.    Roxane/Boehringer Ingelheim sent Novartis a Paragraph IV certification on
August 31, 2015.  Novartis sued Roxane/Boehringer Ingelheim in the U.S. District Court for the
District of Delaware on October 9, 2015 (15-cv-908).

319.    Natco and Amneal each sent Novartis Paragraph IV certifications within days of
each other, on September 15 and 17, 2015 respectively.  Novartis sued both companies in the
U.S. District Court for the District of Delaware on October 28, 2015 (Natco, 15-cv-987; Amneal,
15-cv-986).

320.    A proposed scheduling plan was filed on April 4, 2016, consolidating for all
purposes the Roxane action with the actions involving Natco and Amneal and calling for, among
other things, substantial completion of document production on or before November 18, 2016.

321.    Roxane's 30-month stay expires on February 28, 2018.
Natco's and Amneal's 30-month stays expire on March 15 and 17, 2018, respectively.

322.    Shilpa Medicare Ltd. sent Novartis a Paragraph IV certification on October 26,
2015.  Novartis sued Shilpa in the U.S. District Court for the District of Delaware on November
20, 2015 (14-cv-1111).  Shilpa's answer is due on April 25, 2016, pursuant to a stipulation
between the parties.  The 30-month stay expires on February 26, 2018.

323.    Wockhardt Bio AG sent Novartis a Paragraph IV certification on December 15,
2015.  Novartis sued Wockhardt in the U.S. District Court for the District of Delaware on
January 26, 2016 (16-cv-40).  Wockhardt's answer is due on May 17, 2016, pursuant to a
stipulation between the parties.  The 30-month stay expires on June 15, 2018.

324.    A chart summarizing the patent litigation involving Gleevec ANDAs appears on
the following page as Figure 2.

**Figure 2: Patent Infringement Litigation Chart**

| Generic | ANDA | Para. IV Sent | 30-Month Stay Expires | Tentative Approval | Final Approval | Lawsuit and Date First Filed | Patents Asserted | Status |
|---|---|---|---|---|---|---|---|---|
| Sun | 078340 | 8/24/07 | | 11/13/09 | 12/3/15 | 13-cv-3542 (D.N.J.) (Declaratory judgment action filed by Sun 6/7/13; counterclaim filed by Novartis 7/26/13) | '051 | Settled 5/15/14; launch permitted 2/1/16; launched 2/2/16 |
| Apotex | 079179 | Unknown | - | 10/30/14 and 12/18/15 | None | None in U.S. | - | - |
| Brecken-ridge | 205990 | 6/13/14 | 12/13/17 | None | None | 14-cv-5729 (S.D.N.Y.); filed 7/25/14 | '051, RE'932 | Answer due 4/11/16 |
| Dr. Reddy's | 205565 (tabs); 206898 (caps) | 8/27/14 | 2/27/17 | None | None | 14-cv-157; 14-cv-387; 14-cv-1076; 14-cv-1283; (D. Del.); first filed 2/5/14 | '051, RE'932 | Settled 6/18/14 |
| Ranbaxy | 206723 | 11/19/14 | 5/19/17 | None | None | 14-cv-1526 (D. Del.); filed 12/29/14 | '051, RE'932 | Settled 10/16/15 |
| Roxane / Boehringer Ingelheim | 207856 | 8/31/15 | 2/28/18 | None | None | 15-cv-908 (D. Del.); filed 10/9/15 | '051, RE'932 | Sched. Plan due filed 4/4/16 |
| Natco | 207818 | 9/15/15 | 3/15/18 | None | None | 15-cv-987 (D. Del.); filed 10/28/15 | '051, RE'932 | Sched. Plan filed 44/16 |

| Generic | ANDA | Para. IV Sent | 30-Month Stay Expires | Tentative Approval | Final Approval | Lawsuit and Date First Filed | Patents Asserted | Status |
|---------|------|---------------|----------------------|--------------------|----------------|------------------------------|------------------|--------|
| Amneal | 207495 | 9/17/15 | 3/17/18 | None | None | 15-cv-986 (D. Del.); filed 10/28/15 | '051, RE'932 | Sched. Plan filed 4/4/16 |
| Shilpa Medicare Ltd. | 208302 | 10/26/15 | 2/26/18 | None | None | 15-cv-1111 (D. Del.); filed 11/20/15 | '051, RE'932 | Answer due 4/25/16 per stip |
| Wockhardt Bio AG | 208429 | 12/15/15 | 6/15/18 | None | None | 15-cv-0040 (D. Del.); filed 1/26/16 | '051, RE'932 | Answer due 5/17/16 per stip |

**Q.      The 2015-2016 Facts**

**1.      Sun Launches generic Gleevec**

325.    On December 3, 2015, the FDA issued a final approval letter to Sun.  The FDA confirmed that Sun was eligible for 180 days of generic drug exclusivity running from the date of commercial marketing.  The FDA asked Sun to inform the FDA when the exclusivity began to run.

326.    The FDA also noted that the '799 patent and the RE '932 patent were listed after Sun's ANDA, so any litigation with respect to those patents would create no statutory stay of approval.

327.    On February 2, 2016, Sun launched a generic imatinib mesylate product, over six years after receiving tentative approval from the FDA.

328.    No other generic versions of Gleevec are currently available in the U.S. market.

## 2.      FDA Approved Indications for Gleevec

329.     Because of Gleevec's dramatic positive effects in treating CML as demonstrated in early clinical trials, Gleevec was granted accelerated consideration by the FDA and received approval on May 10, 2001, for the treatment of patients with blast crisis, accelerated phase or chronic phase Ph+ chronic myeloid leukemia (CML) who have failed interferon-alpha therapy.

330.     Gleevec has since received additional FDA approval for treatment of adults and/or children in eight more indications:  newly diagnosed adult and pediatric patients with Philadelphia chromosome positive chronic myeloid leukemia (Ph+ CML) in chronic phase; adult patients with relapsed or refractory Philadelphia chromosome positive acute lymphoblastic leukemia (Ph+ ALL); adult patients with myelodysplastic/ myeloproliferative diseases (MDS/MPD) associated with PDGFR (platelet-derived growth factor receptor) gene re-arrangements; adult patients with aggressive systemic mastocytosis (ASM) without the D816V c-Kit mutation or with c-Kit mutational status unknown; adult patients with hypereosinophilic syndrome (HES) and/or chronic eosinophilic leukemia (CEL) who have the FIP1L1-PDGFRα fusion kinase (mutational analysis or FISH demonstration of CHIC2 allele deletion) and for patients with HES and/or CEL who are FIP1L1¬ PDGFRα fusion kinase negative or unknown; adult patients with unresectable, recurrent and/or metastatic dermatofibrosarcoma protuberans (DFSP); patients with Kit (CD117) positive unresectable and/or metastatic malignant gastrointestinal stromal tumors (GIST); and adjuvant treatment of adult patients following resection of Kit (CD117) positive GIST.

## 3.      How Gleevec is Prescribed and Dosed

331.     Gleevec tablets and capsules are currently sold in scored 100-milligram and 400-milligram tablets.  Various factors determine the precise dosages for each individual, but most adult patients take between 400 and 800 milligrams per day in once daily or twice daily dosings.

332.    Patients with CML and other forms of Philadelphia chromosome-positive cancers who are treated with Gleevec have normal life expectancies (*i.e.*, they are expected to live as long as they would have without cancer and to die from some other cause).  A CML patient whose cancer is successfully treated with Gleevec must continue to take Gleevec every day for the remainder of his or her life or face the rapid recurrence of the disease.

333.    There are currently approximately 95,000 CML patients in the U.S., and approximately 5,000 individuals are newly diagnosed with CML each year.

**4.    Gleevec Sales in the United States**

334.    Novartis first brought Gleevec to market in capsule form.  Gleevec was the only imatinib mesylate available for treatment of CML.  Because of its unique ability to treat CML, doctors prescribed Gleevec often, and the drug garnered hundreds of millions of dollars of sales. The FDA later approved Gleevec in tablet form, also for treatment of CML. Once the tablet form of Gleevec received FDA approval, Novartis sold Gleevec tablets in 100 mg and 400 mg dosages.

335.    Both the capsule and the tablet forms of Gleevec contain and have always contained the β-crystal formulation of imatinib mesylate salt.

336.    Gleevec is currently sold only in tablet form in the U.S. (though the FDA determined that Gleevec capsules were not withdrawn from sale for reasons of safety or effectiveness).

337.    Novartis's U. S. revenues for Gleevec exceeded $2 billion in 2014.

**5.    Gleevec's Cost**

338.    Brand-name Gleevec currently costs more than $9,000 per patient per month in the U.S. In 2001, when Gleevec first became commercially available in this country, the price was around $2,200 per month; the price has more than quadrupled over the last 14 years.

339.    Since the Sun generic entered the U.S. market on February 2, 2016, the cost of imatinib mesylate has been substantially less.

340.    The plaintiffs and the other Class members have been compelled to pay prices for Gleevec substantially greater than the prices they would pay absent the illegal conduct alleged herein, because: (i) plaintiffs have been deprived of the opportunity to purchase lower-priced generic Gleevec instead of expensive brand-name Gleevec, and (ii) plaintiffs have been forced to pay artificially inflated prices for imatinib mesylate.

341.    End payers purchase substantial amounts of Gleevec from wholesalers or pharmacies.  End payers include third-party payers such as the plaintiffs (health plans, government entities) and consumers.  End payers, as the name suggests, are at the end of the distribution chain.

342.    Under the state antitrust and consumer protection laws identified below, end payors are entitled to recover damages for their overcharges.

**6.    Novartis's Unlawful Conduct Harms Competition**

343.    In the absence of Novartis's ongoing anticompetitive scheme to delay generic Gleevec competition in the United States, generic entry would have occurred on or around July 5, 2015.  At least two reputable generic companies had received tentative approval (meaning they had satisfied all bioequivalence, CMC, labeling, and other FDA requirements).  The only obstacle to generic entry as of July 5, 2015, was the Novartis-Sun settlement.

344.    In the absence of the anticompetitive, illegal, and ongoing conduct alleged in this complaint, the plaintiffs and members of the class would have begun paying less for their imatinib mesylate as of July 5, 2015.  Novartis, by its anticompetitive conduct, has injured and will continue to injure the plaintiffs and the proposed class by causing them to pay substantial overcharges – potentially hundreds of millions of dollars – on their purchases of Gleevec.

345.     The active ingredient in Gleevec is imatinib mesylate.  Its pharmacological

profile, and thus its side effect and efficacy profile, is different from other prescription and non-

prescription medicines that are used to treat the same or similar conditions.  Those other drugs

are not AB-rated to Gleevec, cannot be substituted for Gleevec by pharmacists automatically, do

not exhibit substantial cross-price elasticity of demand with respect to Gleevec, and thus are

neither economic substitutes for, nor reasonably interchangeable with, Gleevec.

346.     Upon information and belief, as of July 5, 2015, neither Sun's nor Apotex's

generic versions of Gleevec would have infringed a valid Novartis patent.

347.     Novartis's prosecution of its counterclaims for infringement of a patent it knew to

be invalid and unenforceable constituted sham litigation that was conducted for the illegal

purpose of keeping Sun's generic version of Gleevec and other generic versions of Gleevec from

competing with brand Gleevec.  This sham litigation violated state antitrust and consumer

protection statutes in that it improperly maintained and extended Novartis's market and

monopoly power by foreclosing or delaying competition from lower-priced imatinib mesylate.

## VI.     MONOPOLY POWER AND MARKET DEFINITION

348.     At all relevant times, Novartis has maintained monopoly power over imatinib

mesylate in that it has had the power to maintain the price of Gleevec at supracompetitive levels

without losing so many sales as to make the supracompetitive price unprofitable.

349.     Direct proof exists that Novartis has monopoly power over the price of imatinib

mesylate.  Such direct evidence includes, among other things, the abnormally-high price-cost

margins enjoyed by Novartis prior to entry of generic imatinib mesylate and Novartis's ability to

profitably maintain the price of imatinib mesylate well above competitive levels.

350.     To the extent plaintiffs are legally required to prove monopoly power

circumstantially by first defining a relevant product market, the relevant product market is all

imatinib mesylate products — *i.e.*, Gleevec (in all its forms and dosage strengths), and bioequivalent imatinib mesylate products.  The relevant geographic market is the United States and its territories.

351.    A small but significant non-transitory price increase above the competitive level for Gleevec by Novartis would not cause a loss of sales sufficient to make the price increase unprofitable.

352.    At competitive price levels, Gleevec does not exhibit significant positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of Gleevec.

353.    The differences between imatinib mesylate's pharmacological, side effect and efficacy profiles, and those of other prescription and non-prescription medicines used to treat the same or similar conditions, play a critical role in doctors' selection of the most appropriate treatment for a particular patient. Those other drugs are not AB-rated to Gleevec, cannot be substituted automatically for Gleevec by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to Gleevec, and thus are not economic substitutes for, nor reasonably interchangeable with, Gleevec.

354.    The existence of other products designed to treat CML or other illnesses treated by Gleevec has not significantly constrained Novartis's pricing of Gleevec.  Novartis has never lowered the price of Gleevec in response to the pricing of other branded treatments (or the generic versions of such medications).

355.    Novartis needed to control only Gleevec and its AB-rated generic equivalents, and no other products, in order to maintain the price of Gleevec profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Gleevec would render

Novartis unable to profitably maintain its current prices of Gleevec without losing substantial

sales.

356.    Novartis has maintained and exercised the power to exclude and restrict

competition to Gleevec and AB-rated generics.

357.    At all relevant times, Novartis's market share in the relevant market was and

remains 100%, implying substantial monopoly power.

## VII.    CLASS ACTION ALLEGATIONS

358.    The plaintiffs bring this action on behalf of themselves and, under Rule 23(a) and

(b)(3) of the Federal Rules of Civil Procedure, as representative of a class defined as follows:

> All persons or entities in the United States who purchased, paid
> for, and/or reimbursed for some or all of the purchase price for
> brand-name Gleevec and/or its AB-rated generic equivalents in
> Arizona, California, Florida, Iowa, Massachusetts, Maine,
> Michigan, Minnesota, Mississippi, Nebraska, Nevada, New
> Mexico, New York, North Carolina, North Dakota, Oregon, Rhode
> Island, South Dakota, Tennessee, Utah, Vermont, West Virginia,
> Wisconsin, and the District of Columbia, for purposes other than
> resale at any time from July 5, 2015  through and  until the date
> that the anticompetitive effects of the Novartis's conduct cease.

359.    The following persons or entities are excluded from the proposed class:

a.    Novartis and its officers, directors, management, employees, subsidiaries,
and affiliates;

b.    fully insured health plans (*i.e.*, plans that purchased insurance from
another third-party payer covering 100% of the plan's reimbursement
obligations to its members);

c.    pharmacy benefit managers;

d.    government entities, except for government-funded employee benefit
plans; and

e.    the judges in this case and any members of their immediate families.

360.    Certification of the class pursuant to Rule 23(b)(3) is appropriate because common issues predominate over individual issues, and the class mechanism provides a superior method for resolving this dispute.

361.    Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of the plaintiffs or on its own determination utilize Rule 23(c)(5) to divide the class into subclasses.  Subclasses may include a third-party payer subclass and/or a consumer subclass.

362.    Members of the class are so numerous that joinder is impracticable.  Plaintiffs believe that the class numbers in the tens of thousands at least and is geographically spread across the nation.

363.    Plaintiffs' claims are typical of the claims of the members of the class.  Plaintiffs and all members of the class have paid artificially inflated prices for imatinib mesylate and have been deprived the benefits of competition from less-expensive generic versions of Gleevec as a result of Novartis's wrongful conduct.  Plaintiffs have purchased Gleevec since July 5, 2015.

364.    Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.

365.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and who have particular experience with class action antitrust litigation involving the pharmaceutical industry.

366.    Questions of law and fact that are common to the members of the class predominate over questions, if any, that may affect only individual class members, because

Novartis is acting on grounds generally applicable to the entire class.  Such generally applicable

conduct is inherent in Novartis's wrongful conduct.

367.    Questions of law and fact common to the class include:

a.    whether Novartis wrongfully obtained the '051 Patent by making misrepresentations and omissions before the PTO;

b.    whether Novartis's counterclaims against Sun and lawsuits against additional ANDA filers constituted sham litigation;

c.    whether Novartis's sham litigation(s) and settlement(s) thereof effectively suppressed generic competition to Gleevec;

d.    whether Novartis's challenged conduct harmed competition in the market(s) in which Gleevec is sold;

e.    whether Novartis possessed monopoly power over imatinib mesylate;

f.    to the extent a relevant market or markets must be defined, what that definition is or those definitions are;

g.    whether the activities of Novartis as alleged herein have substantially affected interstate commerce;  and

h.    whether, and to what extent, Novartis's conduct caused loss or damage to the business or property of the plaintiffs and the members of the class in the nature of overcharges;

368.    Class action treatment is a superior method for the fair and efficient adjudication

of the controversy.  Among other things, class treatment will permit a large number of similarly

situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

and without the unnecessary duplication of evidence, effort, and expense that numerous

individual actions would engender.  The benefits of proceeding through the class mechanism,

including providing injured persons or entities with a method for obtaining redress on claims that

it might not be practicable to pursue individually, substantially outweigh any difficulties that

may arise in management of this class action.

369.     Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   INTERSTATE AND INTRASTATE COMMERCE

370.     At all material times, Novartis manufactured, promoted, distributed, and sold substantial amounts of Gleevec in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

371.     At all material times, Novartis transmitted funds as well as contracts, invoices and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Gleevec.

372.     In furtherance of its efforts to monopolize and restrain competition in the market for imatinib mesylate, Novartis employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.  The activities of the Novartis were within the flow of and have substantially affected interstate commerce.

373.     Novartis's anticompetitive conduct occurred in part in trade and commerce within each of the states set forth herein.  Novartis's conduct had substantial intrastate effects because retailers within each state have been foreclosed from offering cheaper generic versions of Gleevec.  This directly impacted and disrupted commerce for payers within each state who have been forced to continue to pay *supra*-competitive prices.

## IX.     EFFECTS ON COMPETITION

374.     Typically, generic versions of brand-name drugs are initially priced significantly below the corresponding brand-name drug to which they are AB-rated.  As a result, upon generic entry, purchases of brand-name drugs are rapidly substituted by purchases of generic versions of the drug.  As more generic manufacturers enter the market, prices for generic versions of a drug

predictably plunge even further because of competition among the generic manufacturers, and, correspondingly, the brand-name drug continues to lose even more to the generics.

375.    This price competition enables purchasers to: (i) purchase generic versions of a drug at a substantially lower price, sooner, and/or (ii) purchase the brand-name drug at a reduced price, sooner.  Consequently, brand-name manufacturers have a keen financial interest in delaying the onset of generic competition, and purchasers experience substantial cost inflation from that delay.

376.    Novartis's ongoing anticompetitive scheme as alleged above has allowed it to unlawfully maintain a monopoly and exclude competition in the market for imatinib mesylate. Had Novartis not engaged in an ongoing anticompetitive scheme to delay generic Gleevec competition in the United States, Sun's generic equivalent of Gleevec would have entered the market in the United States as of July 5, 2015.

377.    Novartis implemented its unlawful scheme by (i) obtaining the '051 patent by fraud; (ii) improperly listing the '051, '799, and RE '923 patents in the Orange Book; (iii) prosecuting sham patent infringement lawsuits against generic manufacturers, but for which there would have been no settlements that kept generics off the market until February 2016. These acts, in combination and individually, were anticompetitive.

378.    Had Novartis not engaged in the anticompetitive, illegal, and ongoing conduct alleged in this complaint, plaintiffs and members of the class would have begun paying less for their imatinib mesylate as of July 5, 2015.  Novartis, by its anticompetitive conduct, has injured plaintiffs and the class by causing them to pay substantial overcharges — potentially hundreds of millions of dollars — on their purchases of Gleevec.

379.    Were it not for Novartis's sham litigation against Sun and its agreement settling

that litigation, generic Gleevec products would have entered the market in the U.S. on or around

July 5, 2015, as opposed to February 2, 2016.  This seven-month delay alone is worth an

estimated $1.2 billion to Novartis in monopoly revenue.

380.    Thus, Novartis's unlawful conduct deprived the plaintiffs and the class of the

benefits of competition that the antitrust laws were designed to ensure.

## X.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*Monopolization and Monopolistic Scheme Under State Law*

381.    The plaintiffs incorporate by reference the preceding allegations and paragraphs.

382.    As described in detail above, Novartis engaged in an exclusionary,

anticompetitive scheme designed to create and maintain a monopoly for Gleevec and its generic

substitutes.  As part of this scheme, Novartis :

   a.   With intent to mislead or deceive, failed to disclose to the PTO material

        information known to it and made material misrepresentations to the PTO, but for

        which the '051 patent would not have issued;

   b.   Improperly listed the '051, '799, and RE'923 patents in the Orange Book; and

   c.   Prosecuted sham patent litigation lawsuits against generic manufacturers.

383.    At all relevant times, Novartis intended to – and did – maintain and extend its

monopoly power in the imatinib mesylate market, which allowed them to continue charging

supra-competitive prices for Gleevec without a substantial loss in sales.

384.    As a direct and proximate result of Novartis's illegal and monopolistic conduct,

plaintiffs and other members of the class were injured, in that they paid more than they would

have paid for 100 mg and 400 mg imatinib mesylate, absent such illegal conduct.

385. In the absence of Novartis's illegal conduct, competitors would have begun marketing generic versions of 100 mg and 400 mg imatinib mesylate on or about July 5, 2015.

386. If manufacturers of generic 100 mg and 400 mg imatinib mesylate had entered the market and competed with Gleevec in a full and timely fashion, plaintiffs and other members of the class would have substituted lower-priced generic 100 mg and 400 mg imatinib mesylate for the higher-priced brand-name Gleevec for some or all of the 100 mg and 400 mg imatinib mesylate requirements, and/or would have paid lower prices on some or all of their remaining Gleevec purchases.

387. By engaging in the foregoing conduct, Novartis has intentionally and wrongfully maintained monopoly power in the relevant market in violate of the following state laws:

a. Ariz. Arizona Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases in Arizona by members of the Class.

b. Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Class.

c. D.C. Code §§ 28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class.

d. Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Class.

e. Iowa Code §§ 553.5 *et seq.*, with respect to purchases in Iowa by members of the Class.

f. Mass. Gen. L. Ch. 93A, §1 *et seq.*, with respect to purchases in Massachusetts by members of the Class.

g.   Me. Rev. Stat. Ann. Tit. 10, §§ 1102, *et seq.*, with respect to purchases in Maine by members of the Class.

h.   Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases in Michigan by members of the Class.

i.   Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases in Minnesota by members of the Class.

j.   Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by members of the Class.

k.   Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by members of the Class.

l.   Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, with respect to purchases in Nevada by members of the Class.

m.   N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases New Mexico by members of the Class.

n.   N.Y. Gen. Bus. Law §§ 349, *et seq.*, with respect to purchases in New York by members of the Class.

o.   N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class.

p.   N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases in North Dakota by members of the Class.

q.   Or. Rev. Stat. §§ 646.730, et seq., with respect to purchases in Oregon by members of the Class.

r.  R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchase in Rhode Island by members of the Class.

s.  S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class.

t.  Tenn. Code Ann §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class.

u.  Utah Code Ann. §§ 76-10-3104, *et seq.*, with respect to purchases in Utah by members of the Class.

v.  Vt. Stat. Ann. Tit. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Class.

w.  W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases in West Virginia by members of the Class.

x.  Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Class.

## XII. DEMAND FOR RELIEF

388.  WHEREFORE,  plaintiffs on behalf of themselves and the proposed class, respectfully request that the Court:

a.  Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3); find plaintiffs to be adequate representatives of the class; and appoint the undersigned as class counsel;

b.  Adjudge and decree that the conduct alleged herein is in violation of the statutes as set forth above;

c.  Award the class damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

d.  Award plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law; and

e.   Grant such other further relief as the nature of the case may require or as may be
determined to be just, equitable, and proper by this Court.


Dated: April 8, 2015                              Respectfully submitted,


**/s/ Thomas M. Sobol**
Thomas M. Sobol (BBO # 471770)
Kristen A. Johnson (BBO # 667261)
Hannah Schwarzschild (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700 (phone)
(617) 482-3003 (fax)
tom@hbsslaw.com
kristenj@hbsslaw.com
hannahs@hbsslaw.com

Kenneth A. Wexler
Edward A. Wallace
Bethany R. Turke
Justin N. Boley
WEXLER WALLACE
55 West Monroe Street, Suite 3300
Chicago, IL 60604
(312) 346-2222 (phone)
kaw@wexlerwallace.com
eaw@wexlerwallace.com
brt@wexlerwallace.com
jnb@wexlerwallace.com

Jonathan D. Karmel
KARMEL LAW FIRM
221 N. LaSalle Street, Suite 1307
Chicago, IL 60601
(312) 641-2910 (phone)
jon@karmellawfirm.com

J. Gerard Stranch IV
Joe P. Leniski, Jr.
BRANSTETTER, STRANCH & JENNINGS PLCC
227 Second Avenue North, Fourth Floor
Nashville, TN 37201-1631
(615) 254-8801 (phone)
gerards@bsjfirm.com

joeyl@bsjfirm.com

*Counsel for plaintiffs and the proposed class in civil action no. 15-12732*

Thomas G. Shapiro (BBO #454680)
Adam M. Stewart (BBO #661090)
SHAPIRO HABER & URMY LLP
Seaport East
2 Seaport Lane
Boston, MA 02210
(617) 439-3939 (phone)
(617) 439-0134 (fax)
tshapiro@shulaw.com
astewart@shulaw.com

*Counsel for plaintiffs and the proposed class in civil action nos. 15-13461, 15-13724, 15-13725, and 15-13726*

James R. Dugan, II
Douglas R. Plymale
David B. Franco
Lanson Bordelon
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
(504) 648-0180 (phone)
(504) 648-0181 (fax)
jdugan@dugan-lawfirm.com
dplymale@dugan-lawfirm.com
dfranco@dugan-lawfirm.com
lbordelon@dugan-lawfirm.com

*Counsel for plaintiff and the proposed class in civil action no. 15-13461*

Jeffrey L. Kodroff
William G. Caldes
John A. Macoretta
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300 (phone)
(215) 496-6611 (fax)

jkodroff@srkw-law.com
bcaldes@srkw-law.com
jmacoretta@srkw-law.com

*Counsel for plaintiffs and the proposed class in civil
action nos. 15-13724, 15-13725, and 15-13726*

Karen Hanson Riebel #0219770
Heidi M. Silton #025759X
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900 (phone)
(612) 339-0981 (fax)
khriebel@locklaw.com
hmsilton@locklaw.com

William H. London
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500 (phone)
(224) 632-4521 (fax)
blondon@fklmlaw.com

Christian M. Sande #026474X
CHRISTIAN SANDE LLC
310 Clifton Avenue, Suite 300
Minneapolis, MN 55403
(612) 387-1430 (phone)
(612) 67703078 (fax)
christian@christiansande.com

*Counsel for plaintiff and the proposed class in civil
action no. 15-13725*

## **CERTIFICATE OF SERVICE**

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system.  Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

April 8, 2016                                                   **/s/ Thomas M. Sobol**
                                                               Thomas M. Sobol (BBO# 471770)